KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Daniel J. Fetterman (dfetterman@kasowitz.com)
Michael C. Harwood (mharwood@kasowitz.com)
David J. Mark (dmark@kasowitz.com)
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700

*Attorneys for MF Global Holdings Ltd.,*
*as Plan Administrator*



## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MF GLOBAL HOLDINGS LTD., AS PLAN ADMINISTRATOR, | ) ) ) |
| Plaintiff, | ) ) ) ) |
| -against- | ) ) |
| PRICEWATERHOUSECOOPERS LLP, | ) ) |
| Defendant. | ) ) ) ) |

Civil Action No. _____ 2197

**COMPLAINT**

**JURY TRIAL DEMANDED**

    Plaintiff MF Global Holdings Ltd., as Plan Administrator, for its complaint against Defendant PricewaterhouseCoopers LLP ("PwC"), alleges as follows:

### PRELIMINARY STATEMENT

    1.    This case arises out of PwC's extraordinary and egregious professional malpractice and negligence in its role as the long-time outside auditors and accounting experts for MF Global Holdings Ltd. ("MF Global Holdings" or the "Company"), a financial services firm.  PwC's professional malpractice and negligence caused the Company massive damages in connection with its investment in billions of dollars in European sovereign debt instruments.

    2.    MF Global Holdings relied on PwC's flatly erroneous accounting advice when it made those investments by using so-called "repurchase-to-maturity" financing

transactions, or "Euro RTM" transactions. This is the first case that seeks to hold PwC liable for its malpractice in connection with its advice concerning, and approval of, the Company's off-balance-sheet accounting for its investment in billions of dollars worth of European sovereign debt and is unrelated to the disputes surrounding the use of segregated funds in October 2011.

3. PwC incorrectly and negligently advised the Company to account for these Euro RTM transactions as if they were "sales" by immediately booking revenues from these purported "sales" up to 21 months before the Company actually received those revenues and using off-balance-sheet accounting for those investments. PwC also approved of MF Global Holdings' quarterly and annual financial statements that the Company prepared in reliance on PwC's faulty opinions. However, contrary to PwC's advice, the Euro RTMs did not qualify as "sales" under applicable GAAP accounting rules, and the Company should not have immediately booked the revenues from the Euro RTMs. But for PwC's erroneous accounting advice, MF Global Holdings could not have -- and would not have -- invested heavily in European sovereign debt to generate immediate revenues and would not have suffered the massive damages that befell the Company in 2011.

4. When it rendered its erroneous advice, PwC was aware that the accounting treatment for the Euro RTMs was critically important to MF Global Holdings and that MF Global Holdings' decision to invest heavily in European sovereign debt through Euro RTM transactions was dependent on PwC's approval of accounting for the Euro RTM transactions as sales. PwC knew when it gave its faulty advice that the Company was in

a weak financial condition and that huge positions in European sovereign debt posed significant additional risks to MF Global Holdings.

5.     Had PwC met its duty to provide accounting advice and auditing services consistent with the professional standards of ordinary skill, prudence, and diligence, it would have advised MF Global Holdings that the Euro RTM transactions had to be recorded on the Company's consolidated financial statements as secured financings and not as "sales." In that circumstance, the Company would never have amassed the enormous Euro RTM exposure it did, nor would it have suffered massive damages as a direct and proximate result of PwC's negligence and malpractice.

6.     While PwC's negligence and malpractice concerning the Euro RTMs alone was sufficient to, and did, cause the Company enormous damages, the Company's damages were compounded by other acts of professional negligence by PwC, including (i) its failure to satisfy its obligations pursuant to American Institute of Certified Public Accountants ("AICPA") standards to correctly advise MF Global Holdings and MF Global, Inc. regarding the capital reserve and net capital requirements for the Euro RTM transactions under the applicable SEC regulations, and (ii) its failure to correctly audit MF Global Holdings' financial statements, including its accounting for its Deferred Tax Assets ("DTA").

7.     As alleged in greater detail below, PwC's professional malpractice and negligence were a direct and proximate cause of massive damages the Company suffered in an amount to be determined at trial but not less than $1 billion. From September 2010, when the Company began investing heavily in European sovereign debt through Euro

RTMs, through October 2011, when MF Global Holdings filed for bankruptcy, the enterprise value of MF Global Holdings declined by significantly more than $1 billion.

## JURISDICTION AND VENUE

8.       On October 31, 2011, MF Global Holdings and MF Global Finance USA, Inc. filed voluntary petitions for relief under Chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York.  On December 19, 2011 and March 2, 2012, MF Global Capital LLC, MF Global FX Clear LLC, MF Global Market Services LLC, and MF Global Holdings USA Inc. (collectively with MF Global Holdings, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  The Debtors' cases are being jointly administered by the Bankruptcy Court.

9.       This Court's jurisdiction is founded upon sections 157 and 1334 of title 28 of the United States Code.  This is a non-core proceeding pursuant to 28 USC § 157(b).

10.      Venue in this District is proper under 28 USC § 1409(a).

## THE PARTIES AND OTHER RELEVANT ENTITIES

11.      Plaintiff is acting pursuant to the Second Amended and Restated Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code for the Debtors.  The Plan was confirmed on April 5, 2013, and went effective on June 4, 2013.  Plaintiff is the assignee of all right, title, and interest of MF Global Holdings to the claims asserted herein.

12.      MF Global Holdings, a Delaware limited liability company, was a holding company headquartered in New York, New York.

13.      MF Global, Inc. ("MFGI"), a Delaware corporation, was one of MF Global Holdings' principal indirect subsidiaries and one of its primary operating

4

businesses. MFGI was registered with the National Futures Association as a futures commission merchant and with the Financial Industry Regulatory Authority ("FINRA") as a broker/dealer.

14. MF Global UK Ltd. ("MFGUK") is a private limited company organized under the laws of England and Wales with a registered office in London, England. MFGUK operated as a subsidiary of MF Global Holdings and was one of its primary operating subsidiaries.

15. Defendant PwC is a Delaware limited liability partnership with its principal place of business in New York, New York. During the relevant time period, PwC acted as auditor for MF Global Holdings and also rendered significant accounting, tax, and advisory services to MF Global Holdings.

## FACTS

### A. PwC's Contracts For Accounting Services With MF Global Holdings

16. Since before its initial public offering in 2007 and until MF Global Holdings filed for bankruptcy in October 2011, PwC acted as the independent auditor for MF Global Holdings. In connection with its role as auditor for MF Global Holdings, PwC performed audit work and provided audit and accounting advice as requested on a continuous and ongoing basis. PwC audited the Company's annual financials on a consolidated basis, reviewed its quarterly financial reports, and responded to inquiries from the Company regarding accounting and related practices that affected its business.

17. PwC and MF Global Holdings entered into a series of engagement letters covering the services it provided to MF Global Holdings for each fiscal year, which ended March 31 of each year. In particular, as it relates to the accounting for the substantial buildup in Euro RTMs from September 2010 to October 2011, and the

Company's DTA in 2010 and 2011, PwC and MF Global Holdings entered into engagement letters covering the fiscal years ending March 31, 2011 and March 31, 2012. Pursuant to SEC Regulation S-X, the "engagement period" for each audit period included both the "period covered by [the] financial statements being audited or reviewed" and the "period begin[ning] when the accountant either signs an initial engagement letter . . . or begins audit, review, or attest procedures, whichever is earlier," and "end[ing] when the audit client or the accountant notifies the Commission that the client is no longer that accountant's audit client."

18.     In each of the engagement letters, PwC contracted with MF Global Holdings to "perform an integrated audit of the consolidated financial statements of the Company [for the relevant fiscal year] and of the effectiveness of the Company's internal control over financial reporting" for that period.  In addition, PwC agreed to "perform reviews of the Company's unaudited consolidated quarterly financial information for each of the first three quarters in the [relevant fiscal year], before the Form 10-Q is filed." PwC agreed to perform such reviews in accordance with the standards established by the Public Company Accounting Oversight Board (the "PCAOB").

19.     Pursuant to the engagement letters, PwC agreed to "communicate in writing to the audit committee and management any matters that come to [PwC's] attention as a result of the [quarterly] review that [PwC] believe[s] may require material modifications to the quarterly financial information to make it conform with accounting principles generally accepted in the United States."

20.     Under PCAOB rules, an independent accountant is required to perform an annual audit to obtain "reasonable assurance" about whether the financial statements are

free of material misstatement. "Although not absolute assurance, reasonable assurance is a high level of assurance." PCAOB, AU § 230.

21.     As a result of its long and extensive relationship with MF Global Holdings, as of 2010, PwC should have been fully familiar with MF Global Holdings' business operations and its need to increase revenues.

