UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MF GLOBAL HOLDINGS LTD., AS PLAN ADMINISTRATOR,<br><br>                    Plaintiff,<br><br>        -against-<br><br>PRICEWATERHOUSECOOPERS LLP,<br><br>                    Defendant. | Case No. 14-cv-2197 (VM)<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF
PRICEWATERHOUSECOOPERS LLP'S MOTION TO DISMISS**

Dated: New York, New York
       May 23, 2014

KING & SPALDING LLP

James J. Capra, Jr.
James P. Cusick
David M. Fine
1185 Avenue of the Americas
New York, NY 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222

*Attorneys for Defendant
PricewaterhouseCoopers LLP*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

ARGUMENT ........................................................................................................................ 5

I.   THE PLAN ADMINISTRATOR LACKS STANDING TO SUE PWC ON THE RTM TRANSACTIONS.................................................................................... 5

II.   *IN PARI DELICTO* BARS MF GLOBAL FROM RECOVERING FROM PWC.......... 7

III.   PROXIMATE CAUSATION IS LACKING ON THE FACE OF THE COMPLAINT. ........................................................................................................ 13

IV.   PORTIONS OF THE COMPLAINT SHOULD BE DISMISSED FOR OTHER REASONS. ........................................................................................................... 20

    A.   The Contract Claim Should be Dismissed as Duplicative of Malpractice. ............ 20

    B.   Malpractice and Breach of Contract Claims With Respect to Periods Prior to the FY 2011 Year-End Audit are Time-Barred................................................... 22

    C.   MF Global Cannot State a Claim for Unjust Enrichment. .................................... 23

CONCLUSION.................................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ackerman v. Price Waterhouse*,
  84 N.Y.2d 535 (1994) ...................................................................................22

*AHW Inv. P'ship v. Citigroup Inc.*,
  No. 09-md-2070, 10-cv-9646, 2013 U.S. Dist. LEXIS 155783 (S.D.N.Y. Oct.
  30, 2013) ....................................................................................................15

*Am. Tissue, Inc. v. Arthur Andersen LLP*,
  275 F. Supp. 2d 398 (S.D.N.Y. 2003) ..........................................................11, 21

*Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
  351 F. Supp. 2d 79 (S.D.N.Y. 2004) .............................................................11

*Apple Bank for Sav. v. PricewaterhouseCoopers LLP*,
  895 N.Y.S.2d 361 (1st Dep't 2010) ...............................................................22

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................5, 19

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..................................................................................5, 15

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*,
  757 F.2d 523 (2d Cir. 1985) ........................................................................11

*Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*,
  448 F.3d 573 (2d Cir. 2006) ........................................................................23

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass*,
  754 F.2d 57 (2d Cir. 1985) ..........................................................................14, 20

*Carvel v. Ross*,
  No. 09-cv-0722, 2011 U.S. Dist. LEXIS 25203 (S.D.N.Y. Feb. 16, 2011)...........................23

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*,
  70 N.Y.2d 382 (1987) .................................................................................23

*Deangelis, et al. v. Corzine, et al.* (*In re MF Global Holdings Ltd. Inv. Litig.*),
  No. 11-cv-7866 (VM) (S.D.N.Y. Mar. 11, 2014) .................................................13

*Deangelis, et al. v. Corzine, et al.* (*In re MF Global Holdings Ltd. Inv. Litig.*),
  No. 11-cv-7866 (VM), 2014 WL 667481 (S.D.N.Y. Feb. 11, 2014) .........................7, 8, 9, 12

*Diamond v. Sokol*,
    468 F. Supp. 2d 626 (S.D.N.Y. 2006)................................................................20

*Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*,
    631 F.3d 42 (2d Cir. 2011)................................................................23

*Goldman v. Metro. Life Ins. Co.*,
    5 N.Y.3d 561 (2005)................................................................24

*Harris v. Kahn, Hoffman, Nonenmacher, & Hochman, LLP*,
    871 N.Y.S.2d 919 (2d Dep't 2009)................................................................22

*Healthcare Fin. Grp., Inc. v. Bank Leumi USA*,
    669 F. Supp. 2d 344 (S.D.N.Y. 2009)................................................................15

*Hous. Works, Inc. v. Turner*,
    179 F. Supp. 2d 177 (S.D.N.Y. 2001)................................................................15

*IMO Indus. Inc. v. Anderson Kill & Olick, P.C.*,
    699 N.Y.S.2d 43 (1st Dep't 1999)................................................................21

*Intellivision v. Microsoft Corp.*,
    784 F. Supp. 2d 356 (S.D.N.Y. 2011)................................................................12

*Kirschner v. KPMG LLP*,
    15 N.Y.3d 446 (2010)................................................................8, 9, 12

*Kolbeck v. LIT Am., Inc.*,
    939 F. Supp. 240 (S.D.N.Y. 1996)................................................................14

*Morgenthow & Latham v. Bank of N.Y. Co.*,
    760 N.Y.S.2d 435 (1st Dep't 2003)................................................................11

*O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)*,
    714 F.3d 118 (2d Cir. 2013)................................................................15

*In re Parmalat Sec. Litig.*,
    501 F. Supp. 2d 560 (S.D.N.Y. 2007)................................................................15

*PricewaterhouseCoopers LLP v. Giddens (In re MF Global Inc.)*,
    496 B.R. 315 (S.D.N.Y. 2013)................................................................21

*In re R.M. Kliment & Frances Halsband, Architects*,
    3 N.Y.3d 538 (2004)................................................................22

*RGH Liquidating Trust v. Deloitte & Touche LLP*,
    851 N.Y.S.2d 31 (1st Dep't 2008)................................................................22

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013)................................................................14, 15

*Sapirstein-Stone-Weiss Found. v. Merkin*,
    950 F. Supp. 2d 621 (S.D.N.Y. 2013)..........................................................23

*Senise v. Mackasek*,
    642 N.Y.S.2d 241 (1st Dep't 1996) ............................................................21

*Shearson Lehman Hutton, Inc. v. Wagoner*,
    944 F.2d 114 (2d Cir. 1991) ......................................................................12

*Spool v. World Child Int'l Adoption Agency*,
    520 F.3d 178 (2d Cir. 2008)........................................................................5

*Superintendent of Ins. for N.Y. v. Ochs (In re First Cent. Fin. Corp.)*,
    377 F.3d 209 (2d Cir. 2004)......................................................................23

*Tavakoli v. Corzine, et al. (In re MF Global Holdings Ltd.)*,
    No. 11-cv-7866 (VM), 2014 WL 1229516 (S.D.N.Y. Mar. 24, 2014)...................12

*Williamson v. PricewaterhouseCoopers LLP*,
    9 N.Y.3d 1 (2007) ....................................................................................22

**Statutes**

11 U.S.C. §§ 1106(a)(3) & (4)..............................................................................6

Fed. R. Civ. P. 12(b)(1) & 6 ...............................................................................1

N.Y. C.P.L.R. § 214(6) .....................................................................................22

## INTRODUCTION

PricewaterhouseCoopers LLP ("PwC") moves pursuant to Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure to dismiss the March 28, 2014 Complaint filed by MF Global Holdings Ltd. ("MF Global" or the "Company") as Plan Administrator.  MF Global asserts causes of action against PwC for professional malpractice, breach of contract, and unjust enrichment, based on allegedly incorrect advice that repo-to-maturity ("RTM") transactions involving European sovereign bonds qualified for sales-accounting treatment under generally accepted accounting principles ("GAAP").  MF Global claims that PwC's advice caused the Company to invest heavily in European sovereign debt, which precipitated a liquidity crisis and ultimately caused the Company to go bankrupt and to suffer enterprise-value damages of more than a billion dollars.  The Complaint should be dismissed for several reasons.

