**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MF GLOBAL HOLDINGS LTD., AS PLAN ADMINISTRATOR, | ) ) ) |
| Plaintiff, | ) Civil Action No. 14-cv-2197 (VM) ) |
| -against- | ) **ORAL ARGUMENT REQUESTED** ) |
| PRICEWATERHOUSECOOPERS LLP, | ) ) |
| Defendant. | ) ) |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS ON NON-*IN PARI DELICTO* GROUNDS

KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
Daniel J. Fetterman
Michael C. Harwood
David J. Mark
1633 Broadway
New York, New York 10019
Tel:  (212) 506-1700

*Attorneys for Plaintiff*

Dated: New York, New York
August 5, 2014

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ........................................................................................ ii

BACKGROUND ........................................................................................................ 1

ARGUMENT .............................................................................................................. 3

    I.     The Plan Administrator Is The Proper Plaintiff. .......................................... 3

    II.    The Complaint Plausibly Alleges That PwC's Malpractice Was A
              Proximate Cause Of MF Global Holdings' Bankruptcy. ............................. 6

    III.   Plaintiff's Claims Are Timely. ..................................................................... 14

    IV.   It Would Be Premature To Dismiss The Contract Claim. .............................. 17

    V.    The Unjust Enrichment Claim Should Not Be Dismissed. ........................... 18

CONCLUSION .......................................................................................................... 19

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abu Dhabi Comm'l Bank v. Morgan Stanley & Co. Inc.*,
    888 F. Supp. 2d 478 (S.D.N.Y. 2012)..........................................................................6

*Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*,
    106 F.3d 11 (2d Cir. 1997)..........................................................................................6

*AHW Inv. P'ship v. Citigroup Inc.*,
    980 F. Supp. 2d 510 (S.D.N.Y. 2013)........................................................................12

*Anwar v. Fairfield Greenwich Ltd.*,
    728 F. Supp. 2d 372 (S.D.N.Y. 2010)........................................................................16

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass*,
    754 F.2d 57 (2d Cir. 1985)........................................................................................13

*Common Fund for Non-Profit Orgs. v. KPMG Peat Marwick LLP*,
    No. 96 CIV. 0255 (MGC), 2000 WL 124819 (S.D.N.Y. Feb. 2, 2000) ........................... 17-18

*FDIC v. PwC LLC*,
    No. 2:12-CV-957 (M.D. Ala. July 3, 2014)..............................................................10

*In re Gouiran Holdings, Inc.*,
    165 B.R. 104 (E.D.N.Y. 1994) ................................................................................10

*Healthcare Fin. Grp., Inc. v. Bank Leumi USA*,
    669 F. Supp. 2d 344 (S.D.N.Y. 2009)........................................................................12

*Herbert H. Post & Co. v. Sidney Bitterman, Inc.*,
    219 A.D.2d 214 (1st Dep't 1996) ............................................................................10

*Hildene Capital Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc.*,
    No. 11 CIV. 5832 (AJN), 2012 WL 3542196 (S.D.N.Y. Aug. 15, 2012) ..............................19

*Hous. Works, Inc. v. Turner*,
    179 F. Supp. 2d 177 (S.D.N.Y. 2011)............................................................... 12-13

*Hydro Investors, Inc. v. Trafalgar Power, Inc.*,
    227 F.3d 8 (2d Cir. 2000)..........................................................................................11

*Kolbeck v. LIT Am., Inc.*,
    939 F. Supp. 240 (S.D.N.Y. 1996) ............................................................................12

*Lerner v. Fleet Bank, N.A.*,
    318 F.3d 113 (2d Cir. 2003)................................................................12

*In re Magnesium Corp. of Am.*,
    399 B.R. 722 (Bankr. S.D.N.Y. 2009) ........................................... 16-17

*MCI Worldcom Commc'ns, Inc. v. LD Wholesale Inc.*,
    No. 01 CIV. 6310 (RO), 2002 WL 1483886 (S.D.N.Y. July 9, 2002) .............................18, 19

*MF Global Holdings Ltd. v. PricewaterhouseCoopers LLP*,
    No. 14-CV-2197 (VM), 2014 WL 3402602 (S.D.N.Y. July 9, 2014)............. 1, 2, 7, 11-12, 13

*In re MF Global Inc.*,
    496 B.R. 315 (S.D.N.Y. 2013)...............................................................18

*O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)*,
    714 F.3d 118 (2d Cir. 2013).................................................................12

*In re Parmalat Sec. Litig.*,
    501 F. Supp. 2d 560 (S.D.N.Y. 2007).....................................................13

*Reidy v. Martin*,
    909 N.Y.S.2d 761 (2d Dep't 2010).........................................................18

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013)...................................................................12

*Sarasota, Inc. v. Kurzman & Eisenberg, LLP*,
    814 N.Y.S.2d 94 (1st Dep't 2006) .........................................................18

*Seiden Assocs., Inc. v. ANC Holdings, Inc.*,
    754 F. Supp. 37, 40 (S.D.N.Y. 1991)......................................................18

*Shumsky v. Eisenstein*,
    96 N.Y.2d 164 (2001) ........................................................................14

*Singer v. Xipto Inc.*,
    852 F. Supp. 2d 416 (S.D.N.Y. 2012)......................................................19

*Symbol Techs., Inc. v. Deloitte & Touche, LLP*,
    888 N.Y.S.2d 538 (2d Dep't 2009).........................................................16

*Tayebi v. KPMG LLP*,
    No. 105471 CIV. 07 (BJF), 2008 WL 518149 (N.Y. Sup. Ct. Feb. 20, 2008) .......................17

