**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:   8/5/16
```

-----------------------------------X
                       :

MF GLOBAL HOLDINGS LTD., AS PLAN   :
ADMINISTRATOR,                  :

                     :      14-cv-2197 (VM)
        Plaintiff,      :

                     :    **DECISION AND ORDER**
     - against -       :

                     :

PRICEWATERHOUSECOOPERS LLP,      :

                     :
        Defendant.      :

                     :
-----------------------------------X

**VICTOR MARRERO, United States District Judge.**

    This professional malpractice action arises out of auditing work performed by defendant PricewaterhouseCoopers LLP ("PwC") in its role as outside auditor and accountant for the now-defunct brokerage and financial services firm MF Global Holdings, Ltd. ("MF Global"). MF Global Holdings Ltd. as Plan Administrator ("Plan Administrator") brought this case, one of many filed in the wake of MF Global's October 2011 collapse, in its capacity as assignee of MF Global's claims under the Second Amended and Restated Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code. The complaint ("Complaint," Dkt. No. 2) seeks damages of at least $1 billion for PwC's "extraordinary and egregious" professional negligence in (1) approving MF Global's off-balance-sheet accounting for certain transactions in European sovereign debt; and

(2) approving MF Global's decision not to record a valuation allowance against its deferred tax asset ("DTA") prior to September 2011. Both of these decisions, the Plan Administrator argues, were substantial causes of MF Global's bankruptcy.

The Court denied PwC's motion to dismiss the Complaint on in pari delicto grounds by Order dated July 9, 2014. ("July 2014 Order," Dkt. No. 18.) By Order dated August 27, 2014, the Court dismissed two of the counts in the Complaint, but again declined to dismiss the professional negligence claim on causation grounds. ("August 2014 Order," Dkt. No. 21.)

Upon conclusion of discovery, PwC has now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"). ("Motion," Dkt. No. 46.) PwC argues, first, that the Plan Administrator cannot overcome the affirmative defense of in pari delicto, and second, that the Plan Administrator cannot show that PwC's accounting advice caused MF Global's collapse and subsequent harm to shareholders. ("PwC Mem.," Dkt. No. 47, filed under seal.) The Plan Administrator opposed the Motion ("Opp.," Dkt. No. 49, filed under seal), and PwC

replied. ("Reply," Dkt. No. 51, filed under seal). For the reasons detailed below, the Court DENIES PwC's Motion.

## I. BACKGROUND[1]

This Court has described, in numerous previous decisions, the facts and circumstances surrounding the collapse of MF Global. See, e.g., In re MF Global Holdings Ltd. Inv. Litig. (MF Global II), 998 F. Supp. 2d 157, 168-74 (S.D.N.Y. 2014) ("Commodities Customer Action"); In re MF Global Holdings Ltd. Sec. Litig. (MF Global I), 982 F. Supp. 2d 277, 293-300 (S.D.N.Y. 2013) ("Securities Action"). The Court has also detailed the specific circumstances surrounding the Plan Administrator's claims against PwC in previous decisions in this action. See MF Global Holdings Ltd. v. PricewaterhouseCoopers LLP, 57 F. Supp. 3d 206 (S.D.N.Y. 2014); MF Global Holdings Ltd. v. PricewaterhouseCoopers LLP, 43 F. Supp. 3d 309, 314 (S.D.N.Y. 2014). The Court assumes familiarity with these prior decisions. At this stage, however, the evidentiary

---

[1] PwC has filed a Local Civil Rule 56.1 Statement of Undisputed Facts ("Def.'s 56.1," Dkt. No. 47, filed under seal). The Plan Administrator has filed its Objections and Responses to PwC's Rule 56.1 ("Pl.'s Response 56.1," Dkt. No. 49, filed under seal) as well as its own Local Civil Rule 56.1 Counterstatement of Facts ("Pl.'s 56.1," Dkt. No. 49, filed under seal). PwC has filed a reply to the Plan Administrator's Objections and Responses to the Plan Administrator's Counterstatement of Facts ("Def.'s Reply 56.1," Dkt. No. 51, filed under seal).

record is more thoroughly developed and further elaboration of this matter's factual background is appropriate.

A.   THE PARTIES

MF Global was a registered futures commission merchant and broker-dealer firm that executed trades on behalf of its customers and for its own account. From 2008 until March 2011, J. Randy MacDonald ("MacDonald") was MF Global's Chief Financial Officer and Henri Steenkamp ("Steenkamp") was the firm's Chief Accounting Officer. In March 2011, Steenkamp took over the role of Chief Financial Officer while remaining Chief Accounting Officer. In his role as Chief Accounting Officer, Steenkamp was responsible for MF Global's External Reporting and Accounting Policy Group ("MF Accounting Group"). Within the MF Accounting Group, Margaret Sear ("Sear") was Accounting Policy Manager until July 2011. Pallavi Rayan ("Rayan") was a member of the MF Accounting Group until March 2011, after which time she became Global Controller. (Def.'s 56.1 ¶¶ 8-12.) In March 2010, Jon S. Corzine ("Corzine") became MF Global's Chief Executive Officer. (Def.'s 56.1 ¶ 71.)

PwC began performing independent audit services for MF Global in 2007. During the time relevant to this action, MF Global engaged PwC to audit MF Global's financial

statements for the fiscal years ending March 31, 2010 ("Fiscal Year 2010") and March 31, 2011 ("Fiscal Year 2011"), and to review the firm's quarterly statements in preparation for MF Global's 10-Q reports. (Def.'s 56.1 at ¶ 3; Declaration of J. Emmett Murphy dated Jan. 29, 2016 ("Murphy Dec.") Ex. 28, 29.) In the engagement letters, PwC agreed that it was responsible for performing its integrated audit in accordance with standards established by the Public Company Accounting Oversight Board ("PCAOB"), including obtaining "reasonable assurance about whether the financial statements are free of material misstatement." (Murphy Dec. Exs. 28, 29; Pl.'s Response 56.1 ¶ 4.) MF Global's management, in turn, agreed that it was responsible for reporting financial information in conformity with Generally Accepted Accounting Principles ("GAAP"). (Def.'s 56.1 ¶ 4.) During the Fiscal Year 2010 engagement, Linda McGowan ("McGowan") was the PwC engagement partner with the responsibility for work on MF Global's Fiscal Year 2010 audit. (Def.'s 56.1 ¶ 7.) During the Fiscal Year 2011 engagement, George Gallagher ("Gallagher") was the PwC engagement partner. (Def.'s 56.1 ¶ 120.)

PwC issued an audit report for Fiscal Year 2010 on May 27, 2010, which was included in MF Global's required Form 10-K filed with the United States Securities and Exchange Commission ("SEC") on May 28, 2010 (Def.'s 56.1 at ¶ 6), and an audit report for Fiscal Year 2011 on May 19, 2011, which was included in MF Global's Form 10-K filed with the SEC on May 20, 2011 (Murphy Dec. Ex. 96). PwC continued to act as MF Global's independent auditor, reviewing quarterly financial reports and responding to MF Global's accounting inquiries until MF Global filed for bankruptcy on October 31, 2011. (See Declaration of Frank S. DiCarlo dated March 11, 2016 ("DiCarlo Dec.") Ex. 120; Turner Dec. ¶ 87.)

B.   THE RTM STRATEGY

Prior to early 2010, MF Global earned revenues primarily through commissions on customer orders and interest on customer accounts. (See DiCarlo Dec. Ex. 4 at 3; Murphy Dec., Ex. 94.) When Corzine became CEO, he undertook a new investment strategy in an attempt to transform MF Global and reverse a recent period of losses to achieve profitability. (Def.'s 56.1 ¶ 72.) The core of the new strategy was increased proprietary trading, including significant investments in European sovereign

debt financed through repurchase agreements. (Murphy Dec. Ex. 3 at 125:23-126:15).

A repurchase agreement or "repo" involves one party selling a security, in this case a bond, to a counterparty for cash while simultaneously agreeing to buy back the security at a specified future date and price. (Def.'s 56.1 ¶ 21; Decl. of Lynn E. Turner dated March 8, 2016 ("Turner Dec.") ¶ 39.) MF Global undertook a specific type of repurchase agreement which it referred to as a repurchase-to-maturity ("RTM") transaction.[2] An RTM is distinguished from an ordinary repo by the fact that the date on which the seller is required to repurchase the bond (the "termination date") is the same as, or functionally the same as, the maturity date of the bond.[3] (Def.'s 56.1 ¶ 23.) This means that the seller receives the proceeds from the original bond at the same time as it is required to repurchase the bond from the buyer; accordingly, the RTM may be settled through a clearinghouse so that the seller

_____

[2] As discussed further in this Decision and Order, the parties actively dispute whether the repurchase agreements undertaken were actually RTMs. (See Def.'s 56.1 ¶ 23; Pl.'s 56.1 ¶ 23; Turner Dec. ¶ 48.)

[3] Conversely, a "reverse RTM" is a reverse repurchase agreement involving the purchase of a security subject to an agreement to sell it back at or close to the maturity date of the security. As discussed further in this Decision and Order, the parties actively dispute whether under GAAP the termination date of an RTM or reverse RTM must precisely match the maturity date of the underlying security. (See Def.'s 56.1 ¶ 23; Pl.'s 56.1 ¶ 23; Turner Dec. ¶ 48.)

receives the difference between the accrued interest on the
bond and the payment to the buyer. (See Declaration of
Christine E. Pallone dated March 8, 2016 ("Pallone Dec.")
¶¶ 26, 29); Turner Dec. at ¶ 52.)

In Fiscal Year 2010 and to a greater degree in Fiscal
Year 2011, MF Global increased its use of RTMs to finance
larger investments in European bonds (the "RTM Strategy").
The Court previously explained the operation of the RTM
Strategy, which was coordinated with MF Global's
subsidiaries MF Global Inc. ("MFGI") and MF Global U.K.
Limited ("MFG-UK"):

> [F]irst, MFG-UK purchased European sovereign debt
> securities on the London Clearing House ("LCH")
> exchange. MFG-UK then sold those securities to MFGI.
> Next, MFGI and MFG-UK entered into an RTM agreement.
> MFGI thus sold the securities to MFG-UK while the
> firms simultaneously entered a contract for MFGI to
> repurchase the securities on the securities' maturity
> dates, at the same price plus a pre-negotiated
> interest payment. MFG-UK, which now owned the
> securities, then engaged in a similar repurchase
> transaction with a counterparty through the LCH. The
> repurchase date on that transaction was scheduled for
> two days before the securities' maturity date. MFG-UK
> thus bore the risk of default on the security, and
> MFGI was responsible for maintaining liquidity to
> cover the possible default. MFGI was also expected to
> provide MFG-UK with funds to cover margin calls or
> anticipated margin calls from the LCH.