**B.  GAAS and GAAP Obligations**

22.     In connection with its work on behalf of MF Global Holdings, PwC was required to comply with, among other things, generally accepted auditing standards ("GAAS") in auditing and reviewing the Company's financial statements to make sure the financial statements were in compliance with generally accepted accounting principles ("GAAP"). GAAS required that auditors have adequate training and proficiency, maintain independence in attitude in all matters, and exercise due professional care in the performance of the audit and preparation of the audit report. PCAOB, AU § 150.

23.     GAAS required, *inter alia*, that the auditors: (a) exercise "due professional care . . . in the planning and performance of the audit and the preparation of the report;" (b) adequately plan and supervise audits; (c) state whether financial statements are presented in accordance with GAAP; and (d) obtain sufficient, competent, evidential matter to afford a reasonable basis for an opinion on the financial statements under audit. PCAOB, AU §§ 150.02, 230.01.

24.     The due professional care that an auditor is required to exercise includes obtaining a reasonable assurance of detecting misstatements that could be material, which is a high degree of assurance that the financial statements and the accompanying disclosures are materially accurate. PCAOB, AU § 230.10. PwC's duty of due

professional care required it "to exercise professional skepticism," which "includes a questioning mind and a critical assessment of audit evidence. The auditor uses the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence." PCAOB, AU § 230.07.

25.    PwC's duty to "gather[] and objectively evaluat[e] audit evidence requires the auditor to consider the competency and sufficiency of the evidence. Since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process." PCAOB, AU § 230.08.

26.    GAAS also required an auditor to understand the company being audited, including the type of business the company conducts and the nature and types of transactions it enters into.

27.    PCAOB, AU § 311 required PwC to "obtain a level of knowledge of the [Company's] business that will enable [it] to plan and perform [its] audit in accordance with generally accepted auditing standards," including "an understanding of the events, transactions, and practices that, in [its] judgment, may have a significant effect on the financial statements." PCAOB, AU § 311.06.

28.    PCAOB, AU § 311.07 required PwC to "obtain a knowledge of matters that relate to the nature of the [Company's] business, its organization, and its operating characteristics. Such matters include, for example, the type of business, types of products and services, [and] capital structure . . . ," and to "consider matters affecting the industry in which the [Company] operates, such as economic conditions, [and] government regulations . . . ."

29.     In addition, for the audit year beginning April 1, 2011, PwC was required to comply with PCAOB Auditing Standard 12 ("AS 12"), which provided guidance regarding the auditor's role in identifying and assessing risks of material misstatements. PCAOB, AS 12 required the auditor to "obtain an understanding of the company and its environment," which "includes understanding (a) [r]elevant industry, regulatory, and other external factors; (b) [t]he nature of the company; . . . [and] (d) [t]he company's objectives and strategies and those related business risks that might reasonably be expected to result in risks of material misstatement . . . ." PCAOB, AS 12.7. The understanding of external factors includes "the legal and political environment, and external factors, including general economic conditions." PCAOB, AS 12.9. This duty required PwC to "evaluate whether the risk requires special audit consideration because of the nature of the risk," PCAOB, AS 12.70, including such factors as the "complexity of transactions," and the "degree of complexity or judgment in the recognition or measurement of financial information related to the risk . . . ." PCAOB, AS 12.71.

30.     In performing its audit and review, PwC could not rely solely on statements by, and representations of, management. "The amount and kinds of evidential matter required to support an informed opinion are matters for the auditor to determine in the exercise of his or her professional judgment after a careful study of the circumstances in the particular case." PCAOB, AU § 326.22.

31.     GAAP required that the financial statements issued by MF Global Holdings "present fairly, in all material respects, the financial position" of the Company. PwC acknowledged this GAAP requirement in the opinion letters it issued in connection with MF Global Holdings' annual reports.

32.     GAAS also required PwC to communicate with MF Global Holdings'
independent Audit Committee of its Board of Directors.  "The auditor should also
determine that the audit committee is informed about the methods used to account for
significant unusual transactions . . . .  For example, significant accounting issues may
exist in areas such as revenue recognition [and], off-balance-sheet financing . . . ."
PCAOB, AU § 380.07.

33.     The PCAOB also imposed duties on PwC in performing interim financial
reviews of MF Global Holdings' quarterly financials.  "To perform a review of interim
financial information, the accountant should have sufficient knowledge of the entity's
business and its internal control as they relate to the preparation of both annual and
interim financial information . . . ."  PCAOB, AU § 722.10.  PwC was required to
"perform procedures to update [its] knowledge of the [Company's] business" and to
"identify particular events, transactions, or assertions to which the inquiries may be
directed or analytical procedures applied."  PCAOB, AU § 722.11.

34.     Among the items about which PwC was required to inquire when
conducting interim reviews of the Company's quarterly financials were "[u]nusual or
complex situations that may have an effect on the interim financial information."
PCAOB, AU § 722.18(c).  The PCAOB identified a variety of situations that could be
considered "unusual or complex," including "new or complex revenue recognition
methods," the "use of derivative instruments and hedging activities," "sales and transfers
that may call into question the classification of investments in securities, including
management's intent and ability with respect to the remaining securities classified as held

to maturity," "significant, unusual, or infrequently occurring transactions," and "material off-balance-sheet transactions."  PCAOB, AU § 722.55.

### C.   Repurchase-to-Maturity Transactions Collateralized By European Sovereign Debt

35.     In the fiscal year beginning April 1, 2010, the Company determined that it had a potential to generate significant immediate revenues if it invested in Euro RTMs and applied sales accounting treatment under GAAP.  Sales accounting treatment would allow the Company to book the gains on these transactions as revenue at the time they were entered into instead of waiting until the Company actually received the revenues when the bonds matured.  PwC's approval of that sales accounting treatment was a threshold issue in the Company's decision to engage in Euro RTM trading.

#### 1.   Repurchase Transactions

36.     Repurchase transactions, often called "repos," are transactions in which one party sells securities to a counterparty pursuant to an agreement to repurchase the same or equivalent securities at a later date.  The term of a repo agreement can vary from overnight to multiple years.  Despite the formal transfer of title to the securities, the repo seller (the original "transferor") typically retains the right to the cash flows from the underlying securities and the risk of default by the issuer.  A repo seller typically agrees to repurchase the security at a higher price than it sold the security, so that the repo purchaser (the "transferee") earns a profit on the price spread, while the repo seller seeks to earn a profit from income generated by the security and through a subsequent sale if the security increases in value or through payment in full upon maturity if it still owns the security at that time.  The substance of such a repo transaction is similar to a loan from the repo purchaser, using the security as the collateral, in which the repo seller has the use

of the sale proceeds during the term of the repo while retaining the risk of default by the security's issuer and the benefit of any future increase in the value of the security.

37.   Repos may be used to finance the initial purchase of securities.  Repos also are used as a way of obtaining credit by using securities in an institution's existing portfolio as collateral to finance its operations.   Risks to the so-called buyer and seller in a repo transaction can vary depending on the length of the repo and the financial strength of the repo seller and the issuer of the underlying security.  If an issuer defaults, for example, the repo seller still is obligated to pay the pre-arranged price to repurchase the distressed, or potentially worthless, security at the expiration of the repo.  The repo seller also may be required to post funds or assets at the inception of the repo, called "initial margin," as additional collateral for the repo seller's obligation to repurchase the security at the termination of the repo agreement.  If, during the term of the repo, the market value of the bond(s) held by the repo buyer as security falls or the creditworthiness of the repo seller deteriorates, the repo buyer typically can request additional collateral from the repo seller through a margin call.  These margin requirements have the foreseeable potential to put pressure on the repo seller's liquidity.

38.   If the repo seller defaults, the repo buyer can recover its loss using the transferred securities and any margin funds as collateral.  As such, a repo is akin to a financing relationship where the repo buyer acts as a lender, the price spread between the original sales price and the repurchase price is interest on the loan, and the transferred security and the margin, if any, serve as collateral.

39.   Unless the terms of a repo satisfy certain criteria, discussed in detail below, repo transactions are recorded on the repo seller's financial statements as secured

financings, meaning the repo seller keeps the securities on its balance sheet while recording the obligation to repurchase the security as a liability.  Because the repo seller also bears the risk of default by the security's issuer, the repo seller may need to adjust the value of the securities on its books to reflect changes in the market value of the security during the term of the repo.  This accounting treatment is consistent with the GAAP principle that a company's financial statements should reflect "transactions and events in accordance with their substance," and that "[t]he auditor should consider whether the substance of transactions or events differs materially from their form." PCAOB, AU § 411.06.

 2. Repos-To-Maturity

40. A repo-to-maturity, or "RTM," has certain characteristics that distinguish it from other types of repos and, under certain limited circumstances, it receives different accounting treatment under GAAP.  In an RTM, the termination date for the repo matches the maturity date of the security that is the subject of the repo agreement.  When an RTM reaches its termination date, typically no securities are transferred between the repo seller and repo buyer.  Rather, at the termination of an RTM where no party is in default, typically (1) the repo buyer is still the holder of the bond on the maturity date, (2) the bond issuer pays the principal and accrued interest on the bonds to the repo buyer, and the debt is retired, and (3) the repo buyer deducts the amount that the repo seller owes under its repurchase obligation and transfers the net proceeds back to the repo seller.  The net cash transaction between the repo buyer and the repo seller reflects the difference, if any, between the repurchase price owed by the repo seller less any margin posted by the repo seller, and the payments received from the issuer.