First, the Plan Administrator does not have the authority to bring these claims.  The MF Global liquidation plan assigned to the Litigation Trustee, Nader Tavakoli, the exclusive authority to prosecute MF Global's claims "arising out of or related to the facts and circumstances" set forth in the April 2013 Report of the Chapter 11 Trustee, Louis Freeh, or the subsequent litigation he filed against the Company's former officers (which was later assigned to the Litigation Trustee).  Both the Freeh Report and the lawsuit against the former officers focus on the Company's decision to enter into the European RTM transactions that are at the heart of the claims against PwC.  Only the Litigation Trustee has the authority to bring them.

Second, regardless of which plaintiff is prosecuting MF Global's claims, they are barred under basic principles of *in pari delicto*.  Plaintiff alleges that MF Global's failure was caused by the massive build-up of its European sovereign debt position, which it blames on PwC's accounting advice.  But the European RTM transactions were indisputably directed by the Company's CEO and others in management, and the Company bears at least as much

responsibility for them as PwC, which satisfies the test for *in pari delicto*. This is reinforced by the investigative findings in the Freeh Report and the Chapter 11 Trustee's subsequent lawsuit.

<u>Third</u>, the failure to allege plausible proximate causation dooms MF Global's claims. The Complaint shows that the Company's bankruptcy was caused, not by accounting advice, but by business decisions the Company made to engage in more than EUR 5.3 billion of RTM transactions. It was this excessive exposure to the deteriorating European debt market, not the accounting for the transactions, that caused the well-publicized parade of horribles culminating in MF Global's demise. The findings of the Freeh Report are in full accord.

The Complaint also suffers from other flaws: the contract claim should be dismissed as duplicative of the malpractice claim, portions of the malpractice and contract claims are time-barred, and MF Global cannot state a claim for unjust enrichment.

## BACKGROUND

<u>PwC</u>. PwC was MF Global's independent auditor. It was engaged by contract in August 2010 to perform an audit of MF Global's consolidated financial statements at March 31, 2011 and for the fiscal year then ending, as well as reviews of the company's unaudited quarterly financial information. Complaint ¶¶ 16, 17. PwC was engaged again in August 2011 to audit the Company's March 31, 2012 financial statements and to review the company's unaudited quarterly information. *Id.*[1] Copies of these contracts are attached as Exhibits A and B, respectively, to the Declaration of David M. Fine, dated May 23, 2014 (all exhibits cited herein are to the Fine Declaration). Both contracts provided that the financial statements were the responsibility of Company management, and that PwC was responsible for performing its audits and reviews consistent with applicable professional standards. Ex. A at 1, 3; Ex. B at 1-2, 4.

---

[1] PwC reviewed quarterly information for the first quarter of fiscal year 2012, but did not conclude its work for the second quarter due to the Company's Chapter 11 filing. *See* Complaint ¶¶ 110, 151.

MF Global's Collapse and the RTMs.  MF Global collapsed into bankruptcy on October

31, 2011.  Since then, several forensic investigations have examined the causes of the

Company's demise, including separate investigations by the Chapter 11 Trustee and the SIPA

Trustee for MF Global's broker-dealer subsidiary, MF Global Inc. ("MFGI").  Both Trustees

issued lengthy reports of their respective findings, as did a subcommittee of the House Financial

Services Committee ("HFSC"), which did its own investigation.  The SEC and the CFTC also

conducted investigations, and the CFTC thereafter sued two former MF Global officers.

It is an understatement to say that the Trustees, regulators and Congressional committee

were well aware of the RTM transactions involving European sovereign bonds.  Those

transactions drew more scrutiny than any other aspect of MF Global's business, and the two

Trustees and the HFSC subcommittee all discuss in their reports that the Company accounted for

those transactions as sales (resulting in the de-recognition of the bonds from the balance sheet

and the recognition of a gain on sale) without challenging or even questioning the propriety of

that accounting under GAAP.[2]

Chapter 11 Trustee, Plan Administrator and Litigation Trustee.  Following the issuance of

his Report, the Chapter 11 Trustee filed suit on behalf of the Company against its former

Chairman and Chief Executive Officer, Jon Corzine, former Chief Operating Officer, Bradley

---

[2]  See, e.g., Ex. E, Report of the Chapter 11 Trustee Louis Freeh (Apr. 4, 2013), In re MF Global
Holdings Ltd., et al., No. 11-15059 (MG) (S.D.N.Y. Bankr.) [ECF No. 1279] ("Freeh Report"), at 26
("[RTM] transactions were treated as a sale of financial assets . . . . This allowed MF Global to
immediately recognize the gain from the transaction, while simultaneously removing it from the
Company's balance sheet."); Report of the [SIPA] Trustee's Investigation and Recommendations, In re
MF Global Inc. (June 4, 2012), No. 11-2790 (MG)(SIPA) (S.D.N.Y. Bankr.) [ECF No. 1865], at 66 ("The
RTM transactions qualified for sales accounting treatment under US GAAP, and accordingly were
derecognized from the MF Global consolidated balance sheet."); U.S. House of Representatives Staff
Report of the Subcommittee on Oversight and Investigations of the Committee on Financial Services,
112th Congress (Nov. 15, 2012) ("House Report"), available at http://financialservices.house.gov/
uploadedfiles/256882456288524.pdf (last visited May 18, 2014), at 34 ("Accordingly, FASB accounting
standards require that the borrowing company account for the transaction as a 'sale' . . . .").