*Thabault v. Chait*,
    541 F.3d 512 (3d Cir. 2008)............................................................10, 11

iii

*Vtech Holdings Ltd. v. PwC LLP*,
    348 F. Supp. 2d 255 (S.D.N.Y. 2004) ........................................................................10

*Williamson v. PwC LLP*,
    9 N.Y.3d 1 (2007) ........................................................................14, 15, 16

**Other Authorities**

Fed. R. Civ. P. 8 ........................................................................18

Fed. R. Civ. P. 17 ........................................................................6

# BACKGROUND[1]

PwC's erroneous advice to MF Global Holdings Ltd. ("Holdings" or the "Company") that it could -- indeed should -- account for its investments in European sovereign debt through "repurchase-to-maturity" financing transactions, or "Euro RTM" transactions, as sales constituted professional malpractice and was a substantial factor in Holdings' financial collapse and bankruptcy. When it rendered its advice, PwC was aware that Holdings' decision to engage in the Euro RTM transactions was dependent on PwC's professional opinion concerning the accounting treatment. PwC was also aware that Holdings relied on that erroneous accounting advice in implementing its investment strategy, and PwC reiterated its approval repeatedly during their professional relationship as the Company continued to invest in these instruments.

As this Court observed in the IPD Decision, Holdings' Euro RTM investment strategy backfired when its exposure to European sovereign debt placed great stress on the Company's finances and liquidity requirements. IPD Decision at 4. Holdings' precarious financial condition was compounded by PwC's faulty accounting advice with respect to Holdings' capital reserve requirements and its Deferred Tax Assets ("DTA"). In October 2011, Holdings declared a quarterly loss for the period ending September 30, 2011 of $191.6 million, over half of which was attributable to a belated correction in the accounting treatment for the Company's DTA. *See id*. at 4-5. As the IPD Decision concludes: "[i]n late October of 2011, the financial pressure from the RTM Strategy and the DTA valuation allowance drove MF Global into bankruptcy." *Id*. at 5. PwC's negligence was a substantial factor in that collapse, as the allegations of the Complaint more than sufficiently allege.

---

[1]    By Decision and Order filed July 9, 2014 [Docket No. 18] (the "IPD Decision"), the Court denied PwC's motion to dismiss based on *in pari delicto* and ordered the parties to brief the other grounds asserted in PwC's Memorandum of Law in Support of its Motion to Dismiss [Docket No. 13] ("PwC Mem."). *MF Global Holdings Ltd. v. PricewaterhouseCoopers LLP*, No. 14-CV-2197 (VM), 2014 WL 3402602, at *5 (S.D.N.Y. July 9, 2014). This Memorandum addresses the grounds for dismissal asserted in Points I, III and IV in the PwC Mem.

The Plan Administrator has standing to pursue these claims against PwC.  Holdings' Plan of Liquidation assigned all of Holdings' potential claims to the Plan Administrator, except those that were already asserted by the Litigation Trustee against certain corporate officers or were described in the Chapter 11 Trustee's report against the Company's management.  PwC's overbroad reading of the exception to include these claims against it would effectively eviscerate the Plan's clear intent to assign nearly all remaining causes of action to the Plan Administrator.

PwC's contention that its erroneous advice had nothing whatsoever to do with Holdings' investments in the Euro RTM transactions ignores the well-pled allegations of the Complaint, which must be accepted as true for purposes of this motion.  The Complaint alleges a direct connection between PwC's frequently reaffirmed, but faulty, accounting advice regarding the Euro RTM transactions and the harm that resulted from Holdings' decision to continue to engage in those transactions and amass a huge portfolio of European sovereign debt.  As the Court stated in the IPD Decision: "it is . . . plausible that PwC's improper accounting advice about the RTM Strategy and the DTA valuation allowance could have played a proximate role in driving the company into bankruptcy and thus causing damages."  IPD Decision at 11.  The Complaint clearly supports this conclusion.  If PwC believes the facts show otherwise, it can try to prove so at trial.  But there is no basis to dismiss this case outright based on the allegations of the Complaint.

Nor are the claims barred by the statute of limitations.  PwC acknowledges that claims based on its audit for the 2011 fiscal year (covering April 1, 2010 through March 31, 2011) are timely as that audit was completed within three years of the filing of the Complaint.  All claims based on PwC's malpractice in connection with its work throughout the 2011 fiscal year audit are also timely because they accrued upon completion of its audit work in May 2011 at the

earliest.  Similarly, although PwC provided its audit report in May 2010 for the fiscal year

ending March 31, 2010, the Complaint alleges that PwC continued to provide services in relation

to that audit as late as June 2011, when PwC assisted Holdings in responding to SEC inquiries

about the accounting for its Euro RTMs in that earlier fiscal year.  Thus, Holdings' claims

relating to the 2010 fiscal year accrued no earlier than June 2011 and were timely commenced in

March 2014.

Holdings' breach of contract and unjust enrichment claims are not duplicative of its

malpractice claims.  Until it has been determined after discovery whether all of the services PwC

performed were performed pursuant to its engagement letters with Holdings, it would be

premature to dismiss those alternative claims.