MF Global I, 982 F. Supp. 2d at 296. The discovery record
supports this summary of the allegations in the Complaint

- 8 -

at this stage of litigation. (See, e.g., Declaration of David Mordecai dated March 8, 2016 ("Mordecai Dec.") ¶ 20.)

Corzine was an advocate of the RTM Strategy, at least in part because the interest rate spread for European bonds was significantly greater than the United States interest rate spread, presenting a profit opportunity. (Def.'s 56.1 ¶ 76-77; Murphy Dec. Ex. 3 at 11:42:5-18.) The RTM Strategy ultimately became a sizeable component of MF Global's proprietary trading: MF Global entered into approximately 109 Euro RTMs worth more than $100 million in profits between September 2010 and September 2011. (Def.'s 56.1 ¶¶ 84, 96-97.) The RTMs were used to finance MF Global's investments in Euro sovereign debt in the form of Irish, Spanish, Italian, Belgian and Portuguese bonds with a total par value of over 10 billion Euros. (Def.'s 56.1 ¶¶ 101-102, 128.) MF Global's exposure to European sovereign debt through Euro RTMs increased from 150 million Euros in June 2010 to approximately 4.4 billion Euros in June 30, 2011. (Def.'s 56.1 ¶ 132.) MF Global's Board of Directors approved the RTM Strategy and repeatedly approved increases of the firm's limits on its Euro sovereign portfolio. (Def.'s 56.1 ¶ 104; Murphy Dec. Exs. 24, 43, 45.)

C.   THE SALE ACCOUNTING DECISION

During Fiscal Year 2011 and until MF Global ceased the
RTM Strategy, the proceeds from MF Global's Euro RTM
transactions – the interest rate of the original bond minus
the rate paid to the RTM counterparty – were accounted for
on MF Global's balance sheet as sales at the origination of
the transaction. (Def.'s 56.1 ¶ 97; Turner Dec. ¶ 134.)
Under sale accounting, the bond and the repo financing were
de-recognized from the balance sheet, so the net revenue
expected was accounted for as profit at the time of the
transaction. (See Turner Dec. ¶ 53; Murphy Dec. Ex. 50.)
Which party bears responsibility for MF Global's decision
to adopt sale accounting for the Euro RTMs is sharply
disputed, although certain material facts have been
established.

In mid- to late 2009, the MF Accounting Group began to
consider the accounting treatment for certain Euro RTM
transactions used to finance European bonds in October
2009. (Def.'s 56.1 ¶ 34.) Sear prepared a draft memo in
August 2009 titled "Repo-to-Maturity Transactions as
Sales." ("August 2009 Memo", Murphy Dec. Ex. 46.) In
preparing the August 2009 Memo and subsequent related
memos, Sear drew on accounting literature governing RTMs,

specifically Statement of Financial Accounting Standard No. 140 ("FAS 140"), codified as Financial Accounting Standards Board ("FASB") Accounting Standards Codification Topic 860 ("ASC 860"). (Def.'s 56.1 ¶¶ 25, 38; Murphy Dec. Ex. 106.) ASC 860-10-40-5 prescribes three requirements that must be met for a transaction to be accounted for as a sale. First, the transferred financial assets must have been put beyond the reach of the transferor and its creditors. Second, the transferee must have the right to pledge or exchange the asset free of conditions. Third, the transferor must not maintain effective control over the asset. (Murphy Dec. Ex. 106.)

The August 2009 Memo concluded that, despite the two-day gap between repurchase and maturity mandated by LCH, the RTM transactions MF Global had executed met the conditions to be accounted for as sales. (Murphy Dec. Ex. 46.) It included a footnote ("Footnote 1") stating, in reference to the requirement for sale accounting under ASC 860 that the instrument has matured or expired upon receipt of the collateral at maturity: "We believe maturity means the date of or a few days before the end of the term." (Def.'s 56.1, Murphy Dec. Ex. 46.) The August 2009 Memo was shared only internally. (Def.'s 56.1 ¶ 30.)

On October 2, 2009, David Bateman ("Bateman"), an MFG-
UK repo trader, e-mailed Sear asking her to explain the
accounting treatment for RTMs transacted by MFG-UK. In
response, Sear wrote in an e-mail that "[t]here are a
number of U.S. GAAP requirements we must meet in order to
account for repo-to-maturity trades as sales rather than
secured borrowings." (Def.'s 56.1 ¶ 35, Murphy Dec. Ex.
47.) Following this inquiry, the MF Accounting Group
prepared a draft memo ("October 2009 Memo", Murphy Dec. Ex.
48) that expanded on the analysis in the August 2009 Memo.
The memo developed Footnote 1 to include the following:

> A contract in which the term of the repurchase or
> resale is within a few days (e.g., 1-3 days) of the
> maturity of the underlying collateral would not be
> considered a repurchase or redemption before maturity
> if, because of the timing of the redemption, the
> original repo seller would be unable to sell the asset
> again before its maturity and would be accounted for
> as a sale provided the other conditions are met.
> (Def.'s 56.1, Murphy Dec. Ex. 48.)

In her analysis for the October 2009 Memo Sear also
referred to a series of questions and answers about FAS 140
published by the FASB, one of which analyzed the meaning of
"before maturity" in practice. Question and Answer Number
48 opines that:

> A transferor's agreement to repurchase a transferred
> asset would not be considered a repurchase or
> redemption before maturity if, because of the timing
> of the redemption, the transferor would be unable to

sell the asset again before its maturity (that is, the period until maturity is so short that the typical settlement is a net cash payment). (Def.'s 56.1, ¶ 39; Murphy Dec. Ex. 107.)

MF Global consulted with PwC regarding the correct accounting treatment for the RTM transactions in late 2009 and early 2010. In January 2010, Sear created a memo to file entitled "Accounting for RTM Trades in UK" ("January 2010 Memo") to document the MF Accounting Group's review of the RTM trades executed by MFG-UK and their accounting treatment under GAAP in advance of preparing MF Global's books for the quarter ending December 31, 2009. (Def.'s 56.1 ¶ 44; Murphy Dec. Ex. 54.) The January 2010 Memo stated:

> Operationally, LCH requires us to repurchase the underlying collateral two business days prior to their stated maturity date. Since the collateral are European AA or better rated government bonds, it typically takes three business days to settle these bonds in the European markets. As such, we will not be able to sell the collateral to the market after we repurchase them from LCH two business days prior to their stated maturity date. (January 2010 Memo at 1.)

The January 2010 Memo cited two external legal opinions as well as ASC 860-10-55-51, which states that a repurchase agreement "would not be considered a repurchase or redemption before maturity if because of the timing of the redemption, the transferor would be unable to sell the financial asset again before its maturity." (Murphy Dec.

Ex. 106.) The memo concluded that MF Global's Euro RTM trades "meet the conditions for derecognition for U.S. GAAP financial statement reporting" under ASC 860. (January 2010 Memo at 3.)

On January 7, 2010, an MFG-UK employee emailed the memo to employees at PwC's United Kingdom offices ("PwC UK") asking for feedback from PwC. (Def.'s 56.1 ¶ 52; Murphy Dec. Ex. 54.) PwC UK forwarded the memo to PwC, which e-mailed Sear on January 8, 2010 asking whether net cash settlement was a requirement of sale accounting. Sear replied that in this circumstance "judgment is required to ascertain whether the transferor would be able to sell the asset to gain economic benefits." (Def.'s 56.1 ¶ 53, 56.)

Rayan of the MF Accounting Group e-mailed PwC on January 18, 2010 asking if PwC had cleared accounting treatment for the RTMs and noting that "we will only potentially apply this accounting treatment in Q410 going forward, once we clear the accounting with PwC." (Murphy Dec. Ex. 56.) PwC responded on the same day stating that "the accounting treatment you have proposed is ok under the facts of the situation you have described in the memo, i.e. time to maturity of the underlying collateral at the point you get it back is less than the trade date-settlement date

gap, and to be very clear, only ok if similar facts exist in other situations." (Murphy Dec. Ex. 56.) Sear subsequently e-mailed an MFG-UK repo trader to confirm that the MF Accounting Group had "confirmed the accounting treatment for UK RTM trades with PwC." (Def.'s 56.1 ¶ 61, Murphy Dec. Ex. 57.)

Despite this correspondence ultimately MF Global did not account for RTMs as sales in Fiscal Year 2010. (Pl.'s Response 56.1 ¶ 189.) Although the parties dispute who made the determination that sale accounting should not be used, it is undisputed that the composition of the October 2009 RTMs as "two-legged" repos – that is, RTMs that were constructed of two back to back trades because LCH limited repo terms to a year – prevented them from qualifying for sale accounting. (See Def.'s 56.1 ¶ 64; Pl.'s Response 56.1 ¶ 64.) PwC's working papers from that period note that "we communicated our findings [regarding the back-to-back repos] to PwC NY who has reopened the discussion with group finance team as the evidence appeared inconsistent with the accounting treatment agreed." (Murphy Dec. Ex. 38.) An e-mail from McGowan to PwC dated January 28, 2010 states that "I have agreed with [Steenkamp] that they will not book the transaction as a repo to maturity." (Murphy Dec. Ex. 64.)

In December 2010, Sear and Rayan prepared a draft memo returning to the issue of the two-legged repos' eligibility for sale accounting. (DiCarlo Dec. Ex. 73.) PwC reviewed the memo and advised MF Global that it could proceed with sale accounting for the back-to-back trades under certain circumstances. (DiCarlo Dec. Ex. 71.) Sear and Rayan filed a later version of the memo in February 2011. (Def.'s 56.1 ¶ 111.)

In Fiscal Year 2011, MF Global accounted for its Euro RTM trades as sales. (Def.'s 56.1 ¶ 86.) As the firm continued the RTM strategy into September 2011, it continued to account for the Euro RTMs as sales. (Def.'s 56.1 ¶ 96-97.) For each RTM cleared on LCH, MF Global was required to repurchase the bond two business days before the maturity date of the bond. (Def.'s 56.1 ¶ 98.) The MF Accounting Group prepared two further memos in June 2010 and December 2010 memorializing its position on sale accounting for RTM transactions. (Murphy Dec. Ex. 59, "June 2010 Memo" and Ex. 65, "December 2010 Memo"). Both memos stated:

> As long as the normal trade date and settlement date cycle for the repurchased collateral is at least equal to or greater than the remaining time to maturity of the collateral at the repurchase date, the operational restrictions specific to the UK RTM arrangements would not preclude the trades from being treated as sales,

provided other conditions are met. (June 2010 Memo at 3; December 2010 Memo at 3; Def.'s 56.1 ¶¶ 69, 107.)