     3.     Accounting Treatment For RTMs Under ASC 860

41.     In the United States, the accounting treatment for repos, including RTMs, is governed by Statement of Financial Accounting Standard No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities* ("FAS 140"), codified in September 2009 as FASB Accounting Standards Codification Topic 860, *Transfers and Servicing* ("ASC 860"). Pursuant to FAS 140 and ASC 860, repos are accounted for as financing transactions, unless they satisfy certain specified factors that allow the repo seller to account for them as a "sale." This "sale" exception to the ordinary accounting treatment for repos is allowed only under certain limited circumstances where the repo qualifies as a "repo-to-maturity" in accordance with ASC 860.

42.     Under ASC 860-10-40-5, an entity shall account for an RTM transfer of a financial asset as a sale "if and only if all of the following conditions are met":

1. The transfer of the asset is considered to be a true sale at law. "The transferred assets have been isolated from the transferor – put presumptively beyond the reach of the transferor and its creditors, even in bankruptcy or other receivership";

2. The "transferee . . . has the right to pledge or exchange the assets . . . it received" during the term of the repo; and

3. The transferor "do[es] not maintain effective control over the transferred financial assets . . . [through a]n agreement that both entitles and obligates the transferor to repurchase or redeem them before their maturity."

43.     If any of the conditions listed above is not met, the repo transaction must be accounted for as a secured financing and the asset continues to be recognized on the repo seller's balance sheet.

a.   <u>Repos that terminate before maturity do not satisfy the "effective" control test under ASC 860.</u>

44.   The third prong of ASC 860-10-40-5, which required the repo seller to give up "effective control" of an asset through the asset's maturity date, ordinarily is satisfied only when the repo contract's termination date is the same as the asset's maturity date.

45.   Pursuant to ASC 860's effective control test, a transaction will not be deemed an RTM where "[t]he financial assets to be repurchased or redeemed are the same or substantially the same as those transferred," "[t]he agreement is to repurchase or redeem them before maturity, at a fixed or determinable price," and "[t]he agreement is entered into contemporaneously with, or in contemplation of, the transfer."  ASC 860-10-40-24.

46.   In addition, ASC 860 identified "[t]he only meaningful distinction" regarding the repurchase obligations in these two types of repo "is between a repo-to-maturity, in which the typical settlement is a net cash payment, and a repurchase before maturity, in which the portion of the financial asset that remains outstanding is reacquired in an exchange."  ASC 860-10-55-51.  The section further provided that "[a] transferor's agreement to repurchase a transferred financial asset would not be considered a repurchase or redemption before maturity if, **because of the timing of the redemption, the transferor would be unable to sell the financial asset again before maturity (that is, the period until maturity is so short that the typical settlement is a net cash payment)**."  ASC 860-10-55-51 (emphasis added).

47.   "In repurchase transactions involving readily obtainable held-to-maturity debt securities, the conditions set forth in paragraph 860-10-40-24 shall be carefully

evaluated to determine whether the transactions should be accounted for as a sale or secured borrowing." ASC 860-10-55-54. For the reasons discussed in Section E below, this narrow exception under ASC 860 for repos held to maturity did not apply to MF Global Holdings' Euro RTMs. PwC's opinion that the Euro RTMs should be accounted for as sales was erroneous and breached its duty of due care.

> 4.   The Advantages Of ASC 860 Sales Treatment For MF Global
> Holdings

48.   Accounting for an RTM transaction as a sale carries significant advantages to the repo seller. If the initial transfer of the bond to the repo counterparty is deemed to be a sale, then the repo seller recognizes the anticipated profit from the trade as revenue immediately upon entering into the RTM. The repo seller also removes, or "derecognizes," the bond and the corresponding debt incurred to purchase the bond from its balance sheet. What remains on the RTM seller's balance sheet is a forward repurchase commitment that is carried as an asset or a liability that the seller periodically marks-to-market to reflect the present value of the underlying instrument.

49.   This accounting treatment was advantageous to MF Global Holdings in at least two important respects. First, if MF Global Holdings could account for the RTM trades as sales, it would book the revenues on its investments in European sovereign debt up front, instead of waiting until the bonds mature and MF Global Holdings received the face amount of the bond. As PwC was aware at all relevant times, the immediate booking of the RTM trade revenue was important for MF Global Holdings because it generated needed immediate revenue. Second, by recording these transactions as sales rather than as secured financings, the European sovereign bonds would not be carried on the Company's consolidated balance sheet and the commitment to repurchase the bonds

would not be booked as a debt.  As PwC was aware, by removing an asset (the European sovereign bonds) and the corresponding debt (the obligation to repurchase the bonds) from the balance sheet, MF Global Holdings was able to improve substantially its leverage ratios (*i.e.* the debt to equity ratio), which the investing public and ratings agencies scrutinized carefully.

> **D.  MF Global Holdings Sought PwC's Expert Advice On Accounting For Its European Sovereign Debt RTMs.**

50.     By 2010, MF Global Holdings needed to generate new sources of current revenue and to increase profits.  The Company was considering various opportunities, including investing in European sovereign bonds.  If MF Global Holdings could book RTM trades as sales under ASC 860, then making substantial investments in European sovereign bonds would provide the Company with a potential source of immediate revenues.

51.     PwC's approval of sales accounting treatment for the Euro RTMs was a necessary condition for MF Global Holdings' decision to invest heavily in European sovereign debt.  PwC knew that accounting for the Euro RTMs as sales that generated revenue in the short term was critical to the Company's decision to engage in Euro RTM trading.

52.     Because PwC was MF Global Holdings' independent auditor and would be reviewing its financial statements in connection with its quarterly reviews and annual audits, MF Global Holdings requested that PwC review and opine on the proper accounting treatment of its Euro RTM trades, including whether the contemplated Euro RTMs satisfied the three-part test under ASC 860-10-40-5.

53.     MF Global Holdings advised PwC that it would not account for Euro RTM trades as sales on its books unless PwC advised it that U.S. GAAP permitted such accounting.

54.     MF Global Holdings informed PwC that its Euro RTMs in European sovereign debt cleared on the London Clearing House, or LCH, based in London, England, and in Paris, France.  MF Global Holdings' subsidiary MFGUK was authorized to conduct transactions through the LCH and would clear all of the Company's Euro RTM transactions on the LCH.  Repos cleared on the LCH generally settled within three days of execution.  This meant that the "start" date of the repo is the date on which the repo buyer makes the payment and the underlying bond changes hands three business days after the terms of the transaction are agreed.

55.     The LCH also required that any repos involving European sovereign debt must terminate at least two days before the maturity of the underlying European sovereign obligation.  This meant that the "end" date of the repo was two days before the underlying bond matured, at which time the repo seller had to pay the previously agreed repurchase price and the bond again changed hands back to the repo seller.

56.     MF Global Holdings asked PwC to advise it whether the fact that the Euro RTMs had an end date two days before the maturity date of the underlying bond, rather than on the maturity date, would preclude MF Global Holdings from using sales accounting treatment for these transactions under the effective control prong of ASC 860-10-40-5.

57.     If the Euro RTMs did not qualify for sales accounting treatment, then these investments would not serve MF Global Holdings' desired goals concerning

immediate revenue, profit generation, and leverage ratio reduction. PwC knew that MF Global Holdings would not invest heavily in European sovereign debt unless PwC concluded that the RTMs could be accounted for as sales.

### E. PwC Erroneously Advised MF Global Holdings That Its Euro RTMs Satisfied ASC 860 And Could Be Accounted For As Sales.

58.     PwC responded to MF Global Holdings' inquiries into whether these Euro RTMs that MFGUK conducted on the LCH would satisfy U.S. GAAP treatment as sales and repeatedly concluded that MF Global Holdings could treat these transactions as sales for accounting purposes. In each instance, PwC's advice was wrong.

#### 1.     PwC Was Negligent In Its Initial Review Of Euro RTMs.

59.     MF Global Holdings initially asked PwC for advice regarding the accounting treatment of Euro RTMs in January 2010, in connection with its financial statements for the quarter ending December 31, 2009. MF Global Holdings sought PwC's advice pursuant to its engagement letter for the fiscal year ending March 31, 2010. Although MF Global Holdings filed its 10-K for that year on May 27, 2010, which contained PwC's clean audit letter approving of the Company's consolidated financial statements, PwC completed its work under the 2010 engagement letter no earlier then June 9, 2011, when it assisted MF Global Holdings in responding to requests from the SEC concerning the RTM disclosures in that 10-K. At no time prior to assisting MF Global Holdings in responding to these SEC inquiries did PwC advise the SEC or MF Global Holdings that its engagement period in connection with the 2010 10-K had ended.