Abelow, and former Chief Financial Officer, Henri Steenkamp, primarily focused on the European RTM transactions. *Tavakoli v. Corzine, et al.*, No. 14-cv-0566 (VM) (S.D.N.Y.) (formerly *Freeh v. Corzine, et al.*, No. 13-01333 (MG) (S.D.N.Y. Bankr.)), consolidated with *Deangelis, et al. v. Corzine, et al.*, No. 11-cv-7866 (VM) (S.D.N.Y.) (the "Litigation Trust Action"). On confirmation of the liquidation plan, MF Global was appointed Plan Administrator for the debtor. Later, as part of a post-confirmation "nonmaterial" modification to the liquidation plan, the lawsuit against the former officers, and all potential claims based on the same facts and circumstances, were assigned to a newly created Litigation Trustee, Nader Tavakoli. Ex. D, Second Am. and Restated Joint Plan of Liquidation (May 3, 2013), *In re MF Global Holdings Ltd., et al.*, No. 11-15059 (MG) (S.D.N.Y. Bankr.) [ECF No. 1382], Article I.A.100 (defining "Litigation Trust Claims") & Article IX-2 ("Litigation Trust"). The amended complaint in the Litigation Trust Action charges the former officers with breaches of fiduciary duty as a result of an alleged "scheme" they "masterminded" to use the RTM transactions to "inflate [MF Global's] earnings." Ex. F, First Am. Complaint (Sept. 16, 2013), Litigation Trust Action, No. 13-01333 (MG) (S.D.N.Y. Bankr.) [ECF No. 22] ("Litigation Trust Complaint"), ¶ 2. On March 24, 2014, this Court denied defendants' Rule 12 motion, finding sufficient allegations of wrongdoing, including that the former officers repeatedly increased the Company's risk exposure by making bets on European sovereign debt.[3]

Now, two and a half years after the Company collapsed, MF Global seeks to blame PwC for its billion-dollar bankruptcy, alleging that the manner in which the Company accounted for its European RTMs was incorrect based on advice that PwC gave beginning in early 2010. Notably, MF Global does not claim that the accounting was determined to be incorrect during the

---

[3] PwC requests that the Court take judicial notice of the Freeh Report, the Litigation Trust Complaint, and the Litigation Trustee's opposition brief to the motion to dismiss by the former officer-defendants. *See* Request for Judicial Notice, dated May 23, 2014, and submitted herewith.

Company's existence, much less that some financial, regulatory or other ramification befell the Company as a result of the alleged mis-accounting, its disclosure or its correction.  Instead, the Complaint rests on the notion that the Company would not have engaged in its self-inflicted, fatal buildup of European RTMs if PwC had advised that a different accounting treatment applied to those transactions.

## ARGUMENT

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. (citing *Twombly*, 550 U.S. at 555).  Instead, the allegations "must create the possibility of a right to relief that is more than speculative."  *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008).  Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" (quoting *Twombly*, 550 U.S. at 555)).

## I.     THE PLAN ADMINISTRATOR LACKS STANDING TO SUE PWC ON THE RTM TRANSACTIONS.

MF Global, as Plan Administrator, sues PwC purportedly as the assignee of MF Global's claims.  Complaint ¶ 11.  The Plan Administrator was designated in the MF Global Chapter 11 plan of liquidation, and stands in the shoes of the Company.  Under the liquidation plan as originally confirmed, the Plan Administrator retained and was empowered to enforce any claims of the estate, the proceeds of which were to be used to fund payments to MF Global's creditors. Ex. C, Am. and Restated Joint Plan of Liquidation (Apr. 1, 2013), *In re MF Global Holdings*

*Ltd., et al.*, No. 11-15059 (MG) (S.D.N.Y. Bankr.) [ECF No. 1267], at 34, 37.  However, the

Plan was subsequently modified to create a Litigation Trust, which gave the Trustee "the

exclusive authority to pursue the Litigation Trust claims," defined as:

> the claims set forth in the complaint entitled "*Louis J. Freeh, as
> Chapter 11 Trustee of MF Global Holdings Ltd., et al. v. Jon S.
> Corzine, et al*.", Adversary Proceeding Number 13-01333 (Bankr.
> S.D.N.Y.), as it may be subsequently modified, amended, or
> supplemented, and any claims arising out of or related to the facts
> or circumstances alleged in the complaint or set forth in the Report
> of Louis J. Freeh, as Chapter 11 Trustee of MF Global Holdings
> Ltd., et al., dated April 3, 2013 [Docket No. 1279].

Ex. D (Second Am. and Restated Joint Plan of Liquidation), Article 1.A.100.  The Litigation

Trustee's sole responsibility for these claims is explicit:  "the Litigation Trustee shall have the

exclusive authority to pursue the Litigation Trust Claims, . . . and under no circumstances may

the Plan Administrator pursue the Litigation Trust Claims."  *Id.* Article IV at 37; *see also id.*

Article XI at 65 ("under no circumstances shall any Litigation Trust Assets vest in any Debtor").

      The question of whether the claims against PwC are claims "arising out of or related to

the facts or circumstances" alleged in the Litigation Trust Complaint or set forth in the Freeh

Report is straightforward.  The Chapter 11 Trustee was required by statute to investigate and to

bring any claims available to the estate.  11 U.S.C. §§ 1106(a)(3) & (4); Ex. E (Freeh Report) at

1.  He was also required to file a statement of his investigation (11 U.S.C. § 1106(a)(4)(A)),

which culminated in his April 4, 2013 Report of "the events and circumstances that ultimately

led to [MF Global's] bankruptcy filing[]."  Ex. E at 119.  The RTM transactions, the accounting

for those transactions, the strategy behind the investments, and the consequences of the trades in

the face of changing market conditions were the predominant focus of the report.  *Id.* at 3-7, 24-

26, 26-53, 54-60, 97-108, 117-19.  The Chapter 11 Trustee concluded that, "[w]hen combined

with other factors, strategic decisions and management lapses surrounding the Company's

business, the Euro RTMs ultimately sowed the seeds of the Company's destruction."  *Id.* at 5.

The RTM transactions are also the main focus of the action filed by the Chapter 11 Trustee,

which was later assigned to the Litigation Trustee in the bankruptcy liquidation plan:

> MF Global's bankruptcy can be traced to a scheme [Defendants
> Corzine, Abelow and Steenkamp] designed and implemented to
> prop-up the Company's apparent profitability through highly
> leveraged transactions in foreign debt.

Ex. F (Litigation Trust Complaint) ¶ 1; *see also id.* at ¶¶ 2-4, 33-37, 73-116.

The Litigation Trustee's exclusive authority to pursue claims is extremely broad — "any

claims arising out of or related to the facts or circumstances" within the scope of the Freeh

Report or the Litigation Trust Action — with no other restrictions.  The claims against PwC arise

out of the identical transactions that are the focus of both the Freeh Report and the litigation, and

are thus claims that only the Litigation Trustee can bring.  To this point, he has chosen not to do

so.  The amended liquidation plan precludes the Plan Administrator from usurping that authority.

## II.   *IN PARI DELICTO* BARS MF GLOBAL FROM RECOVERING FROM PWC.

This Court is well familiar with the *in pari delicto* doctrine, and has already applied it in

this MDL to bar claims against PwC brought by the SIPA Trustee, standing in the shoes of

MFGI.  *Deangelis, et al. v. Corzine, et al.* (*In re MF Global Holdings Ltd. Inv. Litig.*), No. 11-cv-

7866 (VM), 2014 WL 667481, at \*23-25 (S.D.N.Y. Feb. 11, 2014) ("Customer Decision").  The

same principles apply to bar MF Global's claims against PwC.