## ARGUMENT

## I.     THE PLAN ADMINISTRATOR IS THE PROPER PLAINTIFF.

The Plaintiff is MF Global Holdings Ltd., in its capacity as Plan Administrator under the

Second Amended and Restated Joint Plan of Liquidation of MF Global Holdings and its

affiliated Chapter 11 Debtors (the "Plan").[2]  Compl. ¶11.  The Plan provides that "the Plan

Administrator, on behalf of each Debtor, shall have and retain and may enforce any claims,

demands, rights and Causes of Action that any Debtor or Estate may hold against any Person or

Entity..., provided, however, that the Litigation Trustee shall have the exclusive authority to

pursue the Litigation Trust Claims...."  Plan at 37.  "Litigation Trust Claims" means (Plan at 11):

> the claims set forth in the complaint entitled "*Louis J. Freeh, as Chapter 11 Trustee
> of MF Global Holdings Ltd., et al. v. Jon S. Corzine, et al.*", Adversary Proceeding
> Number 13-01333 (Bankr. S.D.N.Y.), as it may be subsequently modified,
> amended, or supplemented, and any claims arising out of or related to the facts or

---

[2]     A copy of the only Plan the bankruptcy court approved is Exhibit D to the Declaration of David M. Fine dated
May 23, 2014 ("Fine Dec.") [Docket No. 14].  Contrary to PwC's assertion (PwC Mem. at 5-6), this language was
not added in a subsequent modification to the Plan.  *See* Order Confirming Amended and Restated Joint Plan of
Liquidation, *In re MF Global Holdings Ltd., et al.*, No. 11-15059 (Bankr. S.D.N.Y. Apr. 5, 2013) [Docket No.
1288].

circumstances alleged in the complaint or set forth in the Report of Louis J. Freeh, as Chapter 11 Trustee of MF Global Holdings Ltd., et al., dated April 3, 2013. [Docket No. 1279][3]

PwC contends that this provision assigned to the Litigation Trust all claims that in any way concern "the events and circumstances that ultimately led to MF Global's bankruptcy filing." PwC Mem. at 6. This extremely broad reading of a limited exception is not consistent with the language and would eviscerate the general provision assigning claims to the Plan Administrator. The assignment to the Litigation Trust consists of three prongs: (a) the claims that are currently asserted in the Corzine Complaint; (b) claims "arising out of or related to the facts and circumstances alleged" in the Corzine Complaint; and (c) claims "arising out of or related to the facts and circumstances … set forth" in the Freeh Report. The first prong is inapplicable since the Corzine Complaint does not assert any claims against PwC.

Nor do the claims against PwC here "arise out of or relate to" the facts and circumstances alleged in the Corzine Complaint or set forth in the Freeh Report. The Corzine Complaint is directed at former management and does not allege any accounting issues or any specific wrongdoing by PwC. Therefore, claims against PwC cannot possibly fall within the second prong because the Corzine Complaint does not "allege" any claims against PwC. Similarly, claims against PwC do not fall within the third prong because the Freeh Report does not even mention PwC or analyze the specific circumstances of improper Euro RTM accounting. Rather, after an introduction and a lengthy section titled "Factual Background" (Freeh Report at 7-73), the remainder of the Freeh Report focuses on "Management's Role in the Company's Collapse" and potential wrongdoing by management with respect to the Euro RTMs, not any wrongdoing by PwC, which is detailed in the Complaint in this action. *Id*. at 74-117.

---

[3]    The First Amended Complaint against Corzine (which was filed after the Plan was confirmed) is Exhibit F to the Fine Dec. The Freeh Report is Exhibit E to the Fine Dec.

4

Nonetheless, PwC implausibly argues that because the Chapter 11 Trustee investigated and reported on the events that led to Holdings' bankruptcy and concluded that the Euro RTM Transactions "when combined with other factors" caused the Company's destruction, and because the Corzine Complaint challenges management's Euro RTM investment strategy, then everything that is referenced in either the Corzine Complaint or the Freeh Report is excluded from the broad grant of claims to the Plan Administrator.  PwC Mem. at 6-7.  But the language of the exception, in the context of this broad grant, means nothing more than that the potential claims against senior management that were investigated and actually analyzed in the Freeh Report are assigned to the Litigation Trustee.  This makes sense:  if Judge Freeh analyzed and reported on a potential claim relating to the Euro RTMs against a named entity, then the Litigation Trustee should assert the claims as an assignee pursuant to the Plan, but other potential claims against unnamed entities can be asserted by the Plan Administrator.  Judge Freeh's Report draws this very distinction and reflects the intent of the Plan provision regarding "Litigation Trust Claims."  The last sentence of the Report says that Judge Freeh's investigation led him to conclude that "the actions and failures of key members of MF Global's management … contributed to the losses suffered by Holdings Ltd. and FinCo…."  Freeh Report at 118.  But Judge Freeh still noted that "other factors" combined to cause the collapse as well, which are not detailed in the Report, including PwC, who is not even mentioned.  The claims arising out of these other factors that Judge Freeh did not discuss and the Corzine Complaint does not allege are not the province of the Litigation Trust.

The Plan carves out for the Litigation Trust those claims that are or could be asserted in the Corzine Complaint as well as other potential claims against Holdings' former management relating to the Company's collapse.  There is nothing in the Plan language that mandates that

claims which were not the focus of Judge Freeh's Report against parties that are never even mentioned in the Freeh Report must be brought by the Litigation Trustee. Nor would such an interpretation make sense. The Freeh Report is 119 pages long (without exhibits), and describes a broad range of events dating back to 2005. If all conceivable claims related to the events summarized in the Freeh Report, even those involving unnamed entities, would have to be asserted by the Litigation Trustee, it would effectively eliminate the Plan provisions that contemplate a general assignment of the Debtors' claims to the Plan Administrator, leaving the Plan Administrator with nothing to assert.[4]