Critically, the parties dispute whether the RTM strategy was dependent on sale accounting. The Plan Administrator argues that the RTM Strategy was expected to add to MF Global's revenue in large part because of the benefits of sale accounting. Those advantages, as described in the Complaint, were summarized by the Court in the Securities Action:

> First, the RTM transactions could be counted as sales, rather than as loans, even though MFGI and MFG-UK were contractually obligated to repay the final counterparty for the securities. The obligation to repay was thus "de-recognized" -- it did not appear as a liability on MF Global's balance sheet. The RTM transactions also allowed MF Global to report the transactions as gains at the time of the sale, notwithstanding the subsequent obligation to repay the sale price. Finally, because no liability appeared on MF Global's balance sheet, the RTM transaction did not factor into MF Global's value-at-risk ("VAR") calculations.

MF Global I, 982 F. Supp. 2d at 296. PwC's position is that the RTM strategy was not dependent on sale accounting, and that the advantages of the RTM Strategy would have been adopted for its revenue potential regardless of sale accounting. (See infra, Section III(B).)

On March 30, 2011, MF Global responded to a March 16, 2011 letter from the Securities and Exchange Commission ("SEC") asking questions about MF Global's Form 10-K for

Fiscal Year 2010. (Def.'s 56.1 ¶ 119.) Gallagher reviewed and commented on MF Global's response. (Def.'s 56.1 ¶ 120.) PwC issued its audit opinion for Fiscal Year 2011 in MF Global's 2011 Form 10-K. (Def.'s 56.1 ¶ 127.)

D.   THE DEFERRED TAX ASSETS DECISION

PwC also worked with MF Global to review tax-related accounting decisions in Fiscal Years 2010 and 2011, including the decision whether to take a valuation allowance against deferred tax assets ("DTA"). GAAP standards on DTA, as dictated in Accounting Standards Codification No. 740 ("ASC 740"), require an entity to apply a "more likely than not" test in deciding whether to take a valuation allowance against a DTA. (Def.'s 56.1 ¶ 139.) If an entity deems it "more likely than not" that it will be able to realize the DTA as a tax benefit, it is predicting based on "all the available positive and negative evidence" that it will generate sufficient future taxable income to which it can apply the DTA. (See Turner Dec. ¶ 330; Def.'s 56.1 ¶ 145.) If the opposite is true, and the entity determines it is "more likely than not" the entity will not be able to realize the full amount of the DTA, it should, under GAAP, take a valuation allowance to offset the DTA. (Turner Dec. ¶ 296-97.) MF Global included

- 18 -

DTA with other assets on its balance sheet which it reported in its Form 10-K for Fiscal Years 2010 and 2011. In Fiscal Year 2010, MF Global's reported DTA were $118 million and $108 million in Fiscal Year 2011. (See Murphy Dec. Exs. 94, 96.)

As with the sale accounting decision, the parties dispute who bears ultimate responsibility for the DTA decision. MF Global prepared memos quarterly and at year-end for Fiscal Years 2010 and 2011 documenting its conclusions about the "need for a change in the valuation allowance position of the company." (Def.'s 56.1 ¶ 145; Murphy Dec. Ex. 33, 36.) In its financial statements for Fiscal Years 2010 and 2011, MF Global did not record a valuation allowance. (Def.'s 56.1 ¶ 148; Murphy Dec. Ex. 33, 36.)

The memo prepared on the subject of the Fiscal Year 2011 valuation allowance ("FY2011 VA Memo") documented MF Global's view that no valuation allowance should be recorded for Fiscal Year 2011. The draft memo was sent from MF Global's Director of External Tax Reporting and Compliance, Christine Herbst ("Herbst"), to PwC on April 26, 2011 and later returned to Herbst with PwC's comments and edits on May 18, 2011. (Def.'s 56.1 ¶ 147,149; Murphy

- 19 -

Dec. Ex. 34; DiCarlo Dec. Exs. 104, 107.) The FY2011 VA
Memo states that despite MF Global's three-year cumulative
loss position, "management believes it is appropriate to
consider more fully the business conditions facing the US"
in deciding whether to record a valuation allowance,
including "one-time unusual charges" that contributed to MF
Global's losses during the fiscal year. (Murphy Dec. Ex.
34.) The memo concludes that "it is appropriate to
recognize these deferred tax assets on the Company's
consolidated U.S. GAAP financial statements and . . . no
valuation allowance should be recorded at this time." (Id.)

In both the FY2011 VA Memo and MF Global's notes to
its 2011 Form 10-K, MF Global listed several tax planning
strategies that it could take to increase the likelihood
that it would realize its DTA in the coming year. (Def.'s
56.1 ¶ 157; Murphy Dec. Exs. 34, 96.) The parties dispute
whether MF Global was the principal participant in
determining not to record a valuation allowance for Fiscal
Year 2011, in particular to what degree PwC was responsible
for suggesting the tax planning strategies included in the
FY2011 VA Memo. (See Def.'s 56.1 ¶ 146, Pl.'s Response 56.1
¶¶ 220-221.)

In contrast to the previous reporting periods in which it had not recorded a valuation allowance, on October 25, 2011 MF Global recorded a valuation allowance of $119.4 million for the quarter ending September 30, 2011. (Murphy Dec. Ex. 98; Pl.'s Response 56.1 ¶ 217.) The valuation allowance reflected MF Global's conclusion that MF Global was unlikely to generate sufficient income in the future to utilize its U.S. DTA. (Def.'s Reply 56.1 ¶ 218.) The parties dispute whether, if MF Global had recorded a valuation allowance against its DTA in March 2011 rather than waiting until September 2011, MF Global would have avoided bankruptcy or related damages. (Def.'s 56.1 ¶ 159; Mordecai Dec. ¶ 50.)

E.   MF GLOBAL'S COLLAPSE

In mid- to late 2011, MF Global began to face severe liquidity issues. The parties vigorously dispute whether the decision to account for the Euro RTM transactions as sales or the decision not to record a valuation allowance were proximate causes of MF Global's collapse, but certain events leading up to that event are not genuinely disputed.

In August 2011, the ratings agency Standard & Poor's downgraded long-term U.S. sovereign debt from the triple-A grading it had held for 70 years. (Def.'s 56.1 ¶ 164.) The

parties dispute to what extent the market in European sovereign bonds in summer 2011 was "volatile" and to what degree such volatility created liquidity problems for MF Global; however, it is undisputed that the LCH made additional margin calls in the summer of 2011, stressing MF Global's liquidity. (Def.'s 56.1 ¶ 166, Pl.'s Response 56.1 ¶ 166.) The margin that MF Global was required to post for certain Euro RTMs "dramatically" increased in 2011. (Def.'s 56.1 ¶ 167, 168.)

Also in August 2011, the Financial Industry Regulatory Authority ("FINRA") determined that MF Global had been incorrectly computing the amount of capital required to be held aside as regulatory capital and ordered the firm to come into compliance.[4] (See Declaration of Paul K. Michaud in Opposition to PwC's Motion for Summary Judgment, dated March 8, 2016 ("Michaud Dec.") ¶ 78; Def.'s 56.1 ¶ 171.) This determination required MF Global to amend its Form 10-Q for the period ending June 30, 2011 and set aside $255 million in net capital. (DiCarlo Dec. Ex. 11.)

---

[4] MF Global had previously taken the position that for net capital purposes its Euro RTMs should be treated the same as U.S. Treasury RTMs, for which there was zero capital charge and MF Global did not need to set aside additional regulatory capital. (Def.'s 56.1 ¶ 170.) However, FINRA and the SEC decided in August 2011 that the Euro RTMs should be treated as long corporate bonds, requiring MF Global to post additional capital. (See Murphy Dec. Ex. 23.)

On October 25, 2011, MF Global announced a net loss of $191 million for the quarter ending September 30, 2011. (Pl.'s 56.1 ¶ 217.) The loss included a valuation allowance against the firm's DTA of $119.4 million. (Id.) On the same day, MF Global had to respond to a large margin call prompted by Moody's downgrade of MF Global's credit rating to Baa3. (Def.'s 56.1 ¶ 172; Mordecai Dec. Ex. 1 ¶ 28.) That downgrade was followed by a further downgrade to Ba2 on October 27, 2011, and a downgrading by Fitch to BB+. (Murphy Dec. Ex. 14 at 15.)

In the week prior to its bankruptcy, MF Global received additional margin calls from LCH for hundreds of millions of dollars related to its Euro RTMs. (Def.'s 56.1 ¶ 176; Murphy Dec. Ex. 2.) MF Global could not meet the final series of margin calls received from the LCH, and on October 30, 2011, it became apparent that the firm was unable to account for roughly $1 billion of customer funds. (Def.'s 56.1 ¶ 177.) Although executives made last-minute efforts to sell the firm to Interactive Brokers, LLC, those sale discussions ended after the customer fund deficiency came to light. (Def.'s 56.1 ¶ 179.) MF Global filed for bankruptcy on October 31, 2011. (Def.'s 56.1 ¶ 180.)

The Plan Administrator filed the Complaint on March 28, 2014. The professional malpractice claim -- the sole cause of action surviving against PwC after the Court's August 2014 Order on PwC's motion to dismiss -- alleges that PwC's negligent professional advice regarding the sale accounting decision and the DTA decision was a substantial factor in MF Global's bankruptcy. (Dkt. No. 2; Opp. at 1-3.)

PwC's Motion seeks summary judgment for dismissal of the professional malpractice claim. PwC argues that (1) the doctrine of in pari delicto bars the Plan Administrator from bringing claims for damages related to the sale accounting and DTA decisions because MF Global was an active and voluntary participant in those decisions; and (2) there is no evidence from which a reasonable jury could find that PwC's advice proximately caused MF Global's bankruptcy and subsequent damages. (PwC Mem. at 1.) As discussed infra, upon review of the voluminous summary judgment record including emails, deposition testimony, memoranda, and other material produced during a lengthy discovery period, the Court finds that PwC has not satisfied its burden of demonstrating the absence of any

genuine issue of material fact on the <u>in pari delicto</u>
defense or on the Plan Administrator's claim.

## II.  LEGAL STANDARD

### A.  STANDARD OF REVIEW UNDER RULE 56

Summary judgment is appropriate if the evidence shows
that "there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S.