60.     As of December 31, 2009, MF Global Holdings had invested in EUR 150 million in European sovereign debt through Euro RTMs cleared on the LCH. MF Global

Holdings then asked PwC whether it should account for these RTM transactions as sales or secured financings on its financial statements.

61.     PwC advised MF Global Holdings that these Euro RTMs cleared on the LCH would satisfy U.S. GAAP treatment as sales if they satisfied the effective control test under ASC 860 as well as the other requirements of ASC 860. To determine whether MF Global Holdings would regain effective control over the underlying asset, PwC needed to understand what would occur on the end date of the repo.

62.     PwC conducted a review of the timing and manner in which these repos were concluded on the end date. PwC looked into whether the underlying instrument would actually change hands in exchange for payment in gross by the repo seller on the end date of the repo two days prior to the maturity date or whether there would be a net cash settlement of the respective obligations of MF Global Holdings as the repo seller to pay the repurchase price and the European debt issuer to pay principal and interest on the bond.

63.     As a result of its inquiry, PwC knew or should have known that on the end date of the repo between MFGUK and the LCH, MFGUK would be required to pay to the LCH the gross amount owed under its repurchase obligation and would regain complete ownership of the underlying asset on the end date two days before the maturity date of the security.

64.     Despite the fact that MF Global Holdings would regain complete ownership and control over the underlying European bond on the end date of the repo, prior to the bond's maturity, PwC advised MF Global Holdings that it should treat these transactions as sales for accounting purposes. PwC based its conclusion on its incorrect

assumption that the two days between the RTM end date and the maturity date of the underlying asset was so short that MF Global Holdings would not be able to engage in any other economic transaction, such as a short term sale of the asset, before its maturity.

65.    PwC gave this advice to MF Global Holdings despite the fact that the evidence it reviewed demonstrated that its conclusions were wrong.  Under GAAS, PwC had a duty to understand the operations of the industry in which MF Global Holdings conducted its business.  PCAOB, AU § 311.  PwC knew or should have known at this time in 2010 that participants in the repo market, including MF Global Holdings, regularly engaged in overnight and short-term repos in direct transactions with counterparties that did not occur on the LCH.  PwC knew or should have known that in a repo transaction where MF Global Holdings regained ownership of a European sovereign bond two days before the maturity date of the bond, MF Global Holdings could enter into a short-term repo directly with a counterparty covering that two-day period.  PwC also knew or should have known that such short-term repos were a common method of financing the repurchase obligation by a repo seller.  PwC knew or should have known that instead of MF Global Holdings using its own funds to make a repurchase payment on the end date of the repo prior to the bond's maturity, which would typically involve tens or hundreds of millions of dollars, it could engage in a short-term repo with another counterparty covering the two-day period and use those funds to meet its repurchase obligation to the original counterparty.

66.    After PwC reviewed the procedures for the RTM transactions cleared on the LCH involving European sovereign debt in which MF Global Holdings proposed to invest and after PwC received the information from MF Global Holdings that it requested

as necessary to reach an opinion, PwC provided its expert opinion to MF Global Holdings as to the proper accounting treatment for these RTMs.

67.     PwC advised MF Global Holdings that the Euro RTMs cleared on the LCH satisfied the conditions in FAS 140 and ASC 860 for treatment as sales under U.S. GAAP.  PwC advised MF Global Holdings that the financial statements it filed in February 2010, for the quarter ended December 31, 2009, should reflect the anticipated profit of these Euro RTMs at the inception of the transactions, derecognize the underlying assets from its balance sheet, and reflect the forward repurchase obligation on the balance sheet.

68.     PwC's advice to MF Global Holdings that the Euro RTMs cleared on the LCH should be accounted for as sales on its consolidated financial statements was erroneous.  MF Global Holdings relied on PwC's expert opinion.

69.     In the summer of 2010, MF Global Holdings' senior management sought to accelerate its efforts to turn around its weakening financial performance.  PwC already had advised MF Global Holdings' management that the Company could favorably account for investments in European sovereign debt as sales if they were structured as Euro RTMs.

70.     In reliance on PwC's advice, MF Global Holdings engaged in EUR 1.375 billion in Euro RTM transactions in September 2010.  MF Global Holdings cleared these repo transactions on the LCH and as such they all had an end date two days before the maturity date of the underlying security.  Before completing its quarterly financial statement for that period, MF Global Holdings asked PwC to confirm that it could account for these transactions as sales on its September 30, 2010 10-Q.

  2. PwC Was Negligent In Its Review Of MF Global Holdings'
   September 2010 Euro RTM Documentation.

  71. In preparing its financial statements for its 10-Q for the quarter ending
September 30, 2010, MF Global Holdings asked PwC to review the Euro RTMs to
determine whether they qualified for sale accounting treatment under FAS 140 and ASC
860 in accordance with U.S. GAAP.  MF Global Holdings made this request to PwC in
connection with PwC's agreement under the engagement letter for the fiscal year ending
March 31, 2011.  Pursuant to that engagement letter, PwC agreed that, "in connection
with the annual financial statement audit," it would review MF Global Holdings'
consolidated quarterly financial reports before each 10-Q was filed.

  72. In connection with PwC's review of the financials for the September 30,
2010 10-Q, PwC requested that MF Global Holdings provide "details of the trades sold to
LCH [because it wanted] to match up the maturity dates to ensure [MF Global Holdings]
get[s] RTM accounting."  On or about October 21, 2010, PwC provided a list to MF
Global Holdings of 10 RTM trades between September 19 and September 30, 2010, and
requested that MF Global Holdings provide the "[t]rade ticket confirmations which show
the trade between LCH and MF UK."

  73. On or about October 22, 2010, MF Global Holdings sent to PwC's New
York office screenshot copies of the trade confirmations for each of the Euro RTM
transactions that PwC requested and provided a chart of the various trades consisting of:

- a description of the sovereign debt at issue showing its maturity date;

- the start date and end date of each repo for which it sought to apply RTM
  sales accounting; and

- information regarding the transaction amounts and the expected profit or
  loss.

74.     PwC's request for and review of the trade confirmations reflected its understanding that the maturity dates of the RTMs and the underlying securities were important in determining whether the transactions could receive RTM sales accounting treatment.

75.     Each trade confirmation that MF Global Holdings provided to PwC at its request reflected the "Trade date" on which the repo was agreed, the "Start date" when the repo trade settled, usually three business days later, and the "End date" of the repo. The trade confirmations also identified the "Counterparty" on the transaction, which in all instances was the LCH.  The trade confirmations further described the underlying security that was the subject of the repo, identifying it by a code and the maturity date of the security.

76.     On every trade confirmation that PwC requested and received from MF Global Holdings in connection with its review, the "End date" of the repo was two business days earlier than the maturity date of the underlying security.  These documents demonstrated from a plain reading that the repos ended before the maturity of the securities.

77.     The information regarding the initial trade date, start date, and end date of the repo transactions was reflected on the trade confirmations entered in MF Global Holdings' books and records that were provided to PwC in October 2010.

78.     PwC knew or should have known that on the end date of the repo between MFGUK and the LCH, MFGUK would be required to pay to the LCH the gross amount owed under its repurchase obligation and would regain complete ownership of the underlying asset on the end date -- two days before the maturity date of the security.

      3.    PwC Approved Of The Sales Accounting Treatment For The Euro RTM Transactions In September 2010.

79.     After PwC conducted its inquiry regarding the RTM transactions involving European sovereign debt in which MF Global Holdings had invested and proposed to continue to clear on the LCH, and after PwC received any information from MF Global Holdings that it requested as necessary to reach an opinion, PwC provided its expert opinion to MF Global Holdings as to the proper accounting treatment for these RTMs.

80.     After PwC completed its review of MF Global Holdings' financial statements contained in its September 30, 2010 10-Q, including its RTM testing, PwC advised MF Global Holdings that its accounting treatment of the Euro RTMs as sales in its consolidated financials was consistent with U.S. GAAP.  In its report to the Audit Committee of the Board of Directors dated November 4, 2010, reporting on its review of MF Global Holdings' consolidated financial statements for the quarter ended September 30, 2010, PwC advised the Audit Committee as follows:

> As of September 30, 2010, the Company has repurchase agreements with the London Clearing House (LCH) through which several European sovereign debt securities have been transferred to the LCH. The repurchase agreements meet the criteria to be accounted for as a sale under ASC 860. Therefore, the securities have been de-recognized from MF Global Holdings' balance sheet and a gain on the sale of securities of $10.5 million has been recorded in principal transactions in the current quarter.