There is one difference between the Customer Class Action pleading and the Complaint

in this case:  here, MF Global took pains to avoid any direct references to the wrongful conduct

of its officers — no doubt to try to avoid an early *in pari delicto*-based dismissal of the case.  For

example, Jon Corzine, MF Global's CEO and the admitted architect of the RTM trading strategy,

is not even mentioned in the 50-page Complaint.  Nor are any other officers or employees.  But

Plaintiff's calculated omissions from its pleading cannot hide the indisputable fact that MF Global was an active, voluntary participant in the alleged wrongful conduct that is the subject of this suit.  Indeed, in this same MDL, MF Global — through its Chapter 11 Trustee and then, by assignment, the Litigation Trustee — alleges grossly negligent and reckless conduct by the Company's top officers with respect to the European RTM transactions.  These allegations are consistent with and follow from the results of the Chapter 11 Trustee's investigation, as set forth in the Freeh Report.  Plaintiff's tactical pleading maneuver here should not extend the life of claims that ought to be dismissed on Rule 12 motion based on *in pari delicto*, and the related ground that federal court prudential limitations deny MF Global standing even to bring such claims (the "*Wagoner*" rule).

As this Court ruled in the Customer Class Action, "[t]he traditional principle that a corporation is liable for the acts of its agents and employees applies with full force to the *in pari delicto* analysis."  Customer Decision, 2014 WL 667481, at *23 (citing *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465 (2010)).  "Because a bankruptcy trustee stands in the shoes of the bankrupt corporation, *in pari delicto* prevents the trustee from recovering in tort if the corporation, acting through authorized employees in their official capacities, participated in the tort."  *Id.* at *23 (citations omitted).  The New York Court of Appeals in *Kirschner* identified the types of activities that are within the scope of authority of corporate officers, and therefore imputed, which include the specific conduct in this case:  "everyday activities central to any company's operation and well-being — such as issuing financial statements, accessing capital markets, handling customer accounts, moving assets between corporate entities, and entering into contracts."  15 N.Y.3d at 465-66.  *Kirschner* also "bears directly on the application of the *in pari delicto* doctrine to claims against an auditor by the corporation that employed it" (Customer

Decision, 2014 WL 667481, at *24), which was the fact pattern presented in the question the Second Circuit certified to the New York high court.  The salutary "policy principle underlying *in pari delicto* . . . supported the doctrine's application to bar a corporation's negligence claim against an auditor."  *Id.* (citing *Kirschner*, 15 N.Y.3d at 476-77).  As a result, this Court dismissed MFGI's claims against PwC in the Customer Class Action because it "conclude[d] that *Kirschner* directly controls the outcome."  *Id.* at *25.  The same result should apply here.

MF Global's RTM investment strategy is at the heart of its claims against PwC:

> PwC's professional malpractice and negligence caused the Company massive damages in connection with its investment in billions of dollars in European sovereign debt instruments.  MF Global Holdings relied on PwC's flatly erroneous accounting advice when it made those investments by using so-called "repurchase-to-maturity" financing transactions or "Euro RTM" transactions.

Complaint ¶¶ 1-2; *see also id.* ¶¶ 3-121.  The Complaint further describes the Company's "maintenance of large Euro RTM positions [as] creat[ing] significant financial risks, including liquidity risks."  *Id.* ¶ 114.  Certain inexorable facts underpin this case.  First, MF Global entered into these transactions, not PwC.  *Id.* ¶ 2.  Second, MF Global's management, not PwC, was responsible for the Company's business strategy and decision-making, including whether to make these investments in the first place, and the timing and magnitude of the Company's investments over the years.  *Id.* ¶¶ 4 (referencing the Company's "decision to invest heavily in European sovereign debt through Euro RTM transactions"), 50 (the Company's consideration of opportunities to increase profits, including investing in European sovereign bonds), 60 (describing Euro RTM transactions entered into by the Company in 2009, before any advice was sought from PwC), 69 (senior management's decision-making on the RTM strategy in the summer of 2010), and 83 (the Company's decisions in November and December 2010 to increase the Euro RTM position).  Third, MF Global's management was responsible for the

9

preparation of the Company's financial statements, including the accounting for the RTM

transactions, while PwC was responsible for the audit of those financial statements.  Ex. A at 1,

3; Ex. B at 1-2, 4.

Beyond these basic facts, MF Global alleges in the Litigation Trust Action, consistent

with the Freeh Report, that the RTM transactions were part of a wrongful scheme:

- "[MF Global's] bankruptcy can be traced to a scheme [the CEO, COO and CFO] designed and implemented to prop-up the Company's apparent profitability through highly-leveraged transactions in foreign debt."  Ex. F (Litigation Trust Complaint) ¶ 1.

- Those MF Global officers "masterminded a scheme that dramatically changed MF Global's historical direction and put MF Global on a high-risk path that would devastate the Company's liquidity, deplete customer funds, and ultimately cause the failure of the Company."  *Id.* ¶ 2.

- "Broadly stated, this new path involved the Company making highly leveraged investments in European sovereign-debt instruments using repurchase-to-maturity financing transactions, also known as 'repo-to-maturity' or 'Euro RTM' transactions.  These Euro RTM transactions allowed the Company to inflate its earnings by immediately booking income by selling financed debt instruments while incurring significant future liabilities relating to those instruments."  *Id.*

- "By accounting for these [Euro RTM] transactions as sales and the artificially generated funds as revenues, [the Company's top officers] were able to create an impression that Corzine would return the Company to profitability while obscuring that the Company was holding very large positions in Euro sovereign debt."  *Id.* ¶ 33.

- "Because MF Global was required to repurchase Euro RTMs two business days before maturity, they were not true 'repurchases to maturity' from a consolidated balance sheet perspective."  *Id.* ¶ 33 n.4 (emphasis omitted).

MF Global asserts that these actions of the Company's executives constituted "grossly

negligent and reckless conduct, committed in the absence of good faith and in breach of their

fiduciary duties."  *Id.* ¶ 10.  And, in successfully opposing defendants' Rule 12 motion in the

Litigation Trust Action, MF Global reiterated its allegations that the Company did not properly

account for the Euro RTM transactions, and "[d]efendants thus gave the investing public a

misleading picture of the Company's financial position."  Ex. G, Litigation Trustee Opposition to

Defendants' Joint Motion to Dismiss the First Am. Complaint (Dec. 12, 2013), Litigation Trust

Action, No. 13-01333 (MG) (S.D.N.Y. Bankr.) [ECF No. 29], at 21-22.  MF Global also argued

that the Court had already concluded that its "core allegations" were sufficient to show that

defendants acted with scienter.  *Id.*

Plaintiff MF Global here cannot avoid the consequences of the Litigation Trustee's

allegations and briefing, where the Litigation Trustee stands in the shoes of MF Global as

assignee of the Company's claims.  "A party's assertion of fact in a pleading is a judicial

admission by which it normally is bound throughout the course of the proceeding."  *Bellefonte

Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985).  And that principle has been

applied with respect to allegations in a different action by the same plaintiff.  *Am. Tissue, Inc. v.