## II.  THE COMPLAINT PLAUSIBLY ALLEGES THAT PWC'S MALPRACTICE WAS A PROXIMATE CAUSE OF MF GLOBAL HOLDINGS' BANKRUPTCY.

The Complaint easily satisfies the applicable pleading standards to overcome PwC's motion to dismiss. The Complaint alleges in considerable detail that but for PwC's negligent advice and audits, Holdings would not and could not have invested heavily in European sovereign debt *and* that PwC's advice regarding such investments was a substantial factor that led directly to the Company's downfall. *See, e.g.*, Compl. ¶¶3, 5, 57, 86, 137, 145. Holdings told PwC that it would not continue to engage in the Euro RTM transactions without assurances from PwC that it could treat them as sales in order to book revenues from those transactions immediately and remove that debt from its balance sheet. *Id.* ¶¶51-54, 56-57, 59, 67, 70-71, 83, 86, 88, 97. PwC's advice, under GAAP, was not merely that Holdings had the option of accounting for these Euro RTMs as sales, but that the structure of the Euro RTMs required

---

[4]    In any event, there is no practical difference whether the Plan Administrator or the Litigation Trustee is the plaintiff in this action since that would not affect how any proceeds would be distributed under the Plan. Moreover, if the Court were to determine that the Litigation Trustee were the proper plaintiff, the Litigation Trustee should be granted a reasonable amount of time to be substituted into the action, with the claims relating back to the commencement date, in accordance with Rule 17(a)(3) of the Federal Rules of Civil Procedure: "the court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest." *See, e.g.*, *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 19 (2d Cir. 1997); *Abu Dhabi Comm'l Bank v. Morgan Stanley & Co. Inc.*, 888 F. Supp. 2d 478, 489 (S.D.N.Y. 2012).

Holdings to account for them as sales.  *Id*. ¶¶69, 86.  The Complaint identifies numerous occasions in 2010 and 2011 when Holdings sought PwC's advice concerning the accounting treatment for Euro RTMs and asked PwC to confirm that advice as its European sovereign debt holdings increased from EUR 1.375 billion in September 2010 (*id*. ¶70), to EUR 2.4 billion in December 2010 (*id*. ¶83), EUR 5.32 billion in March 2011 (*id*. ¶96), and a high of approximately $9 billion in September 2011, partially offset by reverse RTMs of $2.7 billion (*id*. ¶109).  After receiving PwC's advice in January 2010, when Holdings had EUR 150 million in European sovereign debt (*id*. ¶¶59-60), the Company reconfirmed PwC's advice in November and December 2010, and January and May 2011 (*id*. ¶¶80, 87, 90, 104).  *See* IPD Decision at 9-10.  PwC reviewed each of the quarterly financials using this accounting treatment and raised no problems with the Company, its Board, or its Audit Committee.[5]

In its role as Holdings' long-time auditor, PwC was well aware of the buildup of Holdings' Euro RTM positions and that this buildup could not have occurred without PwC's advice and opinion that Holdings should utilize sales accounting to book revenues when it entered into the transactions and remove the sovereign debt from its balance sheet.  *Id*. ¶¶49, 51-57, 60, 70, 79-83, 87-90, 102-06.  Holdings needed to show improved financial statements to the rating agencies and this accounting treatment, if appropriate, provided Holdings with a basis for doing so.

PwC also was aware of the significant financial risks the Company faced due to the large Euro RTM positions.  *Id*. ¶¶4, 114-15, 138-39.  Among other things, these risks included the liquidity risks from the margin payments that Holdings had to post when it entered into each Euro RTM, and the additional margin calls it was required to meet to maintain its positions as the

---

[5]   PwC mischaracterizes the Complaint by suggesting that it is solely based on PwC's initial advice in January 2010.  PwC Mem. at 16-19.

price of the bonds fell and investors unloaded them.  *Id*. ¶¶114-15, 138-39.  The margin

requirements for the Euro RTMs increased dramatically in 2011.  From March through July

2011, the total funding requirement for the Euro RTM portfolio increased from $105 million to

$592 million.  Another contributing factor to the liquidity crunch was Holdings' need to obtain

funds to finance the repurchase of the Euro RTMs two days before the maturity dates of the

bonds.  *Id*. ¶¶138-39.  Not only did PwC negligently misconstrue the accounting treatment of the

Euro RTMs due to Holdings' obligation to repurchase the bonds and hold them during the two-

day gap, but it also ignored the significant financial impact of having to pay hundreds of millions

and in some cases billions of dollars to cover the two-day gap between the Euro RTM repurchase

date and the maturity date of the government bond when it would receive payment.  *Id*. ¶¶64, 68-

78, 81-82, 87, 101, 106.  When the foreseeable liquidity crisis occurred as a result of the

Company's large position in Euro RTMs, Holdings suffered massive damages.  The Euro RTMs

were closed out at a loss of hundreds of millions of dollars.

　　　　Yet another factor in Holdings' downfall was FINRA's and the SEC's determination in

August 2011 that MFGI was undercapitalized by $150.6 million as of July 31, 2011.  The

regulators' adverse determination was driven by Holdings' failure, facilitated and approved by

PwC, to factor in its huge Euro RTM portfolio when it calculated MFGI's capital reserve

requirements.  *Id*. ¶¶116-21.  PwC's review and audit of Holdings' financials included a review

of the necessary capital reserves.  *Id*. ¶¶6, 117, 136.  Without PwC's advice concerning the Euro

RTM accounting treatment, Holdings could not have built up a portfolio large enough, or been so

seriously under-reserved, to result in this liquidity crisis.  PwC's advice was a significant factor

in causing the liquidity crisis.