317, 322 (1986). In making this assessment, the Court looks
to the relevant substantive law to determine which facts
are material: "Only disputes over facts that might affect
the outcome of the suit under the governing law will
properly preclude the entry of summary judgment." <u>Anderson
v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). To
survive summary judgment, the disputed factual issues must
also be "genuine" -- that is, "sufficient evidence [must]
favor[] the nonmoving party for a jury to return a verdict
for that party." <u>Id.</u> at 249. The role of a court in ruling
on such a motion "is not to resolve disputed issues of fact
but to assess whether there are any factual issues to be
tried, while resolving ambiguities and drawing reasonable
inferences against the moving party." <u>Knight v. United
States Fire Ins. Co.</u>, 804 F.2d 9, 11 (2d Cir. 1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. See Celotex Corp., 477 U.S. at 323. If the moving party satisfies its burden, the nonmoving party must provide specific facts showing that there is a genuine issue for trial in order to survive the motion for summary judgment. See Shannon v. New York City Transit Auth., 332 F.3d 95, 98–99 (2d Cir. 2003). In determining whether the moving party is entitled to judgment as a matter of law, the court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008). Although the party opposing summary judgment may not "rely on mere conclusory allegations nor speculation," D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998), if there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party that supports a finding that a material factual dispute exists, summary judgment is improper. See Gummo v. Village of Depew, N.Y., 75 F.3d 98, 107 (2d Cir. 1996).

- 26 -

B.   PROFESSIONAL NEGLIGENCE

PwC's professional malpractice claim asserts a cause of action brought under New York law, which provides that professional malpractice is a "species of negligence" and requires a showing of three elements: (1) negligence (2) which is the proximate cause of (3) damages. Hydro Inv'rs, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 15 (2d Cir. 2000); see also Di Benedetto v. Pan Am World Serv., Inc., 359 F. 3d 627, 630 (2d Cir. 2004). Specifically, to prove liability for professional negligence, a plaintiff must show that: (1) the plaintiff contracted for the service, or the service ordinarily would be performed in the course of the professional performing its obligations under a contract; (2) the defendant's professional services "departed from the 'accepted standards of practice' in the relevant field;" and (3) the departure proximately caused the plaintiff's injuries. Wax NJ-2, LLC v. JFB Const. & Dev., 111 F. Supp. 3d 434, 447 (S.D.N.Y. 2015) (citing Bruno v. Trus Joist a Weyerhaeuser Bus., 87 A.D.3d 670, 672 (N.Y. App. Div. 2d Dept. 2011)).

The standard of care required of a professional demands that he or she "exercise the skill and knowledge normally possessed by members of his or her trade or

profession in good standing in similar communities." AJ
Contracting Co. v. Trident Managers, Inc., 234 A.D.2d 195,
196 (N.Y. App. Div. 1st Dept. 1996) (citing Restatement of
Torts, 2d § 299A). As in any negligence action, a plaintiff
must demonstrate "beyond the point of speculation and
conjecture, a causal connection between its losses and the
defendant's actions." Herbert H. Post & Co. v. Sidney
Bitterman, Inc., 219 A.D.2d 214, 224 (N.Y. App. Div. 1st
Dept. 1996). The plaintiff must establish that but for the
alleged malpractice, it would not have sustained
ascertainable damages. Franklin v. Winard, 199 A.D.2d 220,
221 (N.Y. App. Div. 1st Dept. 1993). In addition to showing
"but for" cause, the plaintiff must show that a harm was
within the ambit of reasonably foreseeable risk. Aegis Ins.
Servs., Inc. v. 7 World Trade Co., L.P., 737 F.3d 166, 177
(2d Cir. 2013) (citing Derdiarian v. Felix Contracting
Corp., 51 N.Y.2d 308, 316 (N.Y. 1980) (finding that
defendant could have concluded that a "foreseeable, normal
and natural result of the risk created by" the defendant's
act was the harm to the plaintiff)). A defendant is only
responsible to "those with respect to whom his acts were a
substantial factor in the sequence of responsible
causation." Rothstein v. UBS AG, 708 F.3d 82, 91 (2d Cir.

2013) (citing Lerner v. Fleet Bank, N.A., 318 F.3d 113, 123 (2d Cir. 2003), abrogation on other grounds recognized by Am. Psychiatric Ass'n v. Anthem Health Plans, Inc., 821 F.3d 352, 359 (2d Cir. 2016)). Proof of proximate causation is "an essential element of any malpractice claim, including accountant's malpractice." Herbert H. Post & Co., 219 A.D.2d at 223.

Where there exist intervening acts between the defendant's conduct and the plaintiff's injury, "the causal connection is not automatically severed." Derdiarian, 51 N.Y.2d at 315. In that case, "liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's negligence." Id. Additionally, an intervening act "may not relieve an actor of responsibility, where the risk of the intervening act is the very same risk which renders the actor negligent." Id.

C.   IN PARI DELICTO

Under New York law, "the doctrine of in pari delicto mandates that the courts will not intercede to resolve a dispute between two wrongdoers." Kirschner v. KPMG LLP, 938

- 29 -

N.E.2d 941, 950 (N.Y. 2010) (footnote omitted).[5] The purpose

of the doctrine is to deter illegality by denying relief to

parties who have admittedly broken the law, while avoiding

forcing courts to intercede in disputes between two

wrongdoers. See id. ("No court should be required to serve

as paymaster of the wages of crime, or referee between

thieves.") New York courts have long applied the doctrine

of in pari delicto to bar a debtor from suing third parties

for a fraud in which the debtor participated. See id. at

950; In re Bernard L. Madoff Inv. Sec. LLC., 721 F.3d 54,

63 (2d Cir. 2013) (citing Barnes v. Schatzkin, 215 A.D. 10,

10 (N.Y. App. Div. 1st Dept. 1925).

     When presented as an affirmative defense to a tort

claim, in pari delicto "bars a party that has been injured

as a result of its own intentional wrongdoing from

recovering for those injuries from another party whose

equal or lesser fault contributed to the loss." In re Lehr

---

[5] The Plan Administrator's professional malpractice claim is brought
under New York state law, and PwC's in pari delicto defense is
correspondingly a state law defense. See O'Melveny & Myers v. F.D.I.C.,
512 U.S. 79, 84-85 (1994) (holding that where no federal statutory
provision applied, state law controlled whether equitable defenses were
available against a trustee). The application of a state law defense to
state law claims is governed exclusively by state law. See In re MF
Global Holdings Ltd. Inv. Litig., 611 F. App'x 34, 37 (2d Cir. 2015).
Although federal common law of in pari delicto may apply where the
plaintiff's claims are brought under federal law, see, e.g., Pinter v.
Dahl, 486 U.S. 622, 636 (1988); BrandAid Mktg. Corp. v. Bliss, 462 F.3d
216, 218 (2d Cir. 2006), New York's law of in pari delicto applies in
this case.

Constr. Corp., No. 15 Civ. 4350, 2016 WL 164616, at *4
(S.D.N.Y. Jan. 12, 2016) (citing Rosenbach v. Diversified
Group, Inc., 85 A.D.3d 569, 570 (N.Y. App. Div. 1st Dept.
2011)). "The defense requires intentional conduct on the
part of the plaintiff or its agents." Sacher v. Beacon
Assocs. Mgmt. Corp., 980 N.Y.S.2d 121, 124 (App. Div. 2d
Dept. 2014) (citing Kirschner, 938 N.E.2d at 957).

In pari delicto is also premised on the traditional
principle that a corporation is liable for the acts of its
agents and employees. See Kirschner, 938 N.E.2d at 950-51.
In Kirschner, the leading case governing the application of
in pari delicto as a defense under New York law, the New
York Court of Appeals answered a question certified by the
Delaware Supreme Court regarding the scope of the 'adverse
interest' exception to the in pari delicto defense.[6] In one
of the cases considered in Kirschner, a corporation
derivatively sued its independent auditor for failure to
detect fraud perpetrated by the corporation's officers. The
Delaware Supreme Court posed the following question:

> Would the doctrine of in pari delicto bar a derivative
> claim under New York law where a corporation sues its

---

[6] The adverse interest exception, which is the single exception to the
rule that a corporate agent's acts are imputed to the corporation,
arises where the agent has "totally abandoned his principal's interests
and [is] acting entirely for his own or another's purposes."
Kirschner, 938 N.E.2d at 952 (emphasis in original).

> outside auditor for professional malpractice or
> negligence based on the auditor's failure to detect
> fraud committed by the corporation; and the outside
> auditor did not knowingly participate in the
> corporations fraud, but instead failed to satisfy
> professional standards in its audits of the
> corporation's financial statements? (Teachers'
> Retirement Sys. of La. v. PricewaterhouseCoopers LLP,
> 998 A.2d 280, 282-83 (Del. 2010))

Kirschner, 938 N.E.2d at 949. The Kirschner court

agreed with the Delaware court that in pari delicto barred

the negligence claims against the auditor. See id. In doing

so it noted that "the justice of the in pari delicto rule

is most obvious where a willful wrongdoer is suing someone

who is alleged to be merely negligent. . . . But . . . the

principle also applies where both parties acted willfully."

Id. at 464. "Indeed, the principle that a wrongdoer should

not profit from his own misconduct is so strong in New York

that we have said the defense applies even in difficult

cases and should not be weakened by exceptions." Id.

(internal citations omitted).

This Court has recognized in prior decisions that

under New York law, as stated in Kirschner, the paramount

inquiry under in pari delicto is the "relative fault of the

plaintiff and the defendant," as in the contrast the

Kirschner court noted between willful as opposed to merely

negligent wrongdoers. DeAngelis v. Corzine (In re MF Global

Holdings Ltd. Inv. Litig.), 998 F. Supp. 2d 157, 190–91
(S.D.N.Y. 2014); see also In re Lehr Constr. Corp., 528
B.R. 598, 608 (Bankr. S.D.N.Y. 2015). Affirming that
decision in the Customer Commodities Action, the Second
Circuit summarized the doctrine as follows: "[A]
corporation that engages in malfeasance cannot sue outside
accountants who negligently failed to detect or prevent
that malfeasance." In re MF Glob Holdings Ltd. Inv. Litig.
(DeAngelis v. Corzine), 611 F. App'x 34, 37 (2d Cir.),
cert. denied sub nom. Bearing Fund LP v.
PricewaterhouseCoopers LLP, 136 S. Ct. 497 (2015).

## III. DISCUSSION

At the motion to dismiss phase this Court, accepting
all facts alleged in the Complaint as true, denied PwC's
motion to dismiss the professional malpractice claim. The
Court found that the Plan Administrator had sufficiently
alleged causation and that its claim withstood an in pari
delicto defense. With the benefit of extensive discovery,
it is apparent that there remain genuinely disputed
material facts that preclude summary judgment: first,
regarding the application of in pari delicto as a defense;
and second, related to the causal relationship between the
sale accounting decision and MF Global's bankruptcy.