81.     PwC did not advise anyone at MF Global Holdings or on its Board or its Audit Committee that there was anything it had learned from its RTM testing that would require material modifications to the September 30, 2010 quarterly financials.  PwC did not advise MF Global Holdings' Board or its Audit Committee that there was any question about the sales accounting treatment in light of the two-day gap between the end

date of the RTM and the maturity date of the underlying security.  MF Global Holdings

relied on PwC's expert advice and accounted for these Euro RTMs as sales on its

September 30, 2010 10-Q.

        4.    PwC's Accounting Advice Was Wrong.

    82.    PwC's approval of the Euro RTM sales accounting treatment under ASC

860 was wrong.  MF Global Holdings regained effective control of the European

sovereign bonds because the Euro RTMs both "entitle[d] and obligate[d] [MFGUK] to

repurchase or redeem [them] before their maturity" through a gross payment of the

repurchase price and receipt of the bonds, rather than through a net payment of the spread

between the repurchase price and the redemption payment on the maturity date.  As such,

these were not true RTMs and could not be accounted for as sales under ASC 860 and

U.S. GAAP.

    **F.    PwC Continuously Reaffirmed Its Erroneous Advice Regarding The Euro RTM Positions, And MF Global Holdings Relied On That Advice.**

    83.    From the time that MF Global Holdings requested that PwC advise it on

the proper accounting treatment for the September 2010 RTMs until MF Global Holdings

received PwC's opinion, MF Global Holdings did not engage in any further Euro RTM

transactions.  After MF Global Holdings received PwC's approval of its Euro RTM sales

accounting treatment in early November 2010, MF Global Holdings increased its Euro

RTM holdings from EUR 1.375 billion to EUR 1.55 billion during November 2010.  MF

Global Holdings then increased its Euro RTM holdings to EUR 2.4 billion in December

2010.  In entering into these Euro RTM transactions, MF Global Holdings relied on

PwC's advice that it should account for them as sales on its financial statements.

### G. PwC Erroneously Advised MF Global Holdings Concerning The Accounting Treatment For Longer Term Euro RTMs.

84.     In December 2010, to generate additional revenues, MF Global Holdings contemplated investing in Euro RTMs that lasted as long as 21 months.  LCH policies prohibited RTM transactions on its exchange that lasted more than one year.

85.     To enter into these longer term Euro RTMs on the LCH, MF Global Holdings proposed entering into a trade that would consist of a six-month repo that would automatically roll over into a 12-month repo on the same underlying security with the same financial terms.  Once again, MF Global Holdings needed expert advice as to whether these "two-legged" repo transactions would satisfy the requirements of ASC 860 for sales accounting treatment.

86.     In the first half of December 2010, MF Global Holdings advised PwC that it intended to enter into a two-legged Euro RTM but would not do so without receiving an opinion from PwC that the proposed structure would qualify for sales accounting treatment under ASC 860.  MF Global Holdings and PwC engaged in a series of discussions in which MF Global Holdings described the proposed two-legged RTM that MFGUK would clear on the LCH.

87.     On December 14, 2010, PwC advised MF Global Holdings that these two-legged Euro RTMs should be treated as sales for accounting purposes under U.S. GAAP despite the fact that they were not true RTMs because the second segment of the two-legged Euro RTM cleared on the LCH ended two days before the maturity date of the underlying sovereign debt.  In reliance on PwC's advice that it should account for the two-legged trade as a sale, MF Global Holdings authorized its traders to enter into two-legged Euro RTM transactions.

88. After providing this advice to MF Global Holdings, the Company advised PwC that it intended to enter into more of these two-legged transactions in December 2010 and requested a written opinion confirming its accounting advice. PwC requested that MF Global Holdings provide documents relating to the two-legged Euro RTMs and reviewed those documents. In connection with this review, PwC advised MF Global Holdings on December 21, 2010, that it would "audit" the information concerning the two-legged trades that MF Global Holdings cleared on the LCH. This meant that PwC would conduct a more extensive inquiry than otherwise was required for a review of unaudited quarterly financials. As such, MF Global Holdings relied on PwC to examine, on a test basis, the evidence it deemed necessary to support the amounts and disclosures in the financial statements regarding the two-legged Euro RTMs.

89. On or about January 17, 2011, MF Global Holdings gathered the relevant trade confirmations concerning all of the two-legged trades that MF Global Holdings transacted in December 2010 based on PwC's advice. Included in these materials that PwC requested were the trade confirmations for the first two-legged trade that MFGUK transacted on December 14, 2010. The trade confirmations reflected that the first leg of this repo trade had a starting settlement date of December 17, 2010, an end date of June 13, 2011, and involved a Portuguese government bond with a face amount of EUR 20 million and a maturity date of June 15, 2012. The confirmation for the second leg reflected a repo trade with a starting settlement date of June 13, 2011, an end date of June 13, 2012, and involved the same Portuguese government bond with a face amount of EUR 20 million and a maturity date of June 15, 2012, two days after the repo end date.

90.     On January 27, 2011, PwC advised the Company's Audit Committee of its opinion that these two-legged repo transactions qualified as sales under ASC 860.  PwC stated in its report to the Audit Committee for the quarter ended December 31, 2010:

> During the 3rd quarter ended December 31, 2010, the Company entered into additional repurchase agreements that are accounted for as sales with forward commitments to repurchase the security on the same date the security matures. As such these trades are considered "Repos-to-Maturity" ("RTM's"). The repurchase agreements met the criteria to be accounted for as a sale under "Transfers and Servicing". Therefore, the securities have been de-recognized from MF Global's balance sheet and a gain on the sale of securities of $24.4 million has been recorded in principal transactions in the current quarter. As of December 31, 2010, the total contract value associated with European Sovereign underlyers is approximately EUR 2.4 billion. This quarter the Company entered into 18 month trades that have been split into two transactions for 6 and 12 months respectively.

91.     PwC's opinion that the Euro RTMs reflected on MF Global Holdings' 10-Q for this quarter should be accounted for as sales, including the two-legged Euro RTMs, was wrong.  MF Global Holdings relied on PwC's expert opinion and was not aware that PwC's advice concerning the accounting treatment of its Euro RTMs was erroneous when it filed its 10-Q for the quarter ended December 31, 2010.

**H.    The SEC Scrutinized MF Global Holdings' March 31, 2010 10-K.**

92.     On or about March 16, 2011, MF Global Holdings received a letter from the SEC seeking additional information regarding disclosures that MF Global Holdings had included in its 10-K for the prior year ending March 31, 2010.  Among other inquiries, the SEC asked MF Global Holdings to "[d]escribe all the differences in transaction terms that result in certain of your repurchase agreements qualifying as sales versus collateralized financings" and "[p]rovide a detailed analysis supporting your use of sales accounting for your repurchase agreements."

93.     To respond to this letter from the SEC, MF Global Holdings sought and obtained assistance from PwC, which had audited the financial statements contained in the March 31, 2010 10-K and had agreed with the sales accounting treatment for certain repurchases reflected in those financials.

94.     Between March 25 and March 29, 2011, MF Global Holdings exchanged drafts of its SEC response letter with PwC for review and comment.  In answering the SEC's inquiries regarding sales accounting for the RTMs, the drafts all explained the three part test under ASC 860, including the condition that the repo seller give up effective control of the underlying asset through to the maturity date.  The response letter dated March 30, 2011, which PwC reviewed at MF Global Holdings' request and with which PwC agreed, stated that for the fiscal year ending March 31, 2010, "**[a]ll repurchase transactions where the repurchase date is not the same as the date when the transferred assets mature, are accounted for as collateralized financings**." (emphasis added).

95.     At the time that this letter was sent to the SEC on March 30, 2011, PwC already was working on its audit of MF Global Holdings in connection with the audit for the fiscal year ending on March 31, 2011.  PwC continued assisting MF Global Holdings through June 9, 2011 in responding to further inquiries from the SEC regarding the March 31, 2010 10-K.  At that time, PwC understood the significance of the maturity date matching the repurchase date of an RTM for the transaction to qualify for sale accounting treatment.

I.    **PwC Was Negligent In Conducting Its Audit Of The Company's Financial Statements For The Fiscal Year Ending On March 31, 2011.**

96.    PwC knew when it was conducting its audit of the 10-K financial statements for the fiscal year ending on March 31, 2011, that the SEC was concerned about the accuracy of the accounting treatment for RTMs as either sales or secured financings.  As of March 31, 2011, MF Global Holdings' total volume of Euro RTMs had increased to EUR 5.32 billion, more than double what it had been at the end of the prior quarter on December 31, 2010.

97.    PwC knew at this time that MF Global Holdings had substantially increased its portfolio of Euro RTMs in reliance on PwC's conclusion that MF Global Holdings should account for these transactions as sales.