Arthur Andersen LLP*, 275 F. Supp. 2d 398, 405 & n.8 (S.D.N.Y. 2003) (citing *Bellefonte Re Ins.

Co.*, 757 F.2d at 528) (allegations in an earlier action against the company's directors and

officers constituted judicial admissions that required dismissal of the complaint against the

auditor per *Wagoner*); *see also Morgenthow & Latham v. Bank of N.Y. Co.*, 760 N.Y.S.2d 435,

441-42 (1st Dep't 2003); *but see Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*,

351 F. Supp. 2d 79, 96 (S.D.N.Y. 2004) (declining to rely on statements in a separate action, and

finding the complaint before the court provided a sufficient basis for dismissal per *Wagoner*).

That principle should have even more force in the context of MDL proceedings.

On March 24, 2014, this Court denied defendants' motion in the Litigation Trust Action

because the complaint against MF Global's former top officers:  (1) "sufficiently alleges conduct

that gives rise to reasonable inferences that [their] actions were grossly negligent," including

because of the prior rulings in the Securities Class Action and Customer Class Action that

"arise[] out of the same or similar conduct"; and (2) "sufficiently alleges that [they] acted in bad faith," including because they "repeatedly increased the company's exposure on risky bets on sovereign debt." *Tavakoli v. Corzine, et al.* (*In re MF Global Holdings Ltd.*), No. 11-cv-7866 (VM), 2014 WL 1229516 (S.D.N.Y. Mar. 24, 2014), at \*3.  Four days after securing that favorable ruling against the former officers, MF Global sued PwC.  The Company should not be permitted to turn its back in this case on allegations related to the same subject matter that allowed it to prevail in the Litigation Trust Action.  *See Intellivision v. Microsoft Corp.*, 784 F. Supp. 2d 356, 364-65 (S.D.N.Y. 2011), *aff'd*, 484 F. App'x 616, 618-19 (2d Cir. 2012) (judicial estoppel bar arising out of plaintiff's successful opposition to Rule 12 motion).

On this record there can be no question that the allegations of MF Global here and the Litigation Trustee, as MF Global's assignee, meet the *in pari delicto* test set out by the Supreme Court and previously applied by this Court in barring MFGI's claims — namely, that MF Global was an "active, voluntary participant in the unlawful activity that is the subject of the suit," and that it "bears at least substantially equal responsibility for the violations [it] seeks to redress[.]" Customer Decision, 2014 WL 667481, at \*23-25 (quoting *Pinter v. Dahl*, 486 U.S. 622, 633 (1988)) (alteration in original); *see also Kirschner*, 15 N.Y. 3d at 464 n.4.  The claims also fail the related "*Wagoner*" standing test — that a bankruptcy trustee (or similarly situated party) has no standing in federal court to bring claims against third parties where the bankrupt corporation participated in the alleged wrongful conduct.  *See Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118-20 (2d Cir. 1991).[4]

---

[4] Plaintiff has no room to argue the "adverse interest" exception to *in pari delicto*, given that this "most narrow" exception is typically reserved for theft, looting or embezzlement by corporate agents (*Kirschner*, 15 N.Y.3d at 466-67), which is not present here, and that MF Global alleges that the RTM accounting was a benefit to it (*see, e.g.*, Complaint ¶¶ 3, 35, 48-49).

MF Global's allegations in this Complaint fare no better than MFGI's attempt in the Customer Class Action to hold PwC responsible for MFGI's agents' alleged misdeeds.  Indeed, the Court's analysis on plaintiffs' reconsideration motion in that case fits perfectly MF Global's case against PwC, the essence of which is that, "[h]ad PwC met its duty to provide accounting advice and auditing services consistent with . . . professional standards, . . . the Company would never have amassed the enormous Euro RTM exposure it did . . . ."  Complaint ¶ 5; *see also id.* ¶ 3 ("But for PwC's erroneous accounting advice, MF Global Holdings could not have — and would not have — invested heavily in European sovereign debt to generate immediate revenues and would not have suffered the massive damages that befell the Company in 2011.").  In denying reconsideration, this Court rejected MFGI's claims based on the very same theory:

> The gravamen of Count Thirteen [professional negligence] is that PwC's negligent conduct led to MFGI's improper transfer of customer funds.  According to the [Complaint], the D&O Defendants actually committed the improper transfer.  Thus, the harm that PwC caused to MFGI resulted only because of the voluntary acts of the D&O Defendants . . . .

*Deangelis, et al. v. Corzine, et al.* (*In re MF Global Holdings Ltd. Inv. Litig.*), No. 11-cv-7866 (VM) (S.D.N.Y. Mar. 11, 2014), at 13-14.  The same analysis applies here.

## III.   PROXIMATE CAUSATION IS LACKING ON THE FACE OF THE COMPLAINT.

Even if sales-accounting treatment was inappropriate for the European RTM transactions — contrary to all previous investigations and reports — the causal chain of events between PwC's alleged incorrect accounting advice and MF Global's collapse almost two years later is too long and attenuated to hold PwC liable.  While the Complaint teems with legally insufficient conclusory allegations of proximate causation, it is devoid of plausible specific factual allegations that MF Global's failure was proximately caused by incorrect accounting advice.  Instead, the Complaint alleges what the Chapter 11 Trustee found:  that a series of events in 2010

and 2011, having nothing to do with accounting advice, caused MF Global's bankruptcy. Chief among those events were the risky business decisions by Corzine and his management team to transact increasingly huge dollar amounts of European RTMs over the last year and a half of the Company's existence. The Complaint alleges other subsequent events in the causation chain that either stemmed from the excessive build-up of RTMs or constitute separate causal factors having nothing to do with accounting advice. These other causal events include the reporting of past and expected future operating losses, unfavorable regulatory action, credit agency downgrades, adverse media attention, and a leverage crisis at the Company. The only plausible reading of the Complaint is that it was these business decisions and market events, not PwC's alleged accounting advice, that caused MF Global's bankruptcy.