　　　　In addition, throughout this period, PwC agreed with Holdings' accounting treatment of

its approximately $170 million DTA at full value, without any valuation allowance to reflect the likelihood that Holdings would not have sufficient profits in the near future against which it could apply the DTA.  *Id*. ¶¶6, 127-28, 130-34.  PwC knew from its review of the financials, its knowledge and familiarity with Holdings' business, and its discussions with the Company and its finance department that Holdings was not likely to use the full DTA.  PwC's failure to provide correct accounting advice regarding the DTA led the Company to revise its DTA treatment belatedly, at a time when it caused the most harm.

On October 25, 2011, Holdings announced its results for the quarter ended September 30, 2011, posting a $191.6 million GAAP net loss, over half of which was caused by the belated DTA allowance.  *Id*. ¶135, 141.  The result of the announcement that exposed Holdings' heavy position in Euro RTMs, improper DTA treatment, and undercapitalization, all of which was attributable to PwC's erroneous advice, was an immediate drop in the Company's stock price followed by the bankruptcy filing less than a week later.  *Id*. ¶¶141-44.

If PwC had properly performed its professional services regarding the Euro RTMs, the DTA, and the capital reserve requirements, Holdings would not have been in such a precarious financial position on October 25, 2011, and would not have sustained the substantial damages it suffered.  *Id*. ¶136.  PwC had been Holdings' auditor since before the initial public offering in 2007, and it provided audit and accounting advice on a continuing basis.  PwC was familiar with Holdings' business operations and its dire financial condition.  *Id*. ¶¶16, 21.  It was reasonably foreseeable to PwC that the liquidity issues that were attendant to the huge build-up of the Euro RTM exposure, combined with Holdings' weak financial condition, would cause the Company's collapse and the resulting damages.

On these facts, Plaintiff has stated a plausible claim for relief against PwC.  The leading

9

New York case addressing proximate causation in an accounting malpractice case is *Herbert H. Post & Co. v. Sidney Bitterman, Inc.*, 219 A.D.2d 214 (1st Dep't 1996).  There, the court rejected the auditor's argument that the case should be dismissed because plaintiff's business failed due to bad management, not accounting errors:

> Post offered substantial documentary evidence and testimony at trial demonstrating that the companies failed as a result of Leonard Bitterman's own mismanagement and the companies' continuing operating losses during the years in question, losses which far exceeded the amount attributable to the defalcation and which resulted in the companies' inability to generate sufficient profit to pay off their loan obligations with MHT or to find a replacement lender.  **Nevertheless, there is an issue discernible as to whether it was reasonably foreseeable and a natural result of the risk created by Post's failure to detect Hecker's embezzlement that, notwithstanding these other factors, the companies would be so financially weakened by the embezzlement that they could not withstand normal business vicissitudes and would be forced to liquidate**.

219 A.D.2d at 224-25 (citation omitted) (emphasis added).  Here, the alleged causal connection between PwC's negligence and Holdings' collapse is stronger because the sales accounting treatment that PwC approved was central to Holdings' ability to amass the huge Euro RTM position.  The allegations of the Complaint make it clear that it was "reasonably foreseeable and a natural result of the risk created" by PwC's malpractice that Holdings would continue to invest in the Euro RTMs at such levels that it would suffer a liquidity crisis and fail, notwithstanding PwC's contention that the company's failure was due primarily to the "risky business decisions by Corzine and his management team to transact increasingly huge dollar amounts of European RTMs."  PwC Mem. at 14.[6]  This is enough to overcome a motion to dismiss.

    *Thabault v. Chait*, 541 F.3d 512, 520-23 (3d Cir. 2008), also is instructive.  The Third Circuit affirmed a jury verdict that awarded plaintiff over $182 million in damages against PwC

---

[6]    This Court has relied on *Post*.  *See Vtech Holdings Ltd. v. PwC LLP*, 348 F. Supp. 2d 255, 262-66 (S.D.N.Y. 2004); *see also In re Gouiran Holdings, Inc.*, 165 B.R. 104, 108 (E.D.N.Y. 1994) (whether management's decision to take on unmanageable debt or an insider's embezzlement were intervening acts that preclude recovery "is a factual inquiry related to the extent of the embezzlement and the amount of debt taken on due to the allegedly negligent financial statements.")  *Gouiran* was recently followed in *FDIC v. PwC LLC*, No. 2:12-CV-957 (M.D. Ala. July 3, 2014), where the Court denied a motion to dismiss a malpractice claim on proximate cause grounds.

in a malpractice case arising out of the failure of a Vermont insurance company. PwC argued

that the trial court should have instructed the jury on superseding causes because the company's

management engaged in "egregious" conduct, which included underwriting the risky insurance

that was the direct cause of the losses. The Third Circuit disagreed:

> The District Court found that PwC failed to provide evidence that intervening events
> were "sufficiently extraordinary or so clearly unrelated to the antecedent negligence
> that imposition of liability would be unreasonable." We agree. However egregious
> Chait's conduct may have been, we cannot conclude on the record before us that the
> evidence presented at trial indicates that his conduct was so unrelated to PwC's
> negligent conduct that it would have extinguished PwC's liability.

541 F.3d at 526 (citation omitted). The decision was based on New Jersey law, which provided

that where multiple factors contribute to an injury, a defendant is not liable only if his conduct

was "too remotely or insignificantly related" to the injury. *Id.* at 523. New York law is

substantially similar. *See, e.g.*, *Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 15

(2d Cir. 2000) ("A proximate cause determination does not require a jury to identify the liable

party as the sole cause of harm; it only asks that the identified cause be a substantial factor in

bringing about the injury.").