A.   PWC'S IN PARI DELICTO DEFENSE

In its July 2014 Order denying PwC's motion to
dismiss, the Court outlined the standard that PwC must
satisfy to prevail on a summary judgment motion:

> While in pari delicto could apply in a professional
> malpractice suit in which the corporation
> intentionally participated in creating and employing
> the incorrect opinion, such as by "intentionally
> provid[ing] inaccurate financial statements to" the
> auditor, Sacher v. Beacon Assocs. Mgmt. Corp., 980
> N.Y.S.2d 121, 124 (App. Div. 2d Dept. 2014), no such
> allegations have been made here. If discovery reveals
> a basis for allegations of that kind, the Court can
> revisit whether in pari delicto applies on a motion
> for summary judgment.

MF Global Holdings Ltd. v. PricewaterhouseCoopers LLP, 57
F. Supp. 3d 206, 211 (S.D.N.Y. 2014). The central question
here is whether MF Global's participation in drafting the
sale accounting decision by itself constitutes the type of
intentional financial wrongdoing that would preclude relief
under in pari delicto. PwC argues that the Court's
statement in the July 2014 Order that in pari delicto
applies only if MF Global was "an active, voluntary
participant in the allegedly improper accounting advice" is
the law of the case and that PwC has met this threshold
upon discovery. (See PwC Mem. at 3.) The Plan Administrator
counters that a sufficient "degree of wrongfulness" is
required to implicate in pari delicto under New York law,

and that PwC cannot show the requisite intentionally wrongful action. (See Opposition at 5-7.)

On this issue, the Court must look once again to the principles underlying the New York common law of in pari delicto as outlined in Kirschner and other decisions. New York courts prior to Kirschner applied in pari delicto where the plaintiff had displayed "immoral or unconscionable conduct that makes the wrongdoing of the party against which it is asserted at least equal to that of the party asserting it," Chem Bank v. Stahl, 237 A.D.2d 231, 232 (N.Y. App. Div. 1st Dept. 1997), or "resorted to gravely immoral and illegal conduct." McConnell v. Commonwealth Pictures Corp., 7 N.Y.2d 465, 471 (N.Y. 1960). Kirschner itself involved corporate insiders engaged in fraud -- in one instance, wrongfully using customer assets to make loans and in another misstating financial performance by misrepresenting certain tax obligations. On the basis of these facts, the New York Court of Appeals declined to broaden the adverse interest exception or revise New York precedents as to in pari delicto. See 938 N.E.2d at 959. Kirschner did not directly analyze whether in pari delicto would apply in cases where a corporate agent's acts were not intentionally wrongful, though in

- 35 -

rejecting the plaintiffs' argument that New York's apportionment of damages statute[7] abolished in pari delicto, the court noted that "there is no reason to suppose that the statute did away with common-law defenses based on intentional conduct, such as in pari delicto." Id. at 957 (emphasis added).

Since Kirschner was decided, courts applying New York law of in pari delicto to claims against a corporate auditor or accountant have recognized the doctrine exclusively where corporate management was alleged to have engaged in intentional wrongdoing or fraud. See, e.g., CRC Litig. Trust v. Marcum, LLP, 19 N.Y.S.3d 291, 293 (N.Y. App. Div. 2d Dept. 2015) (finding in pari delicto barred claims against auditor where corporate management was alleged to have executed a 'phantom revenue' scheme, recording revenue for billings where it knew no payment would be received); Serino v. Lipper, 994 N.Y.S.2d 64, 67 (App. Div. 1st Dept. 2014) (affirming summary judgment on in pari delicto grounds where fund manager committed criminal securities fraud by grossly inflating funds' value); Chaikovska v. Ernst & Young, LLP, 132 A.D.3d 938, 939 (N.Y. App. Div. 4th Dept. 2010) (in pari delicto

---

[7] New York Civil Practice Law and Rules Section 1411.

applied to bar claims against auditor where corporate managers were "aware that they were fraudulently altering the corporate books to obtain funding for [the company].")

Conversely, courts have declined to apply in pari delicto where a corporate agent did not intentionally provide inaccurate financial statements to its outside auditor, but may have acted merely negligently. See, e.g., Sacher, 980 N.Y.S.2d at 124. In Sacher, the Appellate Division rejected, at the pleading stage, an in pari delicto defense in a derivative suit brought on behalf of a corporation against the corporation's auditor. The court reasoned that the corporation was not alleged to have "intentionally provided inaccurate financial statements" to the auditor and therefore could not satisfy the pleading requirements for an in pari delicto defense. Id.[8]

In this case, the Plan Administrator points out that companies routinely participate in formulating accounting decisions related to their financial statements, and "if doing so established in pari delicto when the accounting

---

[8] PwC cites Granite Partners, L.P. v. Bear, Stearns & Co. Inc., a case in which a New York common law claim was barred under in pari delicto because the plaintiffs were the "central decisionmakers" in wrongful securities purchases. In that case, however, a bankruptcy trustee straightforwardly alleged wrongdoing on the part of the corporate actors, and the court emphasized that the complaint did not sound in negligence but in "deliberate misrepresentation." 17 F. Supp. 2d 275, 309 (S.D.N.Y. 1998)

turned out to be simply wrong . . . rather than intentionally wrongful, as New York law requires, it would effectively put an end to all professional malpractice actions against accountants." (Opp. at 7.) The Court agrees, as it agreed in its July 14 Order, that this is not the outcome intended by <u>Kirschner</u> and by New York common law. <u>See</u> <u>MF Glob. Holdings Ltd.</u>, 57 F. Supp. 3d at 212 ("such a broad reading of the doctrine would effectively put an end to all professional malpractice actions against accountants – an outcome not in line with <u>Kirschner</u> or the New York courts' interpretation of it.").

In the July 2014 Order, the Court distinguished this matter from the Commodities Customer Action, in which the Court dismissed claims against PwC on <u>in pari delicto</u> grounds. <u>See</u> <u>MF Global II</u>, 998 F. Supp. 2d at 187-190.[9] The Court observed, "[i]n the Commodities Customer Action, the face of the complaint demonstrated that any of PwC's violations resulted only because MF Global employees violated statutory and common law by transferring customer funds out of secured and segregated accounts." (July 2014

---

[9] The Court later granted final judgment as to the claims against PwC, and the Second Circuit affirmed the decision in <u>In re MF Glob. Holdings Ltd. Inv. Litig.</u> (DeAngelis v. Corzine), 611 F. App'x 34, 36 (2d Cir. 2015), <u>cert. denied sub nom.</u> <u>Bearing Fund LP v. PricewaterhouseCoopers LLP</u>, 136 S. Ct. 497 (2015).

Order at 8.) Not only did the Court find that the Litigation Trustee sought to hold PwC liable for "something that MF Global officers indisputably participated in" (id.), it relied on the fact that the "something" referred to constituted unlawful conduct - specifically, the fraudulent transfer of customer funds. See MF Global II, 998 F. Supp. 2d at 173-75. That distinction between mere participation and intentionally wrongful action remains decisive at this stage. There is a material difference between MF Global officers participating with the company's auditors, even if actively, in the formulation of an accounting strategy where there is no evidence of intentional wrongdoing on the corporate officials' part, and the same individuals committing statutory and common law fraud by improperly withdrawing funds from customer accounts and applying them to effectuate unauthorized purposes.[10]

Applying the principles stated above, the Court now considers the summary judgment record presented by PwC in support of its Motion.

_____

[10] This point explains the Court's emphasis in the July 2014 Order on the significance of the existence of evidence at the summary judgment stage demonstrating that MF Global officers intentionally provided inaccurate financial statements to PwC so as to secure the sale accounting strategy. See MF Global, 57 F. Supp. 3d at 211.

1.    Sale Accounting – PwC's Evidence

Regarding PwC's accounting opinions in this case, there is no disputing that the summary judgment record shows MF Global had a role, often a vocal role, in the company's Euro RTM sale accounting decision. But PwC cannot show undisputed evidence that MF Global was an intentional wrongdoer in undertaking that role in the accounting decision, in the sense that it "intentionally provided inaccurate financial statements" to PwC so that it would create an incorrect opinion. Sacher, 114 A.D.3d at 656.

PwC contends that several key pieces of evidence support its argument that the Plan Administrator intentionally participated in creating the sale accounting decision. First, PwC points to the August 2009 Memo, October 2009 Memo, January 2010 Memo, and June 2010 Memo prepared by the MF Accounting Group, each of which concludes that sale accounting is the proper form of accounting for the Euro RTM transactions through LCH. (See PwC Mem. at 4.) The memos document the MF Accounting Group's "conclusion on the accounting treatment of [RTM] trades": because the two-day gap between repurchase of a bond and its maturity on the LCH meant that "the original repo seller would be unable to sell the asset again before

- 40 -

its maturity" such repurchase would be accounted for as a sale "provided the other conditions are met." (Murphy Dec. Exs. 46, 48, 54, 59, 65). The preparation of the memos, PwC argues, shows that MF Global "drove the decision to account for the Euro RTMs as sales." (See PwC Mem. at 2.)

The memos indicate that MF Global researched and reached a preliminary conclusion that the firm should account for the RTMs as sales. However, they are not conclusive evidence of the sort necessary to establish intentional provision of inaccurate financial information or misleading action on the part of the MF Accounting Group that would bar a claim by the Plan Administrator on behalf of the corporation under in pari delicto. To the contrary, the memos could equally lead a factfinder to conclude that the MF Accounting Group followed standard practice by undertaking its own good faith research about whether sale accounting applied before consulting PwC and awaiting its response. (See Opp. at 2.) The parties do not dispute that Sear began to consider the accounting treatment for Euro sovereign bond transactions in October 2009 and analyzed accounting literature on RTMs, including FAS 140 and ASC 860, prior to drafting the memos. (Def.'s 56.1 ¶¶ 34, 38.) The parties also agree that after Sear sent the January

- 41 -

2010 Memo to PwC, PWC responded to Sear and the MF Accounting Group confirming that "the accounting treatment you have proposed is ok under the facts of the situation you have described in the memo," after which Sear emailed MFG-UK that "we finally confirmed the accounting treatment for UK RTM trades with PwC." (Murphy Dec. Ex. 56, 57.) The Plan Administrator also points to communication between Sear and accounting groups at other brokerages asking for input on how to account for RTMs. (Pl.'s Response 56.1 ¶ 184, citing Murphy Dec. Exs. 51, DiCarlo Dec. Ex. 42.) On this record, the evidence suggests a distinction between MF Global officials offering PwC their opinions about the sale accounting treatment -- even if professionally erroneous -- based on the findings of their research, as opposed to providing facts within the company's purview that they knew were incorrect and nonetheless intentionally communicated to PwC. The existence of the memos does not support summary judgment on the basis that MF Global "intentionally provided inaccurate financial statements." Sacher, 114 A.D.3d at 656.