98.    PwC began planning its work for the annual audit and the Form 10-K financials for the fiscal year ending March 31, 2011 early in that fiscal year.  PwC met with members of MF Global Holdings' senior management and Audit Committee in May 2010 to plan the audit procedures for the March 31, 2011 fiscal year.  Among the items PwC advised the Company that it planned to perform during the March 31, 2011 fiscal year was "[u]nderstanding [MF Global Holdings'] business by meeting with key members of management and visiting key operational locations" and to **"[i]nquire if there are any repo transactions that were accounted for as sales rather than collateralized financings and ensure that sales accounting treatment is appropriate, if any."**

99.    PwC knew or should have known that MFGUK paid the gross amount owed on the Euro RTMs on their termination date **two days before the maturity date** of the bonds and that the LCH returned the bonds to MFGUK for the two-day "stub period"

before the bonds matured.  The evidence for these repurchase transactions was apparent from MF Global Holdings' books and records.

100.    One of the RTM trades that PwC reviewed in October 2010, and confirmed the sale accounting treatment for, was a trade involving an Irish government security that had a maturity date of March 14, 2011.  On or about September 29, 2010, MFGUK entered into an RTM transaction cleared on the LCH with a termination date of March 10, 2011.  As such, on March 10, 2011, MFGUK was required to pay the full repurchase price to the LCH four days before the bond matured.  This four-day period included two business days and a weekend.  Rather than pay this entire amount out of pocket, MFGUK entered into a separate repo transaction with Société Générale for the period March 10, 2011 to March 14, 2011, using the same Irish government bond that was the collateral for the original RTM.  MFGUK thus resold to Société Générale the same bond over which it had regained actual control upon the termination of the RTM with the LCH, and used the sales proceeds on March 10, 2011 to cover its payment obligation to LCH on that date.  Then on March 14, 2011, when the Irish government's payment obligation came due, MFGUK and Société Générale netted their payment obligations under the existing short term RTM between them.  All of this information was reflected in the trade confirmations provided to PwC and/or on MF Global Holdings' books and records that were available to PwC.  By reselling the Irish government bond in March 2011, MFGUK exercised actual, not just effective, control over that asset.

101.    PwC was negligent in failing to advise MF Global Holdings that because it was paying the gross amount owed on the Euro RTMs before the maturity date of the bonds and was able to finance that payment obligation through a repo of the same bonds

that LCH returned to it two days before the maturity dates, the transactions did not meet the "effective control" test of ASC 860 and could not be booked as sales under U.S. GAAP.

102.    In connection with its year-end audit of the March 31, 2011 financials, PwC again received materials from MF Global Holdings concerning the RTMs.  On March 7, 2011, PwC requested from MF Global Holdings back up materials for a list of fourteen principal trades in Euro RTMs.  The requests from PwC included trade tickets and confirmations between MFGUK and LCH for certain time periods, yield analyses for "all eligible RTM transactions reflecting yield to maturity analysis" for certain time periods, Bloomberg screen prints reflecting the yield to maturity rates for the underlying collateral, and journal entry details regarding the RTMs on the balance sheet and profit and loss for certain periods.  On March 10, 2011, PwC sent a list of an additional sixteen items that it sought from MF Global Holdings.  On information and belief, MF Global Holdings complied with each of PwC's requests for information.  PwC never advised the Audit Committee that PwC had not received the information that it had requested.

103.    In April 2011, during its audit of MF Global Holdings' year-end financials, PwC requested additional back up information concerning the two-legged repos that MF Global Holdings had transacted after the December 14, 2010 transaction. PwC also asked MF Global Holdings for contact information so that it could directly contact the counterparties on certain two-legged RTMs to confirm the terms of the transactions.

104.    In completing its annual audit of MF Global Holdings' year-end financials as of March 31, 2011, PwC reported to the Audit Committee on May 16, 2011 that it had

reviewed the Euro RTMs "that are accounted for as sales with a forward commitment to repurchase the security (FRC) on the same date the security matures (RTM's). . . . The transactions met the criteria to be accounted for as a sale under ASC Topic 860 '*Transfers and Servicing*'." PwC concluded that the Company properly had derecognized the securities from its consolidated balance sheet and properly had included revenues on the Euro RTMs of $46 million for the quarter ending March 31, 2011, and $85.3 million for the full year.

105. In its May 16, 2011, final report to the Audit Committee on the March 31, 2011 year-end audit, PwC advised the Company, among other things, that it (i) was "not aware of any significant risks or exposures that could materially affect the consolidated financial statements," (ii) had "read the MD&A and the other financial information contained in the Company's annual report in Form 10-K . . . [and] noted no instances of inconsistent content or presentation of material misstatement of fact," and (iii) had not noted any "[s]ignificant difficulties encountered during the audit."

106. At no time during the audit of the March 31, 2011, financials or review of the corresponding 10-K did PwC advise the Company, management, or the Audit Committee that MF Global Holdings could not account for the Euro RTMs as sales, that there were any risks to accounting for them as sales, that accounting for these Euro RTMs as sales meant that the financials might contain material misstatements, or that the Company needed to make any additional disclosures either in the financials or the MD&A section regarding any likelihood that the Euro RTMs might not constitute sales because they terminated two days before the maturity dates of the underlying securities.

107.    On May 19, 2011, PwC issued its opinion on MF Global Holdings' financial statements for the fiscal year ended March 31, 2011.  PwC opined that the financial statements

> present fairly, in all material respects, the financial position of MF Global Holdings Ltd. and its subsidiaries (the "Company") at March 31, 2011 and 2010, and the results of their operations and their cash flows for each of the three years in the period ended March 31, 2011 in conformity with accounting principles generally accepted in the United States of America.

108.    MF Global Holdings' books and records for the fiscal year ending March 31, 2011, on their face, reflected (i) gross payments to the LCH on the repo end dates and the return of the European sovereign bonds prior to the bonds' maturity dates and (ii) at least one instance where MF Global Holdings had re-sold the underlying bond as a means to finance its repurchase obligation.  Despite PwC's understanding that such gross payments, receipt of the underlying bonds, and resale of the bonds before the bonds' maturity date were inconsistent with sale treatment under ASC 860, PwC either negligently overlooked or ignored these facts and advised MF Global Holdings that it could continue to account for the Euro RTMs it cleared on the LCH as sales and book the profits on these transactions as revenues immediately upon entering into them.  PwC's advice was wrong.

## J.    PwC Continued To Provide MF Global Holdings With Negligent Advice Concerning The Euro RTMs.

109.    In reliance on PwC's continuing advice, MF Global Holdings entered into additional Euro RTM transactions in substantial amounts in the following two quarters. By the quarter ending September 30, 2011, MF Global Holdings had a gross Euro RTM portfolio of approximately $9 billion which was partially offset by reverse RTMs (*i.e.*,

transactions in which MF Global Holdings sought to hedge its positions) totaling approximately $2.7 billion.

110.    PwC conducted its quarterly review of MF Global Holdings' financials for the quarter ending June 30, 2011, before MF Global Holdings filed its 10-Q for that period.  PwC also conducted a quarterly review of MF Global Holdings' draft financials for the quarter ending September 30, 2011, before MF Global Holdings announced its results for that period.  For each quarter, MF Global Holdings provided PwC with the back up documentation which PwC requested concerning the Euro RTMs that MFGUK cleared on the LCH, and PwC again concluded that MF Global Holdings had correctly accounted for those transactions as sales in its financial statements.  MF Global Holdings relied on PwC's advice and was not aware that PwC's advice concerning the accounting treatment of its Euro RTMs was erroneous when it filed its 10-Q for the quarter ended June 30, 2011, and reported its results for the quarter ended September 30, 2011.

111.    From the time that MF Global Holdings began to invest heavily in Euro RTMs through to the time that MF Global Holdings filed its chapter 11 petition for bankruptcy protection, PwC never advised MF Global Holdings that it had provided erroneous advice concerning the accounting treatment of the Euro RTMs as sales, or even that there was any risk regarding that accounting treatment that needed to be disclosed.  At all times during this period, MF Global Holdings relied on PwC's professional advice and auditing regarding the accounting treatment of its Euro RTMs as sales.

### K.   PwC Knew Of Liquidity Implications Of Maintaining Large Euro RTM Positions.

112.   In addition to complying with GAAS, PwC was under a duty to adhere to the "Audit & Accounting Guide; Brokers and Dealers in Securities" as of July 1, 2010 ("AAG") standards promulgated by the AICPA.  AAG § 5.192 recognized that

> SEC rules require all registered broker-dealers to comply at all times with the net capital requirements and to calculate net capital on a periodic basis to demonstrate compliance. *Net capital* is the broker-dealer's net worth, including allowable subordinated liabilities and other credits adjusted for nonliquid (nonallowable) assets, capital charges for operational items, and possible adverse fluctuations in the value of inventory (haircuts). The purpose of the net capital computation is to determine the broker-dealer's net liquid assets (minimum capital base) in the event of adverse business conditions.

AAG § 5.192.