Central to the notion of proximate cause is the idea that a defendant is only liable "to those with respect to whom his acts were a substantial factor in the sequence of responsible causation and whose injury was reasonably foreseeable or anticipated as a natural consequence." *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003)) (affirming dismissal of complaint because the complaint failed to allege proximate cause). Claims must be dismissed when "th[e] chain of causation . . . is far too long to constitute proximate cause." *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 249 (S.D.N.Y. 1996) (denying plaintiffs' motion to amend because the agent's "failure to register, and defendants' failure to investigate that lapse, had little if anything to do with plaintiffs' losses"). Liability will not attach when the injury is not "a direct or reasonably foreseeable result of the conduct." *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 63 (2d Cir. 1985) (affirming district court's dismissal of aiding-and-abetting claim because the complaint did not allege that the purported acts of the aider and abettor proximately caused the harm).

14

Mere conclusory allegations of a proximate causal relationship do not satisfy the plausibility standard in *Twombly*. *See Rothstein*, 708 F.3d at 97. New York courts have affirmed dismissals and granted Rule 12 motions when a complaint does not sufficiently allege proximate causation. *O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)*, 714 F.3d 118, 122 (2d Cir. 2013) (affirming dismissal of Anti-Terrorism Act and common law intentional tort claims because plaintiffs failed to make the necessary allegations that defendants proximately caused their injuries); *Rothstein*, 708 F.3d at 94 (affirming dismissal of complaint because plaintiffs "failed to allege proximate cause sufficiently to state a claim on which relief can be granted"); *AHW Inv. P'ship v. Citigroup Inc.*, No. 09-md-2070, 10-cv-9646, 2013 U.S. Dist. LEXIS 155783, at *35 (S.D.N.Y. Oct. 30, 2013) (granting motion to dismiss common law fraud claims because the alleged misstatements did not proximately cause plaintiffs' purported loss); *Healthcare Fin. Grp., Inc. v. Bank Leumi USA*, 669 F. Supp. 2d 344, 349 (S.D.N.Y. 2009) (Marrero, J.) (granting motion to dismiss for lack of proximate cause where complaint described other acts that caused plaintiff's damages); *In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 580, 591 (S.D.N.Y. 2007), *aff'd*, *Pappas v. Bank of Am. Corp.*, 309 F. App'x 536, 538 (2d Cir. 2009) (dismissing claims for lack of proximate cause because plaintiffs failed to assert that it was reasonably foreseeable to defendants that their acts eventually would result in plaintiffs' losses); *Hous. Works, Inc. v. Turner*, 179 F. Supp. 2d 177, 222 (S.D.N.Y. 2001) (Marrero J.) (dismissing claims against defendant Hoover because of "absence of proximate cause").

Here, the Complaint alleges a number of events that negate any theoretical causal link between alleged PwC accounting advice and MF Global's bankruptcy. To begin, the Complaint's specific allegation as to PwC is that it advised MF Global beginning in January or February 2010 that sales-accounting treatment was appropriate for European RTM transactions

15

(Complaint ¶¶ 59, 67) — advice that MF Global alleges was "a threshold issue in the Company's decision to engage in Euro RTM trading" (*id*. ¶ 35).  But MF Global concedes that its purchases of European sovereign debt predate that alleged advice.  *Id*. ¶ 60.  What's more important, auditor advice on how to account for a particular transaction is a far cry from the corporate decision to undertake the transaction.  MF Global does not, and cannot, allege that PwC ever gave it ***business*** advice to engage in a single RTM transaction, much less advised it in its risky "decision to invest heavily in European sovereign debt."  *Id*. ¶ 4.  But it was the Company's "huge positions in European sovereign debt [that] posed significant additional risks to MF Global," not the accounting treatment for those investments.  *Id*.

The Complaint attributes these growing investments to MF Global's need by 2010 "to generate new sources of current revenue and to increase profits."  *Id*. ¶ 40.  In the summer of 2010, "weakening financial performance" caused MF Global management "to accelerate its efforts to turn around" the Company (*id*. ¶ 69), resulting in additional European RTM transactions (*id*. ¶ 70).  The Complaint highlights the Company's enormous build-up in European sovereign debt over time:  MF Global's European RTM position increased from EUR 150 million as of December 31, 2009 (*id*. ¶ 60) to EUR 2.4 billion as of December 31, 2010 (*id*. ¶ 83) to EUR 5.32 billion as of March 31, 2011 (*id*. ¶ 96).  This ***35-fold*** increase in MF Global's European RTMs in just fifteen months "created significant financial risks, including liquidity risks," for the Company (*id*. ¶ 114), the "result" of which was a "liquidity crisis" (*id*. ¶ 140).

Consistent with the Complaint allegations, the Chapter 11 Trustee concluded that MF Global's enormous investment in European debt stemmed, not from accounting, but from the "mission" of Corzine, its new CEO and Chairman, "to transform the Company into a full-service [broker/dealer] and investment bank."  Ex. E (Freeh Report) at 3.  Prior to his arrival, "the

Company's future was in doubt," as its traditional commodities and securities broker business "failed to be profitable."  *Id*.  Credit agencies were threatening to downgrade the Company unless it increased revenues and earnings.  *Id*.  After he arrived, "[t]he Company began, for the first time in its history, to engage in significant proprietary trading."  *Id*.  "Corzine initiated a new and aggressive trading strategy, investing heavily in European sovereign debt" financed through RTMs.  *Id*. at 4.  "The transactions were intended to capitalize on volatility and unrest in the European markets."  *Id*.  Corzine has acknowledged "that the Euro RTM positions were his 'personal responsibility' and 'a prime focus' of his attention."  *Id*. at 32.  He "was personally involved in the direction and execution of specific Euro RTMs," typically discussing the profit potential and state of the European markets with one of the Company's proprietary traders.  *Id*.  "On a daily basis, [he] received information from the MFG UK fixed income traders on opportunities in the European bond market."  *Id*.

None of this can be laid at PwC's doorstep.  MF Global's outsize exposure to European RTMs was not "a direct or reasonably foreseeable result" of PwC's alleged accounting advice (*Bloor*, 754 F.2d at 63), but a result of the Company's own considered business strategy "that it had a potential to generate significant immediate revenues if it invested in Euro RTMs" (Complaint ¶ 35).  Nor were the dire consequences to the Company of its enormous investment reasonably foreseeable to PwC in early 2010.  The Complaint explains how MF Global's huge and ever-growing level of European sovereign debt created significant liquidity issues.  "Each new RTM position required MFGUK to post initial margin when it entered into the Euro RTMs on the LCH [London Clearing House], which tied up liquidity for the duration of the investment and introduced the possibility of future margin calls."  Complaint ¶ 115.  Commencing in November 2010, the margin requirements for Ireland and Portugal bonds grew rapidly; the LCH

raised the initial margin requirement for Irish bonds three times, from 7% to 45%.  *Id*.  Again
"[i]n 2011, margin requirements for European debt increased dramatically[,] … greatly
reduc[ing] MF Global Holdings' liquidity."  *Id*. ¶ 138.  The Company's total funding
requirement for the European RTM portfolio increased by almost half a billion dollars in just
five months from March through July 2011.  *Id*.