The primary fallacy of PwC's proximate cause argument is its unstated assumption that

there can be only one proximate cause of an injury. The Freeh Report's conclusion that

Holdings' bankruptcy was "a direct and proximate result of the strategy employed by Corzine

and MF Global management" (quoted in PwC Mem. at 20) is completely consistent with the

Complaint's allegation that PwC's negligence, which was necessary to Holdings' management's

ability to engage in that strategy, was also a "substantial cause" of Holdings' damages. Indeed,

this Court has already observed that there can be multiple proximate causes of an injury. *See*

IPD Decision at 14-15 (citing *Hydro Investors* and commenting that Plaintiff "cannot collect for

damages attributable solely to MF Global's business strategy, rather than to PwC's allegedly

erroneous advice").

The cases PwC cites are fully consistent with Plaintiff's analysis and apply the same proximate cause test. PwC's leading case, *Rothstein v. UBS AG*, 708 F.3d 82, 91, 97 (2d Cir. 2013), applied the "substantial factor" test to a case brought under the federal Anti-Terrorism Act. The Second Circuit held that the defendant bank was not liable for terrorist attacks by Iranian-sponsored organizations merely because the complaint alleged that the bank facilitated fund transfers to Iran:

> We see no nonconclusory allegation in the Complaint that plausibly shows that the moneys UBS transferred to Iran were in fact sent to Hizbollah or Hamas or that Iran would have been unable to fund the attacks by Hizbollah and Hamas without the cash provided by UBS.

*Id*. at 97. Here, in contrast, the Complaint contains detailed allegations that PwC's negligent sales accounting advice was necessary to Holdings' ability and decision to amass its huge Euro RTM portfolio. PwC's other cases (PwC Mem. at 14-15) are also straightforward applications of the substantial factor test to very different facts than those alleged in the Complaint.[7]

---

[7]  *O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)*, 714 F.3d 118 (2d Cir. 2013), concerned factual allegations very similar to those addressed in *Rothstein, supra*.

   In *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123-24 (2d Cir. 2003), plaintiffs asserted a RICO claim against a bank for failing to report an attorney's unauthorized withdrawals from his escrow account to the New York disciplinary committee, which, plaintiffs asserted, would have prevented the subsequent withdrawals that injured plaintiffs. The Second Circuit rejected this argument since it relied on the independent action of a third party whose reaction if the violation had been reported was necessarily speculative. Here, the Complaint alleges the damages flowed directly from PwC's conduct. The Complaint does not require one to speculate about what a third party would have done under hypothetical circumstances. *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 249 (S.D.N.Y. 1996), is similar to *Lerner*. The court rejected an aiding and abetting claim against a broker arising out of the defendant's failure to investigate whether its customer was registered with the CFTC. Whether such an investigation would have prevented the losses suffered by the plaintiffs who invested with the customer was necessarily speculative, so proximate cause was lacking.

   *AHW Inv. P'ship v. Citigroup Inc.*, 980 F. Supp. 2d 510, 526-27 (S.D.N.Y. 2013), dismissed a claim that plaintiff would have sold defendant's stock but for defendant's misleading statements on the ground that whether and when plaintiff would have sold the stock involved many "layers of uncertainty" and was inherently speculative. There is no comparable problem here given the allegations of the Complaint.

   *Healthcare Fin. Grp., Inc. v. Bank Leumi USA*, 669 F. Supp. 2d 344, 349 (S.D.N.Y. 2009), concerned the requirements of pleading loss causation in a Rule 10b-5 claim. The court held that plaintiff's damages were not caused by the disclosure of the information that the defendant allegedly misrepresented. That rule is inapplicable here since no fraud claims are alleged.

   *Housing Works, Inc. v. Turner*, 179 F. Supp. 2d 177, 204-05 (S.D.N.Y. 2011), held that a civil rights complaint

The weakness of PwC's argument is aptly demonstrated by its reliance on Judge Kaplan's decision in *In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560 (S.D.N.Y. 2007), the only accounting malpractice case PwC cites.  The Court dismissed a claim against Deloitte based on its audit of a U.S. subsidiary of Parmalat on the ground that it was not foreseeable to Deloitte that insiders of the Italian parent of the U.S. subsidiary would loot the company.  *See id.* at 591.  As this Court explained in its IPD Decision, the facts here do not involve a situation where Plaintiff's losses were caused by the subsequent illegal conduct of insiders:  "[T]he claims that the Plan Administrator has brought in this action would exist even if MF Global's demise had left customer funds untouched."  IPD Decision at 11.[8]

The foreseeable liquidity crisis that resulted from PwC's erroneous advice regarding the Euro RTMs, the DTA, and the regulatory reserve was already in full swing when Holdings' management went searching for funds that might be available internally to cover the day-to-day demands that were growing exponentially.  If PwC believes that the customer account issue reduces its share of the liability for the Company's collapse, it can argue it should have an opportunity to present evidence to support its argument at trial.  But that is not a basis to dismiss this well-stated claim (which this Court already has indicated is plausible).

---

against New York City did not state a claim against a deputy commissioner who did not directly participate in the City's challenged decision.  That decision has no application here.

[8]   Moreover, Judge Kaplan distinguished an earlier decision in which he upheld a similar claim brought on behalf of Parmalat's Italian parent itself on the ground that its claim was foreseeable.  *In re Parmalat Sec. Litig*, 501 F. Supp. 2d at 580 ("It is reasonably foreseeable that misrepresenting a company's financial condition, and thus hiding from its innocent managers that the company is being driven into the ground, will cause the company harm.").  Judge Kaplan relied in part on *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62-63 (2d Cir. 1985), also cited by PwC.  *Bloor* held that there was an insufficient causal relationship between an alleged violation of the securities laws in connection with the bankrupt company's public offering and the harm it suffered from the subsequent looting of the offering proceeds by members of management.  The allegations in the *Bloor* and *Parmalat* decisions rely on subsequent illegal conduct by management as an intervening cause, which are a far cry from the facts alleged in the Complaint here.