Second, PwC highlights a November 2010 MF Global Finance Department event during which the MF Accounting Group listed as one of its yearly accomplishments having

"created additional balance sheet capacity for the firm . . . by arguing with PwC that trades could be treated as sales rather than as secured borrowings." (See PwC Mem. at 6.) This is evidence, PwC argues, that the MF Accounting Group "continued to own the accounting decision after January 2010." (Id.) The framing of the sale accounting decision by the MF Accounting Group as an "accomplishment," like the content of the various memos described above, represents evidence of MF Global's participation in research related to the sale accounting decision. It does not, however, support a conclusion as a matter of law that MF Global intentionally provided inaccurate information to PwC related to the propriety of sale accounting and is therefore not evidence that "might affect the outcome of the suit" under New York law. Anderson, 477 U.S. at 248.

Third, PwC offers deposition testimony by MF Global's officers and directors to show that MF Global's accounting team had a "starring role" in determining the correct Euro RTM accounting. (PwC Mem. at 8.) PwC cites deposition testimony by MacDonald about MF Global's responsibility for accounting: "[I]t's up to us to come up with the right accounting . . . so certainly [PwC] would have opined on it for their audit and we would have had a discussion if there

was any sort of disagreement about how we were accounting for something." (PwC Mem. at 7, citing Murphy Dec. Ex. 7 at 256:15-257:3.) Similar testimony comes from a member of MF Global's Chair of the Audit and Risk Committee stating that "accounting policy is owned by financial management. It's the external advisor's job to review that policy and make sure they are comfortable with it." (PwC Mem. at 7, citing Murphy Dec. Ex. 4 at 233:21-234:2.) These statements support PwC's contention that MF Global helped shape the firm's accounting policy. Once again, though, they do not establish that MF Global's ultimate implementation of sale accounting was solely its decision, and not causally related to PwC's approval of it based on the professional negligence the Plan Administrator alleges. Nor do the statements establish that MF Global intentionally misled or provided inaccurate financial statements to PwC. The Plan Administrator maintains that "PwC was aware that it was imperative to MF Global that PwC, as its auditor, agreed with MF Global as to accounting issues." (Pl.'s Response 56.1 ¶ 184.) It cites e-mails and testimony demonstrating that MF Global's conclusions regarding sale accounting were "preliminary" and "subject to PwC's review and approval." (Pl.'s Response 56.1 ¶ 184; see infra Section III(A)(2).)

This conflicting testimony raises a triable issue of fact as to MF Global's role in the sale accounting decision. The testimony presented by PwC does not establish conclusively that MF Global engaged in intentional wrongdoing related to the sale accounting decision.

Fourth, PwC offers e-mails between MF Global employees which, PwC maintains, show that MF Global internally discussed concerns about the potential for RTM transactions during the two-day gap between MF Global's repurchase of the bond and the bond's maturity to jeopardize sale accounting. PwC argues that MF Global "concealed from PwC private concerns" about transactions that could preclude sale accounting. (PwC Mem. at 8.) This constitutes the only factual assertion made by PwC that suggests MF Global intentionally misled PwC as to the propriety of sale accounting. It also raises a point of disputed material fact. For that reason, the Court cannot resolve the conflicting factual accounts on a summary judgment motion.

PwC cites a portion of MF Global expert Lynn Turner's ("Turner") report highlighting a March 2011 transaction that, Turner concludes, would undermine the sale accounting decision. The report describes MF Global's repurchase of an Irish bond two days prior to the bond's maturity, followed

by its sale of a portion of the bond subject to an agreement to repurchase it. Such a transaction would demonstrate that MF Global maintained effective control over the bond in violation of ASC 860's standards for sale accounting. (See Turner Dec. ¶¶ 183-87.) PwC itself, however, disputes that such a bond transaction took place. (Def.'s 56.1 ¶ 113-115.) Regardless of its position that the two-day repo never happened, PwC argues that it is material that MF Global internally discussed the potential for such a transaction but "never shared its concerns with PwC." (PwC Mem. at 10.) It points to an e-mail between Sear and another MF Accounting Group colleague in which Sear asked, "Are you as troubled with regard to the fact that we are able to repo it after re-taking possession of it?" (Murphy Dec. Ex. 41.) A later e-mail from Sear to another MF Global employee stated that a hypothetical reverse RTM would "absolutely . . . jeopardize" sale accounting treatment. (Murphy Dec. Ex. 62. PwC argues that MF Global "never communicated Sear's concerns to PwC." (PwC Mem. at 10.)

The Plan Administrator strongly disputes that MF Global concealed any doubts about the propriety of sale accounting from PwC. It argues that to the extent MF Global

internally questioned whether sale accounting applied, the firm resolved any initial doubts in good faith. Record evidence presented by the Plan Administrator supports this contention, including excluded portions of the e-mails cited by PwC. One such e-mail is a response to Sear's message asking if her colleague was "troubled" about the potential for a second repo. (Murphy Dec. Ex. 41.) The colleague replies that "if it is our usual practice to . . . not repo the security again, I think we could make the argument for RTM." (Murphy Dec. Ex. 61.) In response to the email stating that reverse RTMs would "jeopardize" sale accounting, the Plan Administrator cites an email summarizing the firm's conclusion upon a "detailed assessment of the accounting . . . reviewed by PwC" that reverse RTMs "do not negate" sale accounting. (Murphy Dec. Ex. 63.) The Plan Administrator has provided "evidence in the record from which a reasonable inference could be drawn in its favor" on the issue of whether any intentional concealment took place. Gummo, 75 F.3d at 107. Accordingly, PwC's proffered evidence that MF Global concealed doubts about sale accounting is the subject of a dispute of material fact, and thus insufficient to permit summary judgment on this basis.

2.   Sale Accounting - Plan Administrator's Evidence

The Plan Administrator presents additional facts that
are material to the issue of whether MF Global engaged in
intentional wrongdoing in the course of the company's sale
accounting decision. These facts are drawn from e-mails,
memos, and contemporaneous notes that raise material fact
disputes as to whether (1) at all times MF Global gave PwC
the final word on accounting treatment, and (2) at no time
did MF Global provide deliberately false information to PwC
or conceal private doubts about sale accounting. (See Opp.
at 8-12.)

The record before the Court contains evidence creating
a genuine issue as to whether MF Global or PwC made the
ultimate decision regarding sale accounting. Emails among
the MF Accounting Group and between the MF Accounting Group
and PwC reflect an understanding that PwC's review was
necessary prior to MF Global implementing sale accounting
for Euro RTMs. Sear initially e-mailed PwC the January 2010
Memo asking it to "review [the] attached memo and let us
know if any concerns" (Murphy Dec. Ex. 54), followed by an
e-mail from Rayan asking "has your team cleared our
accounting treatment for RTM in the UK? . . . we will only
potentially apply this accounting treatment in Q410 going

forward, once we clear the accounting with PwC." (Murphy
Dec. Ex. 64.) A January 4, 2010 e-mail from Rayan to a MFG-
UK employee states "we have been working on memo outlining
our position for getting repo to maturity treatment in the
UK. . . . I think it would be prudent to have PWC UK review
it and confirm their agreement, before we tell the desk
that we can definitely get this accounting treatment."
(Murphy Dec. Ex. 52.) Another e-mail emphasized that MF
Global wanted to "have a quick review with PwC on this
[accounting treatment]." (Murphy Dec. Ex. 53.)

The Plan Administrator also points to the fact that MF
Global did not book any Euro RTMs as sales during Fiscal
Year 2010 because it was instructed by PwC that the "two-
legged" repos transactions would not square with sale
accounting. An email from McGowan confirmed that MF Global
would not book the 2009 RTM trades as sales on PwC's
instructions. (Pl.'s Response 56.1 ¶ 188(i).) A PwC
workpaper reported that "at Q3 FY10, we concluded that
where there is a series of Repos the conditions for RTM
accounting are not met and RTM accounting could not be
applied." (See Pl.'s Response 56.1 ¶ 20, citing Murphy Dec.
Ex. 42, DiCarlo Dec. Ex. 4.) There is evidence, further,
that MF Global provided PwC with access to its transactions

and documents without interference. Employees of both PwC
and MF Global testified that MF Global gave PwC free access
to its trade records and other information necessary for
its audit. (Pl.'s Response 56.1 ¶ 195.)

Additionally, there is evidence in the record that may
support a reasonable finding that MF Global executives
believed in good faith that sale accounting was the correct
form of accounting for the Euro RTMs. Steenkamp testified
that he believed that sale accounting for MF Global's Euro
RTMs was proper in 2010 and 2011 and that he still believed
so at the time of deposition. (Def.'s 56.1 ¶ 138.) In an
email exchange between Rayan and Sear, Rayan wrote that she
believed the MF Accounting Group's position on sale
accounting was "strong" but confirmed that PwC should
review the conclusion. (DiCarlo Dec. Ex. 30.) Sear, when
asked whether her intent in preparing the January 2010 Memo
was "to be as accurate as [she] could . . ." affirmed that
such was her intent. (DiCarlo Dec. Ex. 21 at 128:25-129:6.)

The Court thus concludes that the record presented by
the Plan Administrator could support a reasonable jury
finding that MF Global developed preliminary conclusions
about sale accounting in good faith and consistently asked
PwC to review its conclusions.

### 3.   The Litigation Trustee Action

As was the case in its motion to dismiss, PwC additionally maintains that in pari delicto applies because MF Global's litigation position in this action - laid out in the Litigation Trustee's now-settled claims against MF Global's former officers[11] -- conflates the RTM Strategy and the sale accounting decision. PwC argues that (1) the Litigation Trustee, who like the Plan Administrator stands in the shoes of the defunct firm, has alleged that the officers' implementation of the RTM Strategy was closely tied to MF Global's use of sale accounting, and (2) these allegations are sufficient to permit an in pari delicto defense. (PwC Mem. at 9.)[12] At the motion to dismiss phase,

---

[11] Nader Tavakoli, as Litigation Trustee of the MF Global Litigation Trust v. Corzine, et al., No. 13-01333 (S.D.N.Y. Bankr. Sept. 16, 2013) ("Litigation Trustee Action"). The Litigation Trustee Action reached a settlement agreement on July 6, 2016 as part of a global settlement among the Trustee, the Commodities Customer Class, and former MF Global officers and directors and is set for a fairness hearing by this Court on September 16, 2016. (See Dkt. No. 1108, 11 Civ. 7866.)