113.   AAG § 5.193 directed the auditor to "review the broker-dealer's procedures and controls covered by [the net capital requirements] and perform those tests necessary to be satisfied that the procedures and controls, including the written documentation, provide reasonable assurance that the broker-dealer is in compliance with the rule."  PwC was required to be familiar with these SEC requirements and to review and test MF Global Holdings' financial statements to determine whether the Company was in compliance with the SEC rules.

114.   As PwC was at all relevant times aware, MF Global Holdings' maintenance of large Euro RTM positions created significant financial risks, including liquidity risks.

115.   Each new RTM position required MFGUK to post initial margin when it entered into the Euro RTMs on the LCH, which tied up liquidity for the duration of the investment and introduced the possibility of future margin calls.  Commencing in

November 2010, investors were rapidly unloading the bonds of certain European countries -- specifically Ireland and Portugal. As a result, the margin requirements associated with those countries' sovereign debt were growing rapidly. The LCH raised the initial margin required on Irish bonds three times from 7% to 15%, then to 30%, and then to 45%.

### L.  PwC's Negligence Caused MF Global Holdings To Restate Its June 30, 2011 Quarterly Report.

116.    In May 2011, FINRA was aware of MF Global Holdings' large European sovereign debt exposure and FINRA learned that the Company, through its subsidiary MFGI, was not reserving any capital for these positions. Reserving no capital against off-balance-sheet RTM positions is permitted under the SEC's net capital rules only if they are considered to be riskless transactions. U.S. Treasury and federal agency RTMs traditionally had been considered riskless, and therefore a repo seller was not required to maintain a capital reserve for such off-balance-sheet securities.

117.    MFGI's compliance with the SEC net capital rules was material to the Company's consolidated financial statement. PwC was required to audit MFGI's compliance with the SEC's net capital rule in connection with its audit of MF Global Holdings' financial statements for the fiscal year ended March 31, 2011. PwC approved MF Global Holdings' position that MFGI did not need to maintain any net capital reserve under the SEC regulations in connection with its Euro RTM transactions. PwC's audit opinion approving MF Global Holdings' consolidated financial statements for the fiscal year ended March 31, 2011 incorporated PwC's agreement with MFGI's position with respect to application of the net capital rules, including MFGI's decision not to take any capital charge against its RTM positions. PwC's opinion was erroneous.

118.    In August 2011, FINRA, with the support of the SEC, required MFGI to recognize a $255 million capital charge on the Euro RTMs.  FINRA determined that it had been inappropriate for MFGI to treat the European sovereign debt underlying the RTM trades as riskless in the same way that U.S. Treasury and federal agency RTMs had been treated.

119.    PwC never advised MF Global Holdings that MFGI should have been reserving capital for the Euro RTMs.  PwC's failure to advise MF Global Holdings properly regarding these net capital requirements breached its duties under the PCAOB standards to understand MF Global Holdings' business and the risks concerning that business and the economic forces affecting it.  PwC knew or should have known that the European sovereign debt that MF Global Holdings was acquiring through the Euro RTMs was not riskless and could not be treated the same as U.S. government securities for net capital calculation purposes.

120.    When FINRA and the SEC notified MFGI that it needed to apply the new capital charge retroactively to July 2011, MFGI became undercapitalized by $150.6 million as of July 31, 2011.  As a result of PwC's negligence and failure to comply with AAG § 5.193, MF Global Holdings was required to file an amended 10-Q for the quarter ended June 30, 2011.

121.    The negative impact of MF Global Holdings' filing of an amended 10-Q was significant.  It created bad press, undermined investor confidence and that of the rating agencies, and created a higher level of scrutiny and mistrust of MF Global Holdings on the part of its regulators.

### M.  PwC Negligently Advised MF Global Holdings Concerning Its Deferred Tax Assets.

122.    Deferred Tax Assets are losses, credits, and other tax deductions that may be used to offset taxable income in future years.  Before using DTAs to offset gains, a company can record them as assets under GAAP if certain requirements are met.  If a company is not likely to use some or all of its DTA in the future, it must take a "valuation allowance" reducing the amount of the DTA that it can carry as an asset under GAAP.

123.    GAAP standards for DTA accounting were set forth in ASC No. 740, "Accounting for Income Taxes" ("ASC 740").  ASC 740-10-30-17 provided that "[a]ll available evidence, both positive and negative, shall be considered to determine whether, based on the weight of that evidence, a valuation allowance for deferred tax assets is needed."  Important evidence to be considered includes an enterprise's results for recent years and its current financial position.  Cumulative losses by an enterprise in prior years are significant negative evidence that indicates a valuation allowance is necessary under ASC 740.

124.    ASC 740-10-30-21 provided that "[f]orming a conclusion that a valuation allowance is not needed is difficult when there is negative evidence such as cumulative losses in recent years."  Under GAAP, where a company has negative evidence of profitability, such as a track record of three or more unprofitable years in a row, a valuation allowance should be taken against a DTA unless there is sufficient evidence to the contrary.

125.    To avoid a valuation allowance, the countervailing positive evidence must be specific and reliable, including, for example, "(a) [e]xisting contracts or firm sales backlog that will produce more than enough taxable income to realize the deferred tax

asset based on existing sales prices and cost structures; (b) [a]n excess of appreciated

asset value over the tax basis of the entity's net assets in an amount sufficient to realize

the deferred tax asset; and (c) [a] strong earnings history exclusive of the loss that created

the future deductible amount . . . coupled with evidence indicating that the loss . . . is an

aberration rather than a continuing condition." ASC 740-10-30-22.

126.    PwC was aware that MF Global Holdings reported that its U.S. operations

had suffered three years of cumulative pre-tax losses as of the end of the fiscal 2010 year.

PwC also was aware that MF Global Holdings had reported consolidated corporate losses

over that same three-year period.

127.    PwC approved of MF Global Holdings' March 31, 2010, audited financial

statements dated May 27, 2010, in which MF Global Holdings included its U.S. DTA as

an asset without any valuation allowance. PwC's approval of the 2010 annual financials

without any valuation allowance for the DTA was improper.

128.    PwC approved of MF Global Holdings' March 31, 2011, audited financial

statements dated May 19, 2011, in which MF Global Holdings included its U.S. DTA as

an asset without any valuation allowance. PwC's approval of the 2011 annual financials

without any valuation allowance for the DTA was improper.

129.    PwC had repeated its erroneous failure to require a valuation allowance

each time it approved of MF Global Holdings' quarterly financial statements for the first

three quarters of fiscal 2011, and again when it approved of the quarterly financial

statement in the 10-Q for the quarter ended June 30, 2011.

130.    In its audited financials for the fiscal years ending March 31, 2010, and

March 31, 2011, MF Global Holdings carried a DTA of $171.7 million and $169.2

million, respectively.  PwC was aware that MF Global Holdings had cumulative losses for the three years prior to 2010, totaling in excess of $150 million.  PwC also was aware that there was no applicable exception to the general rule in favor of a valuation allowance when there is a three-year period of cumulative losses without sufficient countervailing positive evidence.  Nonetheless, PwC did not advise the Company that it needed to take a valuation allowance.

131.    PwC approved of MF Global Holdings carrying its DTA as an asset at its full value on its financial statements without any valuation allowances in violation of PwC's obligations under GAAS when it audited MF Global Holdings' financial statements for the March 31, 2011 fiscal year and in its quarterly statements through the quarter ending June 30, 2011.  This advice was negligent and breached PwC's duties to MF Global Holdings under its engagement letters, GAAS, and common law.

132.    Under GAAP, MF Global Holdings should have reported a valuation allowance against its U.S. Deferred Tax Asset no later than May 2010 when MF Global Holdings reported its financial results for its 2010 fiscal year.  As of MF Global Holdings' 2010 10-K, (i) MF Global Holdings' U.S. operations were operating at a three-year cumulative loss as of March 31, 2010; (ii) MF Global Holdings did not have evidence "of sufficient quality and quantity to counteract [that] negative evidence;" and (iii) MF Global Holdings did not have prudent and feasible tax strategies to avoid recording a full valuation allowance against its U.S. DTA.

133.    There was insufficient evidence at the time of MF Global Holdings' 2010 10-K for PWC to opine that MF Global Holdings' financial statements fairly presented its financial condition without a valuation allowance against the DTA pursuant to ASC 740

and GAAP.  PwC compounded its error when it approved of MF Global Holdings' audited financials for the fiscal year ending March 31, 2011.

134.    When PwC approved of this accounting treatment for the DTA in the 2011 10-K, it was placing its imprimatur on MF Global Holdings' hopes that its turnaround strategy would be sufficient to utilize the entire DTA in the coming fiscal year.  In doing so, PwC breached its duty of care to MF Global Holdings.

135.    On October 25, 2011, MF Global Holdings issued a press release announcing a loss in the quarter ending September 30, 2011 of $191.6 million.  The press release stated that over half of the loss was caused by "[s]ignificant charges in the quarter includ[ing] valuation allowances against deferred tax assets of $119.4 million."