"In May 2011, FINRA was aware of MF Global Holdings' large European sovereign debt
exposure and . . . learned that the Company, through its subsidiary MFGI, was not reserving any
capital for these positions."  Complaint ¶ 116.  As a result, "[i]n August 2011, FINRA, with the
support of the SEC, required MFGI to recognize a $255 million capital charge on the Euro
RTMs."  *Id*. ¶ 118.  FINRA and the SEC also required MFGI to apply the new capital charge
retroactively to July 2011, with the result that MFGI became undercapitalized by $150.6 million
as of July 31, 2011, which caused MF Global to file (on September 1, 2011) an amended Form
10-Q for the quarter ended June 30, 2011.  *Id*. ¶ 120.  "The negative impact of MF Global
Holdings' filing of an amended 10-Q was significant.  It created bad press, undermined investor
confidence and that of the ratings agencies, and created a higher level of scrutiny and mistrust of
MF Global Holdings on the part of its regulators."  *Id*. ¶ 121.

On October 25, 2011, MF Global issued a press release announcing a loss in the quarter
ending September 30, 2011 of $191.6 million, over half of which was attributed to a valuation
allowance (a non-cash expense) the Company took in the quarter related to its deferred tax
assets.  Complaint ¶ 135.  A deferred tax asset ("DTA") is a loss, credit or other tax deduction
that may be used to offset taxable income in future years.  *Id*. ¶ 122.  GAAP requires a company
to book a valuation allowance when it becomes clear that the company "is not likely to use some
or all of its DTA in the future" (*id*.) — *i.e.*, when it concludes that taxable losses are more likely

than taxable gains in the future.  This telegraphing of likely future losses "occurred at approximately the same time that MF Global Holdings had to disclose the large capital charge imposed by FINRA and to amend its June 30, 2011 10-Q."  *Id.* ¶ 136.  The confluence of these events — none of which was proximately caused by PwC's alleged RTM accounting advice eighteen months earlier — resulted in "major hits to [MF Global Holdings'] liquidity, capital, and financial position at a time and in a manner that exacerbated the negative effects on the Company in the marketplace when it could least afford it."  *Id.*[5]

During the last week of its operations, additional bad things happened.  The Company's credit rating was downgraded several times, and MF Global suffered greater and greater liquidity pressures.  Complaint ¶¶ 138-43.  The LCH imposed higher and higher margin requirements, and when the Company could not meet them, the LCH closed out its positions at a loss of hundreds of millions of dollars.  *Id.*  In a desperate attempt to raise cash, MF Global sold a substantial portion of its portfolio at distressed prices (*id.* ¶ 142), resulting in additional losses.[6]  Bankruptcy soon followed.

MF Global cannot plausibly allege that its enterprise-value losses were a direct and reasonably foreseeable result of PwC's alleged advice on how to record RTM investments under

---

[5] While the Complaint focuses on PwC's alleged RTM accounting advice, it tacks on conclusory allegations that PwC was negligent in failing to advise MF Global about its net capital requirements (Complaint ¶ 119) and in signing off on financial statements that did not include a DTA valuation allowance despite cumulative losses in prior years (*id.* ¶¶ 126-28).  But these allegations lack "sufficient factual matter" and are not "plausible on [their] face."  *Iqbal*, 556 U.S. at 678.  Regarding net capital, the Complaint cites to an audit guide and alleges that an auditor must "review the broker-dealer's procedures and controls."  Complaint ¶ 113.  But no factual connection is alleged between PwC's year-end audit work and the FINRA net-capital charge (which occurred at an interim month-end).  As for DTA, the Complaint concedes that, under GAAP, a valuation allowance is not required if management concludes countervailing positive evidence overcomes cumulative prior losses.  *Id.* ¶¶ 124-25.

[6] The Complaint omits the most publicized event in MF Global's demise:  management's failure to segregate and protect commodity customer assets.  The Chapter 11 Trustee found that by October 29, 2011, a deficit of almost $1 billion in customer funds was identified at MFGI.  Ex. E (Freeh Report) at 69.  At the time, the Company was negotiating a potential sale of itself to Interactive Brokers, LLC, which would have allowed the Company to survive.  *Id.* at 71; House Report at 67.  The disclosure of the large deficiency in customer funds caused the potential sale of the Company to collapse.  Freeh Report at 71.

GAAP.  *See Bloor*, 754 F.2d at 62.  MF Global does not, and cannot, allege that sales-accounting

treatment was ever determined to be incorrect, much less that such determination had adverse

financial, regulatory or other consequences for the Company.  Instead, the only plausible reading

of the Complaint is consistent with the conclusion of MF Global's Chapter 11 Trustee, that "[a]s

a direct and proximate result of the strategy employed by Corzine and MF Global management,

MF Global suffered substantial losses, collapsed as an organization, and was forced to file for

liquidation, administration or bankruptcy around the world."  Ex. E (Freeh Report), Appendix E;

*id*. at 118 ("actions and failures of key members of MF Global's management, in particular the

former Chairman and CEO Corzine, the former COO Abelow, and the former CFO Steenkamp

contributed to the losses . . . between $1.5 and $2.1 billion").  MF Global's Complaint against

PwC fails for lack of plausible proximate cause.

## IV.   PORTIONS OF THE COMPLAINT SHOULD BE DISMISSED FOR OTHER REASONS.

### A.   The Contract Claim Should be Dismissed as Duplicative of Malpractice.

As a general rule, a contract claim alleging breach of an express agreement to provide

services in accordance with professional standards is duplicative of a malpractice claim and

should be dismissed.  Only where the defendant promised a particular result, and thus assumed

an obligation separate and apart from compliance with the applicable standard of care, is a

plaintiff permitted to maintain a contract claim in addition to a tort claim.  *See Diamond v. Sokol*,

468 F. Supp. 2d 626, 640-41 (S.D.N.Y. 2006) (dismissing breach of contract claim as duplicative

of malpractice claim because it "does not rest upon a promise of a particular or assured result,

but rather upon defendant's alleged breach of professional standards") (internal quotation marks

omitted); *Am. Tissue, Inc. v. Arthur Andersen, L.L.P.*, 275 F. Supp. 2d 398, 405 n.7 (S.D.N.Y.

2003) (malpractice, breach of contract and breach of fiduciary duty "boil down to one claim for

the provision of deficient accounting services"); *IMO Indus. Inc. v. Anderson Kill & Olick, P.C.*, 699 N.Y.S.2d 43, 44 (1st Dep't 1999) (breach of contract claim "did not rest upon a promise of a particular or assured result, and only claimed a breach of general professional standards, which is viewed as a redundant pleading of a malpractice claim") (internal quotation marks omitted); *Senise v. Mackasek*, 642 N.Y.S.2d 241, 242 (1st Dep't 1996) (same).