III.     **PLAINTIFF'S CLAIMS ARE TIMELY.**

The Complaint alleges that PwC gave all of its faulty advice in connection with audits that it completed after March 28, 2011, less than three years before Plaintiff filed the Complaint on March 28, 2014. PwC's contention that the three-year statute of limitations applicable to malpractice claims bars those portions of the Complaint that relate to advice and opinions PwC provided prior to its 2011 audit opinion rendered in May 2011, ignores these facts and is wrong on the law.

Under New York law, claims based on the services that a professional performs pursuant to a continuing relationship embodied in an agreement do not accrue until the representation is completed. The leading Court of Appeals decision is *Shumsky v. Eisenstein*, 96 N.Y.2d 164 (2001). Defendant attorney was retained to prosecute a claim but failed to do so before the statute of limitations expired and did not advise plaintiffs until much later. *Id.* at 165. The Court held that where the parties entered into a retainer agreement, the continuous representation doctrine tolled the limitations period until plaintiffs were put on notice that the defendant was no longer representing them. *Id.* at 170. In *Williamson v. PwC LLP*, 9 N.Y.3d 1 (2007), the Court applied this rule to an audit malpractice case where, as here, the parties entered into annual engagement letters. The Court held that each annual engagement gave rise to a separate agreement, and "once defendant performed the services for a particular year, no further work for that year was undertaken." *Id.* at 10-11. In the absence of allegations of plaintiffs' "awareness of a condition or problem warranting further representation and the fact that no course of representation was alleged," the Court limited the continuous representation doctrine to the services provided in relation to each contract year. *Id.* at 11.

PwC and Holdings entered into a series of engagement letters covering PwC's services for each fiscal year ending March 31, 2010, 2011, and 2012. The engagement letters provided

that PwC would audit Holdings' year-end financial statements and conduct reviews of the quarterly financial statements for each of the first three quarters of each fiscal year.  PwC also routinely responded to inquiries from the Company regarding accounting and related practices. Compl. ¶¶16-18, 59; *see also* PwC Mem. at 2.[9]  Under New York law, Holdings can timely commence an action challenging all of PwC's work during any fiscal year within three years after PwC completed its work relating to those audit services.

PwC completed the 2011 fiscal year audit no earlier than May 19, 2011, when it issued its opinion on the financial statements for that fiscal year.  Compl. ¶107.  There can be no dispute that Holdings' claims relating to services PwC provided from the beginning of that fiscal year on April 1, 2010, until May 19, 2011, are timely under *Williamson*.  This result covers all of the challenged advice cited in the Complaint that PwC gave Holdings regarding accounting for Euro RTMs except for the one opinion PwC rendered in January 2010, which occurred during the prior fiscal year ending on March 31, 2010.  PwC's services for that year, however, did not end upon delivery of the audit opinion in May 2010.  In March 2011, the SEC asked Holdings to explain its disclosures and sales accounting treatment for its Euro RTMs in the 2010 10-K.  PwC assisted the Company in responding to the SEC since it audited the 2010 financial statements and had advised Holdings to use the sales treatment that the SEC was questioning.  PwC assisted Holdings in responding to the SEC's inquiry and follow-up requests through Holdings' final response on June 9, 2011.  Compl. ¶¶59, 92-95.  Thus, PwC did not complete its work on the fiscal year March 31, 2010 audit until June 9, 2011.  During that time, Holdings was "awar[e] of a condition or problem warranting further representation," *Williamson*, *supra*, *i.e.*, the SEC review of its financial reporting, and its claims regarding the services PwC provided during that entire period were timely on March 28, 2014.

---

[9]     Copies of the agreements for the 2011 and 2012 fiscal years are Exhibits A and B to the Fine Decl.

To the extent that PwC argues that Holdings may only sue under general rules of professional negligence rather than under contract principles, then it is still clear that the claims are timely because PwC had a continuing relationship with Holdings regarding the Euro RTM accounting issues throughout its professional relationship, regardless of the dates of the engagement letters and year-end audit letters, which extended well after March 28, 2011. Beginning in January 2010, PwC provided specific advice and opinions to Holdings on numerous occasions regarding the Euro RTMs, in addition to advice concerning the DTA and the regulatory reserve.  PwC provided its advice and opinions as part of the quarterly reviews and annual audits, as well as in response to specific inquiries.  *See, e.g.*, Compl. ¶¶59-64, 70-80, 86-87, 90, 92-111, 116-36.  Thus, the Complaint alleges a course of representation regarding the Euro RTMs that began in January 2010 and continued at least until June 9, 2011, when Holdings relied on its opinion on sales accounting in responding to the SEC, within the three-year limitations period.

As a result, in accordance with *Williamson*, all the allegations in the Complaint are sufficient to withstand a motion to dismiss whether under a contract theory or a general negligence theory.  *See Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 461 (S.D.N.Y. 2010) ("The Court is persuaded that these averments [that PwC continuously audited plaintiff's funds and provided recurring auditing and related services], credited at the pleading stage without the development of a fuller factual record, sufficiently invoke the continuous representation doctrine."); *Symbol Techs., Inc. v. Deloitte & Touche, LLP*, 888 N.Y.S.2d 538, 541-42 (2d Dep't 2009) (plaintiff's audit malpractice claim was not time-barred because the continuous representation doctrine tolled the statute until the period of representation was complete); *In re Magnesium Corp. of Am.*, 399 B.R. 722, 752-53 (Bankr. S.D.N.Y. 2009)

16

("[W]here an accountant commits a particular form of malpractice in the course of preparing several year-end financial statements, the continuous representation doctrine tolls the limitations period for this specific species of malpractice until the accountant ceases to provide the client with those services."); *Tayebi v. KPMG LLP*, No. 105471 CIV. 07 (BJF), 2008 WL 518149, at *4-5 (N.Y. Sup. Ct. Feb. 20, 2008) (denying motion to dismiss malpractice claim -- whether later services were related to services provided earlier was a question of fact).