[12] PwC argues that the Litigation Trustee's allegations in the Litigation Trustee Action constitute judicial admissions by MF Global. (PwC Mem. at 12 n.12.) Although the Second Circuit has not definitely ruled on the matter, "the general rule seems to be that a judicial admission only binds the party that makes it in the action in which it is made, not in separate and subsequent cases." Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp., 351 F. Supp. 2d 79, 96 (S.D.N.Y. 2004); see also Hausler v. JP Morgan Chase Bank, N.A., 127 F. Supp. 3d 17, 37 (S.D.N.Y. 2015) (noting that judicial admissions in one case may be treated as evidentiary admissions in another). Even if the Court were inclined to consider the pleadings in the Litigation Trustee action as evidentiary admissions, the allegations are insufficient to establish in pari delicto for the reasons discussed herein.

the Court was not persuaded that the RTM Strategy was "the same voluntary, unlawful conduct at issue in this lawsuit." MF Global, 57 F. Supp. 3d at 212

PwC now argues that the there is sufficient evidence in the discovery record to support a conclusion that the sale accounting advice was, as alleged by MF Global, indistinguishable from the RTM Strategy. PwC principally cites the expert reports presented by the Plan Administrator's causation expert David Mordecai ("Mordecai"). (PwC Mem. at 13-14.) In his report, Mordecai states that sale accounting "presented to MF Global the incentive to increase [Euro RTM] exposure for the appearance of increased recurring revenue with reduced

---

PwC argues further that MF Global is judicially estopped from contesting misconduct by former MF Global officers because the Litigation Trustee prevailed on those officers' motion to dismiss. See In re MF Global Holdings Ltd., 507 B.R. 808, 811 (S.D.N.Y. 2014). The Court will not deem the Plan Administrator's claims judicially estopped. Judicial estoppel "applies only if the party against whom the estoppel is claimed actually obtained a judgment as a result of the inconsistent position." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Georgiadis, 903 F.2d 109, 114 (2d Cir. 1990). The Litigation Trustee Action was voluntarily dismissed pursuant to a settlement, and the denial of the motion to dismiss, without findings of fact specific to the issues in this case, is not a basis for estoppel. Estoppel applies only when a party's current position is "clearly inconsistent with its earlier position." New Hampshire v. Maine, 532 U.S. 742, 750 (2001). As discussed further in this Decision and Order, the pleadings and filings in the now-settled Litigation Trustee Action did not relate to the specific claims regarding MF Global's sale accounting policy in this case.

leverage ratios." (Mordecai Dec. Ex. 90 ¶ 32.) PwC also points to an interrogatory response by the Litigation Trustee in the Litigation Trustee Action stating its position that Steenkamp was "closely involved in the decisions to add more RTM positions to artificially generate revenue," and in doing so, "concealed [MF Global's] leverage, resulting in materially misleading financial reports." (PwC Mem. at 13; Murphy Dec. Ex. 104.)

The Court is not persuaded that the Litigation Trustee's allegations regarding the RTM Strategy bar the Plan Administrator's professional malpractice claim against PwC pursuant to _in pari delicto_. The claims in the Litigation Trustee action were, as this Court noted in the July 2014 Order, related to the RTM Strategy and did not allege intentional wrongdoing specific to the sale accounting decision. The Court remains unpersuaded that the facts related to the RTM Strategy and the accounting decision are so materially indistinguishable as to compel the conclusion that a claim on the basis of the former also constitutes a claim on the basis of the latter. For the Court to apply _in pari delicto_ at the summary judgment stage, the pleadings and undisputed facts presented in the course of litigation must establish intentional wrongdoing

by the plaintiff that is the subject of the litigation.
See, e.g., In re Adelphia Commcns Corp. Sec. & Derivative
Litig., No. 03-MD-1529, 2014 WL 6982140, at *10 (S.D.N.Y.
Dec. 10, 2014), reconsideration denied, No. 03-MD-1529,
2015 WL 268846 (S.D.N.Y. Jan. 21, 2015) (denying
application of in pari delicto because "drawing all
inferences in Plaintiff's favor," defendant failed to
sufficiently show corporate actor engaged in fraud on
behalf of corporation); Walker, Truesdell, Roth &
Associates, Inc. v. Globeop Fin. Servs. LLC, No. 600469/09,
2013 WL 8597474 at *12 (N.Y. Sup. Ct. May 27, 2013)
(applying in pari delicto where management "as established
on the pleadings" engaged in wrongdoing assisted by outside
advisors).

The pleadings and all fact discovery completed prior
to settlement in the Litigation Trustee Action pertained to
the RTM Strategy, not to the sale accounting decision. PwC
points to the allegation in the Litigation Trustee's
complaint that MF Global engaged in "a scheme . . .
designed and implemented to prop up [MFG's] apparent
profitability through highly leveraged transactions in
foreign debt." (PwC Mem. at 12.) There is no explicit
mention in this statement of sale accounting forming any

aspect of the scheme referred to. But PwC's implication is
that this language could be read as asserting that in fact
sale accounting was an indistinguishable part of MF
Global's wrongdoing for the purposes of in pari delicto.
With little else to go on, for the Court to accept PwC's
theory would require it to make a giant factual leap, not
just construing a claim that particular language may be
subject to different interpretations, but actually writing
into the text a provision that it does not clearly express.
In deciding this Motion, the Court is required to draw all
inferences in the Plan Administrator's favor; to that end,
the Court declines to infer that the Litigation Trustee
action alleged intentional wrongful sale accounting
treatment of the RTM trades by the MF Global officers.

Additionally, Mordecai's expert report -- while
relevant to the causal link between sale accounting and the
RTM Strategy -- does not conclusively demonstrate that the
Plan Administrator's litigation position is that sale
accounting and the RTM Strategy constitute the same
intentionally wrongful scheme. The Plan Administrator does
not deny that the sale accounting decision was a key factor
driving the RTM Strategy. (See Opp. at 13.) On the
contrary, the link between PwC's approval of the sale

accounting policy and the RTM Strategy is a key part of MF
Global's causation argument. The Plan Administrator seeks
to prove that the RTM Strategy was dependent on treatment
of the RTM trades under sale accounting principles, and
that PwC's approval of such a professional practice
permitted MF Global to undertake the doomed strategy. (Id.)
Although PwC looks to cast the Plan Administrator's
allegations regarding causation as a litigation position
implicating in pari delicto, the Court will not infer such
a 'litigation position' where it is not manifest in the
Litigation Trustee Complaint or discovery evidence.

### 4.   DTA and Valuation Allowance

PwC's in pari delicto argument as to the deferred tax
asset and valuation allowance suffers from the same
inadequacy as its argument regarding sale accounting. With
the benefit of discovery PwC has presented evidence that MF
Global's tax department was involved in the March 2011
conclusion that it was "more likely than not" that MF
Global would realize its DTAs in the upcoming period.
However, PwC has not established any undisputed material
facts that would show MF Global engaged in intentional
wrongdoing in the DTA determination such that in pari
delicto would bar the Plan Administrator's claims.

PwC points to MF Global's draft memos outlining the reasons why a valuation allowance was not warranted for Fiscal Year 2011. In the memos, MF Global documents its conclusion that recent losses were due to "one-time unusual charges" and that the firm would be able to realize its DTA with the benefit of tax planning in the future. (DiCarlo Dec. Ex. 111.) There is evidence that those memos, like the memos discussing sale accounting discussed supra, were drafted internally by MF Global employees and sent to PwC for feedback and revision before MF Global finalized a decision. Not only did PwC review the memos, it provided substantive suggestions regarding possible tax planning strategies that MF Global could take to realize its DTA in future reporting periods. Gallagher, for instance, at one point emailed another PwC employee asking whether MF Global could not "argue as a tax planning strategy that they could move down the yield curve to say 10-30 years US Bonds?" (DiCarlo Dec. Ex. 105). Later emails showed that MF Global incorporated PwC's language regarding "tax planning initiatives" into its memo. (DiCarlo Dec. Exs. 107, 111.) PwC presents no facts tending to show that MF Global intentionally provided wrong information to or intentionally misled PwC. Therefore, PwC has not met its

burden at this stage to demonstrate that in <u>pari</u> <u>delicto</u> bars MF Global's claim as to the valuation allowance decision.

For the reasons stated above, the Court is persuaded that triable issues of fact exist as to whether the affirmative defense of <u>in</u> <u>pari</u> <u>delicto</u> bars the Plan Administrator's professional malpractice claim. The Court declines to grant summary judgment to PwC on <u>in</u> <u>pari</u> <u>delicto</u> grounds.

B.   <u>CAUSATION</u>

   1. <u>Sale Accounting</u>

Questions of causation are ordinarily reserved for a finder of fact, and on a motion for summary judgment the moving party bears the burden of showing that no issues of material fact exist and that it is entitled to judgment as a matter of law. See <u>Vera v. Citibank N.A.</u>, No. 00 Civ. 1383, 2001 WL 619379, at *2 (S.D.N.Y. June 6, 2001); <u>Packer v. Skid Roe, Inc.</u>, 938 F. Supp. 193, 196 (S.D.N.Y. 1996) ("Issues of proximate cause are normally questions of fact for the jury to decide, unless the court concludes that a reasonable jury could reach only one conclusion."); <u>Perrin v. Hilton Int'l, Inc.</u>, 797 F. Supp. 296, 299-300 (S.D.N.Y. 1992) ("Although questions of proximate cause are normally

questions of fact, a court may decide that a reasonable jury can reach only one conclusion, and decide the issue as a matter of law.").

The question of whether the series of events leading up to MF Global's collapse are superseding causes that break the chain of causation in relation to MF Global's malpractice claim against PwC is sharply disputed. (See PwC Mem. at 15-17, Opposition at 23.) First, PwC argues that the RTM Strategy was not contingent on sale accounting. (PwC Mem. at 15.) In support of this position, PwC relies largely on Corzine's deposition testimony that MF Global would have undertaken the RTM Strategy regardless of accounting treatment. PwC cites Corzine's testimony that sale accounting "wasn't a driver of why we got there" but "certainly wasn't a detriment" for the firm. (Murphy Dec. Ex. 3 at 1147:21-1148:22.) Corzine also testified that MF Global "took the [Euro RTM] positions to add to the revenue of MF Global." (Def.'s 56.1 ¶ 75.)   PwC also cites Steenkamp's response when asked whether the RTM trades were executed for the purpose of booking income up front: "My understanding was not that it was for sales accounting treatment. Sales accounting treatment was the required way

of actually booking the trades." (Murphy Dec. Ex. 11 at 703:12-21.)