136.    This DTA valuation allowance occurred at approximately the same time that MF Global Holdings had to disclose the large capital charge imposed by FINRA and to amend its June 30, 2011 10-Q.  If PwC had properly performed its professional services for MF Global Holdings regarding the Euro RTMs, the DTA, and the regulatory capital reserve requirements, MF Global Holdings would not have been in the precarious financial position in which it found itself on October 25, 2011, and would not have incurred the substantial damages it suffered.  In reliance on PwC's negligent audit, quarterly reviews, and accounting advice, MF Global Holdings was placed in the position of taking major hits to its liquidity, capital, and financial position at a time and in a manner that exacerbated the negative effects on the Company in the marketplace when it could least afford it.

**N.  PwC's Negligence Caused MF Global Holdings Massive Damages.**

137.    In reliance on PwC's negligent advice as to how to account for, and its approval of the accounting for, the Euro RTMs, MF Global Holdings could and did

amass a significant Euro RTM position that ultimately caused massive damages to the Company. PwC knew that MF Global Holdings' decision to invest heavily in Euro RTMs was dependent on PwC's advice concerning the accounting treatment for these transactions.

138.    In 2011, margin requirements for European debt increased dramatically. The increase in margin requirements greatly reduced MF Global Holdings' liquidity. On March 2, 2011, MF Global Holdings' total funding requirement for the Euro RTM portfolio was approximately $105 million. Less than five months later, by July 29, 2011, the funding requirement reached $592 million.

139.    The liquidity impact of the massive European sovereign debt went beyond increases in margin requirements. Among other things, the need to obtain funds to finance the repurchase of the Euro RTMs two days before the maturity dates of the European sovereign debt further reduced the Company's liquidity. In October 2011, following the announcement of the September 30, 2011 financial results, the Company's credit rating was downgraded. The downgrade, in turn, put further pressure on the Company's liquidity. These events were foreseeable consequences of PwC's extraordinary acts of negligence.

140.    When the foreseeable liquidity crisis occurred as a result of the Company's large positions in Euro RTMs, the Company sustained massive damages. The LCH ultimately closed out the Euro sovereign debt positions at a loss of hundreds of millions of dollars.

141.    On October 25, 2011, after MF Global Holdings announced its results for its second fiscal quarter ended September 30, 2011, posting a $191.6 million GAAP net

loss, compared with a loss of $94.3 million for the same period the prior year, the Company's stock price fell that day by almost 50%.

142.   During the last week before MF Global Holdings' bankruptcy filing, the Company attempted to sell a substantial portion of its portfolio to ensure that it had enough cash to make all of its required payments.  The Company engaged in a distressed sale by sending bid lists to other companies showing the securities that the Company was willing to sell.

143.   During the same week, margin requirements on the Euro RTM positions increased dramatically and further stressed the Company's liquidity.  Euro RTM margin posted at the clearinghouses increased by $211 million to $663 million.  On October 25, 2011, the Company received a large margin call from LCH based on Moody's downgrade of the Company's issuer credit rating to Baa3, which had taken effect on October 24, 2011.  The accelerated pace of the Euro RTM-related margin calls coupled with other liquidity pressures ultimately caused the Company to fail to meet the last $310 million in margin calls received on October 31, 2011.

144.   On October 31, 2011, MF Global Holdings filed its chapter 11 petition for protection under the Bankruptcy Code.

145.   But for PwC's professional malpractice and negligence by, among other things, improperly advising on and approving of sales accounting treatment for the Euro RTM transactions, MF Global Holdings would not have suffered the massive damages that occurred in October 2011.  These damages were compounded by PwC's failing to advise the Company about the need to satisfy FINRA's regulatory capital requirements in

a timely manner and failing to advise the Company to take a valuation allowance against its Deferred Tax Asset earlier.

## AS AND FOR A FIRST CLAIM FOR RELIEF
### (Professional Malpractice)

146.    Plaintiff realleges and incorporates paragraphs 1-145 of the Complaint as if fully set forth herein.

147.    PwC held and continues to hold itself out as a professional accounting firm qualified to perform accounting services, including audits and reviews in accordance with applicable professional standards.

148.    PwC had a duty to use such skill, prudence, and diligence as accountants of ordinary skill and capacity commonly possess and exercise in the performance of such services for and on behalf of MF Global Holdings.

149.    PwC failed to use such skill, prudence, and diligence in the accounting and auditing services it provided to MF Global Holdings.

150.    PwC repeatedly breached its duties of care and committed professional malpractice in providing its services and advice to MF Global Holdings.

151.    MF Global Holdings relied on PwC's advice and expert opinion that its financial statements throughout this time period conformed with GAAP.  As detailed above, MF Global Holdings' annual financial statements for the fiscal year ended March 31, 2011, and the 10-Q quarterly financial reports for the quarters ended June 30, 2010 through June 30, 2011, all of which PwC approved, as well as the financials for the quarter ended September 30, 2011, which PwC reviewed prior to the time that MF Global released them, did not conform with GAAP.  At all relevant times, MF Global Holdings did not know that these financial statements did not conform with GAAP.

152.    In connection with its annual audits and quarterly reviews of MF Global

Holdings' consolidated financial statements for periods alleged in the preceding

paragraphs, PwC failed to meet the standards imposed by, among other things, GAAP,

GAAS, the SEC, the PCAOB, the AAG, and PwC's engagement letters, as alleged

herein.

153.    Because of these acts and omissions, PwC breached its duties to its client,

MF Global Holdings.

154.    As a direct, proximate result of PwC's negligence and malpractice, MF

Global Holdings has suffered massive damages in an amount to be proven at trial.

## AS AND FOR A SECOND CLAIM FOR RELIEF
### (Breach of Contract)

155.    Plaintiff realleges and incorporates paragraphs 1-154 of the Complaint as

if fully set forth herein.

156.    PwC had a contractual accountant/auditor-client relationship with MF

Global Holdings.

157.    MF Global Holdings' contracts with PwC required PwC to provide

accounting and auditing services to MF Global Holdings in consideration for substantial

fees from MF Global Holdings.

158.    PwC had a contractual obligation to, *inter alia*: (i) advise MF Global

Holdings whether its financial statements conformed with GAAP; (ii) conduct audits in

accordance with GAAS; (iii) plan and perform its audits to obtain reasonable assurance

about whether MF Global Holdings' financial statements were free of material

misstatements; (iv) examine evidence supporting the amounts and disclosures in MF

Global Holdings' financial statements; (v) assess the accounting principles used by

management; and (vi) evaluate MF Global Holdings' overall financial statement presentation.

159.    Because of PwC's acts and omissions described above, PwC breached its contractual obligations to MF Global Holdings.

160.    As a direct, proximate result of PwC's breaches, MF Global Holdings has suffered massive damages in an amount to be proven at trial.

## AS AND FOR A THIRD CLAIM FOR RELIEF
### (Unjust Enrichment)

161.    Plaintiff realleges and incorporates paragraphs 1-160 of the Complaint as if fully set forth herein.

162.    From April 2010 through March 2012, MF Global Holdings conferred, and PwC accepted, benefits in amounts totaling $10,889,491 for audit, advisory, and related services performed for MF Global Holdings.

163.    As a direct, proximate result of PwC's acts and omissions described above, PwC has been unjustly enriched at MF Global Holdings' expense in an amount not less than $10,889,491, in addition to any related costs and expenses, including attorneys' fees, in connection with the prosecution of this action.

164.    Equity and good conscience require that MF Global Holdings be compensated for PwC's unjust enrichment, in an amount to be proven at trial, but in no event less than $10,889,491.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against defendant as follows:

A.      On its First Claim for Relief, a money judgment in an amount to be determined at trial but not less than $1 billion, and related costs and expenses, including attorneys' fees, in connection with defendant's professional negligence;

B.      On its Second Claim for Relief, a money judgment in an amount to be determined at trial but not less than $1 billion, and including but not limited to the fees the Company paid to PwC, and related costs and expenses, including attorneys' fees, in connection with the defendant's breach of their contract for professional services;

C.      On its Third Claim for Relief, a money judgment in an amount commensurate with PwC's unjust enrichment to be determined at trial, but in no event less than $10,889,491, in addition to any related costs and expenses, including attorneys' fees, in connection with the prosecution of this action; and

D.      Granting Plaintiff such other and further relief, whether at law or in equity, as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

Dated: New York, New York
March 28, 2014

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP

By: _____

Daniel J. Fetterman (dfetterman@kasowitz.com)
Michael C. Harwood (mharwood@kasowitz.com)
David J. Mark (dmark@kasowitz.com)

1633 Broadway
New York, New York 10019
Tel: (212) 506-1700

*Attorneys for MF Global Holdings Ltd.,*
*as Plan Administrator*