The engagement contract between PwC and MF Global for fiscal year 2011 reiterates PwC's independent obligation to comply with professional standards — an obligation that would apply even absent an express agreement.  Complaint ¶ 18; Ex. A (FY 2011 engagement contract) at 1 ("We will be responsible for performing the audit in accordance with the standards established by the [Public Company Accounting Oversight Board].").  MF Global asserts a breach of contract based upon PwC's alleged failure to comply with these standards.  Complaint ¶¶ 158, 159 (alleging PwC breached the contract by failing to audit the Company's financial statements in accordance with Generally Accepted Auditing Standards, or "GAAS," so as to render an opinion on whether the financial statements conformed with GAAP).  The Complaint does not allege that PwC's engagement contract set forth other particular promises.  Plaintiff's breach of contract claim (Second Claim for Relief, Complaint ¶¶ 155-60) is limited to PwC's alleged failure to adhere to professional standards, and should therefore be dismissed as duplicative of the professional malpractice claim.[7]

---

[7] As the Court has previously noted, under certain circumstances a breach of contract claim is not duplicative of a tort claim.  *PricewaterhouseCoopers LLP v. Giddens* (*In re MF Global Inc.*), 496 B.R. 315, 322-23 (S.D.N.Y. 2013) (citing *Bullmore v. Banc of Am. Sec. LLC*, 485 F. Supp. 2d 464, 469-70 (S.D.N.Y. 2007) and *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 551-52 (1992)).  Here, it is duplicative, because the sole basis for MF Global's breach of contract claim is PwC's alleged failure to comply with professional standards.

B. **Malpractice and Breach of Contract Claims With Respect to Periods Prior to the FY 2011 Year-End Audit are Time-Barred.**

A three-year statute of limitations applies to "an action to recover damages for malpractice . . . regardless of whether the underlying theory is based in contract or tort." N.Y. C.P.L.R. § 214(6); *see In re R.M. Kliment & Frances Halsband, Architects*, 3 N.Y.3d 538, 541-43 (2004) (styling claim as breach of express contractual agreement to comply with professional standards "does not remove the issue from the realm of negligence" for statute of limitations purposes); *Harris v. Kahn, Hoffman, Nonenmacher, & Hochman, LLP*, 871 N.Y.S.2d 919, 919 (2d Dep't 2009) (three-year statute of limitations bars breach of contract claim because it "arise[s] out of the accounting services provided by the defendant pursuant to a contract" and therefore "sound[s] in accounting malpractice"); *RGH Liquidating Trust v. Deloitte & Touche LLP*, 851 N.Y.S.2d 31, 33 (1st Dep't 2008) (breach of contract claim against accounting firm is "in essence a claim of professional malpractice," and thus time-barred under the three-year statute of limitations).

The three-year limitations period under C.P.L.R. § 214(6) runs from the date the audit opinion was issued (or advice was given), not from the date the client discovered the alleged negligence. *See Williamson v. PricewaterhouseCoopers LLP*, 9 N.Y.3d 1, 7-8 (2007) (accounting malpractice claims "accrued on the date the Funds received defendant's audit opinions"); *Ackerman v. Price Waterhouse*, 84 N.Y.2d 535, 541 (1994) (accounting malpractice claim accrues "upon the client's receipt of the accountant's work product"); *Apple Bank for Sav. v. PricewaterhouseCoopers LLP*, 895 N.Y.S.2d 361, 362 (1st Dep't 2010) (same).

The Complaint here was filed on March 28, 2014. To the extent the claims are based on alleged opinions or advice provided by PwC prior to March 29, 2011, they are time-barred and should be dismissed. This includes the allegations based on quarterly financial reports that the

22

Company filed for quarters ended June 30, 2010, September 30, 2010 and December 31, 2010

(Complaint ¶ 151), the last of which was filed February 3, 2011.

### C.   MF Global Cannot State a Claim for Unjust Enrichment.

The business relationship between MF Global and PwC is governed by a valid and

enforceable written contract.  Accordingly, MF Global cannot assert an equitable claim for

unjust enrichment.  "The existence of a valid and enforceable written contract governing a

particular subject matter ordinarily precludes recovery in quasi contract for events arising out of

the same subject matter." *Sapirstein-Stone-Weiss Found. v. Merkin*, 950 F. Supp. 2d 621, 629

(S.D.N.Y. 2013) (Marrero, J.) (dismissing unjust enrichment claim because there was no dispute

that valid contracts governed the relationship between the parties); *accord Superintendent of Ins.*

*for N.Y. v. Ochs (In re First Cent. Fin. Corp.)*, 377 F.3d 209, 213 (2d Cir. 2004) ("[T]he

existence of a written agreement precludes a finding of unjust enrichment . . . ."); *Clark-*

*Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (1987) ("A 'quasi-contract' only

applies in the absence of an express agreement . . . .").  "Where a plaintiff brings claims for both

breach of contract and unjust enrichment but fails to allege any duty owed to her outside that

specified in the contract, her claim for unjust enrichment should be dismissed as duplicative."

*Carvel v. Ross*, No. 09-cv-0722, 2011 U.S. Dist. LEXIS 25203, at *71 (S.D.N.Y. Feb. 16, 2011),

*adopted*, No. 09-cv-0722, 2011 U.S. Dist. LEXIS 25170 (S.D.N.Y. Mar. 11, 2011).  Even if a

plaintiff's breach of contract claim is dismissed, that plaintiff cannot recover under an unjust

enrichment claim if a valid and enforceable agreement exists.  *E.g., Diesel Props S.R.L. v.*

*Greystone Bus. Credit II LLC*, 631 F.3d 42, 54 (2d Cir. 2011) (affirming dismissal of plaintiffs'

breach of contract and unjust enrichment claims noting that plaintiffs could not recover under

unjust enrichment because of the written agreements between the parties); *Beth Isr. Med. Ctr. v.*

*Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 581, 587-88 (2d Cir. 2006)

(dismissing claim of breach of written contracts as untimely and dismissing unjust enrichment claims "as precluded under New York law . . . because we have found valid, enforceable contracts"); *Goldman v. Metro. Life Ins. Co.*, 5 N.Y.3d 561, 571-72 (2005) (affirming dismissal of breach of contract and unjust enrichment claims and noting that given "the disputed terms and conditions fall entirely within the insurance contract, there is no valid claim for unjust enrichment").

## **CONCLUSION**

For the foregoing reasons, the Complaint of MF Global, as Plan Administrator, against PwC should be dismissed with prejudice.

Dated: New York, New York
       May 23, 2014

Respectfully submitted,

KING & SPALDING LLP


By: */s/ James J. Capra, Jr.*
    James J. Capra, Jr.
    James P. Cusick
    David M. Fine
    1185 Avenue of the Americas
    New York, NY 10036
    Telephone: (212) 556-2100
    Facsimile: (212) 556-2222

    *Attorneys for Defendant*
    *PricewaterhouseCoopers LLP*