## IV.    IT WOULD BE PREMATURE TO DISMISS THE CONTRACT CLAIM.

PwC's argument that Holdings' breach of contract claim is duplicative of its professional malpractice claim is premised upon PwC's inaccurate statement that "[t]he Complaint does not allege that PwC's engagement contract set forth other particular promises" in addition to PwC's promise to "comply with professional standards."  PwC Mem. at 21.  In fact, the Complaint identifies specific contractual obligations that PwC owed Holdings (Compl. ¶158):

> PwC had a contractual obligation to, *inter alia*: (i) advise MF Global Holdings whether its financial statements conformed with GAAP; (ii) conduct audits in accordance with GAAS; (iii) plan and perform its audits to obtain reasonable assurance about whether MF Global Holdings' financial statements were free of material misstatements; (iv) examine evidence supporting the amounts and disclosures in MF Global Holdings' financial statements; (v) assess the accounting principles used by management; and (vi) evaluate MF Global Holdings' overall financial statement presentation.

Unless and until the parties conduct discovery and determine whether the contractual obligations set forth in the engagement letters and alleged in the Complaint were completely co-extensive with the professional obligations PwC owed to Holdings, whether PwC fulfilled any additional obligations PwC owed Holdings under either theory, or whether the statute of limitations issue discussed above is affected by the theory of the claim, it would be premature to dismiss the breach of contract claim as duplicative of the malpractice claim.  *See Common Fund for Non-Profit Orgs. v. KPMG Peat Marwick LLP*, No. 96 CIV. 0255 (MGC), 2000 WL 124819,

at *1-2 (S.D.N.Y. Feb. 2, 2000) (declining to dismiss breach of contract claims as duplicative of malpractice claims); *see also Reidy v. Martin*, 909 N.Y.S.2d 761, 762 (2d Dep't 2010) (denying motion to dismiss breach of contract claim as "it was not duplicative of the legal malpractice cause of action"); *Sarasota, Inc. v. Kurzman & Eisenberg, LLP*, 814 N.Y.S.2d 94, 94 (1st Dep't 2006) (fact issues remained whether breach of contract and malpractice claims were duplicative). This Court has also held that "under New York law, tort claims, when based on the violation of an independent legal duty, arise independently from breach of contract claims, even where they are based on the same underlying facts."  *In re MF Global Inc.*, 496 B.R. 315, 322-23 (S.D.N.Y. 2013) ("While the professional and fiduciary duty that PwC owed MFGI was created by [the engagement letters], the duty exists independent of the contract and breach of that duty can serve as the independent basis for the assertion of tort claims.").

## V.      THE UNJUST ENRICHMENT CLAIM SHOULD NOT BE DISMISSED.

Under the pleading standards of FRCP 8(d)(2), plaintiffs "may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.  If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2).  Plaintiffs are entitled to "wide latitude in framing their right to recover."  *MCI Worldcom Commc'ns, Inc. v. LD Wholesale Inc.*, No. 01 CIV. 6310 (RO), 2002 WL 1483886, at *1 (S.D.N.Y. July 9, 2002) ("unjust enrichment cause of action is an alternative pleading to its claim of breach of contract, and '[d]ismissal of plaintiff's alternative theories at this stage would violate the liberal policy of Rule 8(e)(2) which allows plaintiffs wide 'latitude' in framing their right to recover.'") (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 754 F. Supp. 37, 40 (S.D.N.Y. 1991)).

Holdings' unjust enrichment claim is an alternative to its breach of contract claim.  It would be premature and contrary to the FRCP's liberal pleading policy to dismiss this claim at

this stage in the litigation.  *See Singer v. Xipto Inc.*, 852 F. Supp. 2d 416, 426 (S.D.N.Y. 2012) (denying motion to dismiss unjust enrichment claim); *Hildene Capital Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc.*, No. 11 CIV. 5832 (AJN), 2012 WL 3542196, at *11 (S.D.N.Y. Aug. 15, 2012) ("[B]ecause it is difficult to determine the validity or scope of the contract at the pleading stage, courts routinely reject arguments [that an enforceable contract governs the dispute and bars the unjust enrichment claim] as premature.") (citations omitted); *MCI Worldcom*, 2002 WL 1483886, at *1 (denying motion to dismiss unjust enrichment claim). Moreover, Holdings has plausibly stated a claim for unjust enrichment by identifying an underlying benefit it conferred upon PwC, *to wit* "amounts totaling $10,889,491 for audit, advisory, and related services performed for Holdings."  Compl. ¶162.

## CONCLUSION

For the foregoing reasons, PwC's motion to dismiss the Complaint should be denied.

Dated: New York, New York
       August 5, 2014

                    Respectfully submitted,

                    KASOWITZ, BENSON, TORRES
                     & FRIEDMAN LLP

                    By:  /s/ Daniel J. Fetterman
                         Daniel J. Fetterman
                         (DFetterman@kasowitz.com)
                         Michael C. Harwood
                         (MHarwood@kasowitz.com)
                         David J. Mark
                         (DMark@kasowitz.com)
                    1633 Broadway
                    New York, New York 10019
                    Tel:  (212) 506-1700

                    *Attorneys for Plaintiff*