The Plan Administrator, in opposition, points to correspondence indicating that MF Global saw the RTM Strategy as a profitable business opportunity only because of the sale accounting treatment. Presenting at a November 8, 2010 meeting of the MF Global Board of Directors, the MF Accounting Group showed a slide listing "Benefits" of Euro Sovereign RTMs, including the fact that "MFG can derecognize these trades under US GAAP and thus hold them off balance sheet." (DiCarlo Dec. Ex. 69.) The Plan Administrator also cites statements by Corzine at an MF Global Limited Ad-Hoc Global Investment Committee Meeting held on September 15, 2010 that "RTM trades are revenue generation for the firm via FI/Treasury." (DiCarlo Dec. Ex. 47.) On September 22, 2010, an MF Global executive advised his colleagues that Corzine was "looking to do" Euro RTM trades "up to the defined risk limits in each country to get the upfront P&L for this month." (DiCarlo Dec. Ex. 48.) Additionally, the Plan Administrator offers PwC workpapers stating, in reference to the Euro RTMs, "MF Global's overall motivation for entering into these specific contracts is the ability for these securities to be de-

recognized from the balance sheet, and the gain on the sale of those securities . . . recognized in the current period." (DiCarlo Dec. Ex. 81.) Such contradictory testimony, in the Court's view, creates an issue of material fact requiring determinations of state of mind and credibility of witnesses as to whether the RTM Strategy was contingent on sale accounting treatment.

Second, PwC argues that the business decision to amass RTMs, rather than the accounting decision to record the RTMs as sales, was the proximate cause of MF Global's bankruptcy. (PwC Mem. at 15.) PwC points to "Corzine's year-long strategy to invest in more and more European sovereign bonds financed with Euro RTMs" as the proximate cause of MF Global's collapse, along with downturns in MF Global's business lines that led to reported losses and the failure to account for customer segregated funds in October 2011. (PwC Mem. at 22.) There is cognitive dissonance in PwC's argument that MF Global's sale accounting decision was simultaneously so integrally linked with the RTM Strategy as to call for the application of in pari delicto to bar the Litigation Trustee's claims, but at the same time distinct enough that the RTM Strategy but not sale accounting treatment of the RTM trades caused MF Global's

bankruptcy. Putting aside this apparent contradiction, the Court finds that the Plan Administrator has presented sufficient evidence to raise a genuine issue of material fact on this point.

The Plan Administrator has presented sufficient evidence to create a material factual dispute as to whether PwC's acts were "a substantial factor in the sequence of responsible causation, and that the injury was reasonably foreseeable or anticipated as a natural consequence." MF Glob. Holdings Ltd., 43 F. Supp. 3d at 314 (citing Lerner, 318 F.3d at 123). The Plan Administrator points to record evidence including an e-mail from McGowan, the PwC audit partner, to MF Global describing foreseeable liquidity risks (DiCarlo Dec. Ex. 41); an internal PwC e-mail identifying a credit crisis triggering margin calls as the "biggest risk" for MF Global's Euro RTM position (DiCarlo Dec. Ex. 79); and its expert report by Mordecai testifying that it was "reasonably foreseeable to PwC that sale accounting could result in a reach for yield and an accumulation of a large portfolio of Euro RTMs" (Mordecai Dec. ¶ 11.a.). The Court is persuaded that the record contains sufficient evidence raising material factual issues as to whether additional causes cited by PwC -- the

buildup of Euro RTMs, European market volatility, credit downgrades, and margin calls -- are "extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from the defendant's conduct" so as to "break the causal nexus." Derdiarian v. Felix Contracting Corp., 51 N.Y.2d 308, 315 (1980).

Even if at trial PwC were able, as it might be, to establish other potential causes of MF Global's collapse, the Plan Administrator "need not prove . . . that the defendant's conduct was the sole cause of the injuries." Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 513 F. App'x 30, 32 (2d Cir. 2013). As this Court observed in its July 2014 Order, the Plan Administrator "cannot collect for damages attributable solely to MF Global's business strategy, rather than to PwC's allegedly erroneous accounting advice." (July 2014 Order at 14.) The resulting complex factual determination as to what harm to MF Global was caused by the negligent accounting advice and what harm was caused by the RTM Strategy is one for a factfinder to resolve.

Finally, PwC contends that sale accounting did not mislead MF Global about the financial risks that it claims

led to the firm's collapse. (PwC Mem. at 15.) Essentially, PwC argues that as a matter of law, an audit client cannot claim it was misled about its own financial condition. Although PwC presents a number of cases[13] not binding on this Court stating that a client's poor business judgment is not among the foreseeable risks that auditors have a duty to prevent, the Court is not persuaded that, as a matter of New York law, a malpractice claim by an audit client fails as a matter of law unless the client can show that the client was misled about its own financial condition due to the auditor's failure. (PwC Mem. at 25.) A jury could reasonably find that the Plan Administrator satisfied the elements of a professional negligence claim by showing that MF Global relied to its detriment on PwC's assessment of sale accounting treatment, without finding that MF Global was misled as to its own financial condition.

PwC cannot "affirmatively demonstrate that a reasonable jury could reach only one conclusion" as to proximate causation. Vera v. Citibank N.A., No. 00 Civ.

---

[13] See Maxwell v. KPMG LLP, 520 F.3d 713, 716-17 (7th Cir. 2008) ("It was not [the auditor's] duty to give the company business advice"); Fehribach v. Ernst & Young LLP, 493 F.3d 905, 910 (7th Cir. 2007); Johnson Bank v. George Korbakes & Co., LLP, 472 F.3d 439, 443 (7th Cir. 2006).

1383, 2001 WL 619379, at *2 (S.D.N.Y. June 6, 2001). Because a jury could reasonably conclude, based on the testimony and documents in this case, that PwC's approval of sale accounting was a proximate cause of MF Global's buildup of Euro RTMs and of the liquidity issues precipitating MF Global's collapse, these issues cannot be resolved by the Court on a summary judgment motion.

2. DTA and Valuation Allowance

PwC also seeks summary judgment based on the Plan Administrator's DTA claim. PwC argues that no reasonable jury could find that MF Global's failure to record a valuation allowance earlier than September 2011 proximately caused MF Global's bankruptcy. (PwC Mem. at 27.) Although the record on this subject is somewhat thinner than on the sale accounting decision, the Court is persuaded that the Plan Administrator has presented sufficient evidence to create a genuine issue of material fact. MF Global first announced it was taking a $119 million valuation allowance against the DTA on October 25, 2011, as part of its $191 million loss for the quarter ending September 30, 2011. Moody's immediately downgraded MF Global's rating, and one week later MF Global declared bankruptcy. Turner, the Plan Administrator's accounting expert, concluded in his expert

report that "the valuation allowance adjustment in Q2 2012 sent a negative message concerning the Company's future prospects" and "MF Global should have recorded an adjustment to its valuation allowance prior to Q2 2012." (Turner Dec. Ex. 1 ¶¶ 405, 409.) As was the case with the sale accounting decision, the Plan Administrator need only show that the valuation allowance was a "substantial factor" in causing the bankruptcy filing and the attendant damages.[14] Lerner, 318 F.3d at 123. On this record a jury could find that PwC's advice as to the timing of the valuation allowance was one of the factors, along with the sale accounting decision, that caused MF Global's losses.

C.    STATUTE OF LIMITATIONS

PwC argues in addition that the three-year limitations period for auditor malpractice claims precludes the Plan Administrator's claims arising from PwC's audit for Fiscal Year 2010.[15] The limitations period ordinarily runs from the date the audit opinion is issued. Ackerman v. Price Waterhouse, 84 N.Y.2d 535, 541 (1994). The audit opinion

---

[14] The Plan Administrator also presents expert testimony by Mordecai stating that if a ratings downgrade had happened earlier, it is reasonable to anticipate that greater MF Global value would have been preserved. (Mordecai Dec. Ex. 1 ¶ 51.)

[15] This argument pertains only to the valuation allowance decision, since the parties agree that no Euro RTMs were accounted for as sales during Fiscal Year 2010.

for Fiscal Year 2010 was issued on May 27, 2010, and the
Complaint was filed March 28, 2014. However, MF Global
cites the continuous representation doctrine, which in the
context of a client/auditor relationship states that if an
auditor continued to provide work on an audit, the
limitations period does not run until the conclusion of the
auditor's work on the audit. To invoke the continuous
representation doctrine, a plaintiff must establish: (1)
ongoing representation connected to the specific matter at
issue in the malpractice action and (2) clear evidence of
an ongoing, continuous, developing and dependent
relationship between the client and the [auditor]. De Carlo
v. Ratner, 204 F. Supp. 2d 630, 636 (S.D.N.Y. 2002), aff'd,
53 F. App'x 161 (2d Cir. 2002). The ongoing representation
must be specific to the matter in dispute. See In re
Magnesium Corp. of Am., 399 B.R. 722, 749 (Bankr. S.D.N.Y.
2009).

PwC advised MF Global in responding to an SEC comment
letter about its 2010 Form 10-K in June 2011. Although PwC
argues that its advice was in fact part of the Fiscal Year
2011 audit, the Plan Administrator presents evidence that
the work provided on the SEC's comment letter was in fact
related to the 2010 audit. McGowan, the 2010 engagement

partner, participated actively in the response to the SEC letter, reviewing multiple drafts of MF Global's responses. (See DiCarlo Dec. Exs. 92, 94-96.) PwC also continued to review and identify corrections to the Fiscal Year 2010 audit of the DTA into 2011. (See DiCarlo Dec. Ex. 112.) In fact, PwC prepared a workpaper in April 2011 detailing the conclusions it had reached in the 2010 audit. (DiCarlo Dec. Ex. 109.) The record evidence is sufficient to show PwC's "ongoing representation" of MF Global connected to the Fiscal Year 2010 financial statements. De Carlo v. Ratner, 204 F. Supp. 2d at 636. Accordingly, the Court will not grant summary judgment barring the Plan Administrator's claims arising out PwC's work on the Fiscal Year 2010 audit.

D.   CONCLUSION

Based on the summary judgment record, the Court is persuaded that there remain genuine issues of material fact pertaining to the causal relationship between MF Global's bankruptcy and PwC's accounting advice to MF Global in this case, as well as genuine issues of material fact relating to whether the defense of in pari delicto applies to the Plan Administrator's claims. Accordingly, the Court denies PwC's motion for summary judgment.

## IV.  ORDER

For the reasons stated above, it is hereby

**ORDERED** that the Motion of defendant PricewaterhouseCoopers LLP for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (Dkt. No. 46) is **DENIED**.

The Clerk of Court is directed to terminate the motion for summary judgment. (Dkt. No. 46.)

**SO ORDERED.**

Dated:    New York, New York
          4 August 2016

Victor Marrero
U.S.D.J.