*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MF GLOBAL HOLDINGS LTD., AS PLAN ADMINISTRATOR,

Plaintiff,

- against -

PRICEWATERHOUSECOOPERS LLP,

Defendant.

Case No. 14-cv-2197 (VM)(JCF)

**MF GLOBAL'S PRETRIAL MEMORANDUM OF LAW**

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
Daniel J. Fetterman (DFetterman@kasowitz.com)
Michael C. Harwood (MHarwood@kasowitz.com)
Trevor J. Welch (TWelch@kasowitz.com)
David J. Mark (DMark@kasowitz.com)
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700

Attorneys for Plaintiff MF Global Holdings Ltd., As Plan Administrator

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................ 1

BACKGROUND ........................................ 1

ISSUES TO BE TRIED ........................................ 5

I. PWC WAS PROFESSIONALLY NEGLIGENT ........................................ 5

A. PwC Improperly Agreed to Sales Accounting Treatment ........................................ 5

B. PwC Failed to Require MFG to Write Down the DTA ........................................ 7

II. PWC'S NEGLIGENCE PROXIMATELY CAUSED MFG'S HARM ........................................ 8

III. DAMAGES ........................................ 10

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*MF Global Holdings Ltd. v. PricewaterhouseCoopers LLP*,
No. 14-2197, 2016 WL 4197062 (S.D.N.Y. Aug. 5, 2016) ............................................*passim*

Plaintiff MF Global Holdings Ltd. ("MFG"), as Plan Administrator (the "Plan Administrator"), respectfully submits this pretrial memorandum of law.

## PRELIMINARY STATEMENT[1]

PwC's egregious professional negligence was a substantial cause of MFG's collapse. By incorrectly approving sales accounting treatment for MFG's repurchase-to-maturity investments in European sovereign debt ("Euro RTMs"), and failing to properly investigate and assess MFG's deferred tax asset ("DTA"), PwC substantially contributed to MFG's rapid demise in October 2011. Based on PwC's negligent audit failures in approving RTM accounting -- which provided upfront revenue recognition and off-balance sheet treatment, and which MFG expressly stated it would not use unless PwC agreed -- the company amassed a huge portfolio of Euro RTMs that exceeded $6.3 billion by September 2011. The bottom fell out shortly thereafter. By October, when regulators, rating agencies and markets fully appreciated MFG's massive proprietary exposure to this investment, and MFG was forced to take a more than $100 million write down on its DTA, rating agencies downgraded MFG to "junk" status. This sparked margin calls and an evaporation of liquidity, resulting in a total collapse of the company and damages in excess of $2 billion. The Plan Administrator will prove these and other facts at trial.

## BACKGROUND

At the beginning of 2010, MFG was a struggling but viable futures commission merchant. A transition was necessary because the company's traditional income streams were facing continued downward pressure. The markets and MFG's rating agencies also were focused on these

---

[1] Given the page limitation (and purpose of this submission), MFG cannot hope to recount all instances of PricewaterhouseCoopers LLP's ("PwC") professional negligence. Rather, MFG describes and analyzes herein the greater aspects of PwC's misconduct, and respectfully refers the Court to its own recitation of the finer details. *See MF Global Holdings Ltd. v. PricewaterhouseCoopers LLP*, No. 14-2197, 2016 WL 4197062 (S.D.N.Y. Aug. 5, 2016).

concerns. In March 2010, Moody's placed MFG's ratings on negative watch, and emphasized the need for MFG to improve earnings and reduce leverage to preserve its investment grade rating.

In March 2010, Jon Corzine was recruited as MFG's new Chief Executive Officer. Mr. Corzine embarked on a plan to transform MFG into a more robust broker-dealer and investment banking firm, which constituted a significant departure from MFG's historic business model and risk profile. As a bridge to this new business plan, MFG invested in the Euro RTMs that are the focus of this litigation. The Euro RTM strategy appeared to be the perfect solution for MFG's challenges, providing the ability to immediately recognize revenue without increasing leverage. But these benefits could only be realized -- *and the RTM strategy could only be undertaken* -- if PwC agreed to the proposed sales accounting treatment for the investments.

MFG first asked PwC if it agreed to the sales accounting in January 2010, and PwC's incorrect approval soon followed. MFG relied on PwC's incorrect accounting conclusion in implementing its Euro RTM strategy. While genuine RTMs should be accounted for as sales under generally accepted accounting principles ("GAAP"), the Euro RTMs were materially different. True RTMs call for repurchase on the day the bond matures, so the bond is never returned to the RTM seller and the transaction is completed on a "net settlement" basis (*i.e.*, only cash is exchanged). The Euro RTMs, by contrast, were repurchased *two days before maturity* as required by the London Clearing House where the trades were cleared, which required MFG to reacquire the bonds in return for full payment.

In terms of sales accounting, the problems with this structure were many. MFG regained control of the bonds upon repurchase, meaning they were subject to attachment by creditors or in bankruptcy, and had used the bonds to enter into or settle other trades during the gap before maturity, thereby obtaining an economic benefit in clear contravention of GAAP. Although PwC

knew that these transactions were never net settled and that MFG regained control over the securities two days before maturity, PwC inexplicably approved sales accounting for the Euro RTMs. The analysis underlying this decision, if and to the extent undertaken, was never documented.

PwC was well aware of the consequences of its mistake. The entire stream of future income generated by each trade was, under sales accounting, recognized at the inception of each transaction and the bonds were taken off the balance sheet. To generate income quarter-by-quarter, the strategy required MFG to accumulate a significant position in Euro RTMs over time -- an accumulation only made possible by PwC's approval of sales accounting treatment that (i) allowed MFG to recognize the entire gain for RTMs that would not settle for a year or more on the date it entered into those RTMs and (ii) further allowed MFG to derecognize the RTMs from its balance sheet, thereby masking its actual leverage and overall exposure to the RTM portfolio. PwC foresaw the risks of this accumulated exposure but failed to reassess its faulty conclusions. In January 2011, an internal email demonstrates PwC's concern over the liquidity risks created by MFG's RTM portfolio:

> the biggest risk on their EUR 2.4 billion position is that the worsening credit crisis may trigger temporary declines in the prices of the bonds they hold that in turn will trigger margin calls that they might not be able to meet. If that happens, their positions may be liquidated at prices much worse than anyone anticipated.

This proved to be an accurate assessment.

Throughout this time period, PwC also reviewed MFG's tax-related accounting decisions, including whether it should take a valuation allowance against (*i.e.*, write down) its DTA. GAAP requires a valuation allowance when the evidence shows -- and the auditor agrees -- that it is "more likely than not" that a company will not generate sufficient income to which the DTA would apply

(that is, there would be no income for the DTA, *i.e.* the carryforward losses, to offset).

PwC failed to adequately evaluate the information provided by MFG in connection with this analysis and, as a direct and proximate result, MFG did not record a valuation allowance against the DTA until far later than it should have. PwC's specific acts of negligence in this regard were varied, depending on the time at which the information was considered. In fiscal year 2010, PwC failed to recognize that MFG was in a "cumulative loss" position during the prior three years -- a circumstance viewed as a "significant piece of negative evidence that is difficult to overcome." This error was discovered by PwC in connection with its audit of fiscal year 2011. Even then, and despite the fact that fiscal year 2011 had another major loss, contrary to projections of profit, PwC's 2011 audit ignored obvious problems with MFG's profit projections and other so-called "positive evidence," and found it reasonable to project that there would be sufficient income in the future for the DTA to offset.

PwC (along with MFG) reversed course just months later and MFG disclosed a greater than $100 million valuation allowance, resulting in a more than $190 million loss for that quarter. The timing of this decision was critical. Based on these results, Moody's downgraded MFG to the lowest possible investment grade and indicated that it was on negative watch because it was "unlikely" MFG would, in the near term, be able to achieve its financial targets. Because the DTA depended on MFG's ability to generate adequate income, the belated write down confirmed the market's belief that MFG could not meet future earnings targets even 18 months after Mr. Corzine's turnaround effort began. With MFG's simultaneous disclosure of its massive RTM portfolio and its more than $190 million quarterly loss resulting from its delayed valuation allowance, the bottom fell out almost immediately.

As PwC had predicted, and its accounting imprimatur effectively allowed, volatility in the

European sovereign debt market created dire liquidity issues for MFG. The hundreds of millions of dollars in margin that MFG was required to post for these RTMs increased dramatically in the weeks preceding its demise and MFG ultimately was unable to proceed as a going concern. On October 31, 2011, the company filed for bankruptcy and the Plan Administrator filed this action in March 2014. In decisions dated July 9 and August 27, 2014, the Court denied PwC's motion to dismiss and denied its motion for summary judgment on August 5, 2016. In these decisions, the Court twice rejected PwC's causation defenses, determining that it is up to the jury to decide those issues. Similarly, the Court has held that triable issues of fact may exist as to whether the affirmative defense of *in pari delicto* barred MFG's claim for professional malpractice.

**ISSUES TO BE TRIED**

To prove its professional negligence claim, MFG must and will show that it (1) contracted for a professional service from PwC, which (2) departed from accepted standards of practice, and (3) proximately caused MFG's injuries. *MF Global Holdings Ltd.*, 2016 WL 4197062 at *9.

## I. PWC WAS PROFESSIONALLY NEGLIGENT

The evidence at trial will demonstrate that PwC committed professional negligence by, among other things, approving sales accounting treatment for MFG's Euro RTMs and failing to require MFG to write down its DTA before September 2011. PwC's performance with regard to these issues is measured against its obligations under generally accepted auditing standards ("GAAS"), GAAP, and their interpretive guidance.

### A. PwC Improperly Agreed to Sales Accounting Treatment

MFG embarked on its RTM strategy in September 2010. Its ability to pursue this strategy was dependent on PwC's approval of sales accounting treatment for those transactions. That approval was professionally negligent because, under the applicable accounting principles, Euro

RTMs should have been accounted for as secured borrowings.

Plaintiff's expert, Lynn Turner, a former Chief Accountant of the SEC, will testify that PwC's conclusion was wrong and not in compliance with GAAP. ASC 860, which the parties agree is the governing accounting standard, permits repurchase agreements to be treated as sales only if three requirements are met. Mr. Turner will testify that the Euro RTMs did not meet *even one* of those independent requirements.

For example, the final prong, which prohibits the repo-seller from exercising "effective control" over the transferred asset, makes clear that those Euro RTMs did not qualify for sales accounting treatment, and Mr. Turner will explain why. True RTMs generally qualify for sales accounting treatment only because they terminate on the maturity date of the underlying asset, and thus reflect the reality that the repo-seller fully parted with the asset, leaving the repo-buyer to redeem the bond and return the net cash amount to the seller. The Euro RTMs operated much differently, in a manner known to PwC and inconsistent with the GAAP requirements for sales accounting. Unlike a true RTM, the Euro RTMs terminated two days before maturity, at which time MFG was required to buy back the bonds. Whether this form of transaction -- a repo-*before*-maturity -- would qualify for sales accounting is governed primarily by a specific subparagraph of ASC 860. While that subparagraph does not specifically define " before maturity," it does provide that a repurchase transaction can be treated as a sale only if, "because of the timing of the redemption, *the transferor would be unable to sell the financial asset again before maturity (that is, the period until maturity is so short that the typical settlement is a net cash payment)*."

Mr. Turner will explain how the Euro RTMs plainly failed to satisfy this requirement and how PwC's approval of sales accounting treatment without considering the various ways that MFG could sell the bond in the two-day gap, despite the absence of net settlement, constituted

professional negligence. Mr. Turner will testify that MFG could, and on more than one occasion did, sell the bond underlying a Euro RTM in the gap between termination and maturity. The Plan Administrator's repo-trading expert, Christine Pallone, will testify that its ability to do so was "common knowledge" in the industry. PwC's lead audit partner, Linda McGowan, recognized some of these disqualifying concerns almost immediately upon reviewing MFG's preliminary analysis in early 2010. But just days after commenting internally that the Euro RTMs apparently did not qualify for sales accounting because they were not net settled, on January 18, 2010, Ms. McGowan reversed course and approved sales accounting treatment with no additional documented analysis. Without this approval, MFG would not have accounted for these transactions as sales in each of its quarterly and annual financial statements in fiscal year 2011, all of which were reviewed or audited and approved by PwC. PwC's error constituted flagrant professional malpractice and, as explained *infra*, proximately caused MFG's ultimate demise.

### B. PwC Failed to Require MFG to Write Down the DTA

PwC also committed professional negligence in its audit of MFG's DTA. In fiscal year 2011, MFG recorded a $108 million DTA based on its supposed ability to protect that amount of future income from federal taxes. Its ability to do so required a finding, supported by objectively verifiable evidence, that it was more probable than not that it would generate enough future profits to benefit from this tax asset, a standard derived from ASC 740, the undisputed authority on DTAs. GAAP imposes a "heavy burden" to avoid writing down the DTA for companies that have existing cumulative losses in prior years, as MFG had reported.

PwC failed MFG in virtually all aspects of this analysis. After first failing to realize that MFG was in a cumulative loss period as of the fiscal year 2010 audit, PwC performed an insufficient retrospective analysis into the issue and, as Mr. Turner will testify, relied on the

company's subjective projections of future profits from its brand new turnaround strategy to overcome the objective evidence of MFG's reported losses. The 2011 fiscal year audit was similarly sloppy and careless. Despite another loss in that fiscal year, demonstrating that MFG's profit projections were not sufficiently reliable, PwC inexplicably concluded that certain "positive evidence" made it more probable than not that MFG would generate enough profits to realize this tax asset. Several months later, in September 2011, and only after MFG acknowledged that its profit projections could not be met, PwC belatedly recognized that a more than $100 million valuation allowance had to be taken against the DTA. This, again, constituted malpractice.

## II. PWC'S NEGLIGENCE PROXIMATELY CAUSED MFG'S HARM

To establish causation, MFG must show that "PwC's negligent professional advice … was a substantial factor" in MFG's financial damages. *MF Global Holdings Ltd.*, 2016 WL 4197062 at *8. In particular, MFG must show that PwC's malpractice was a "but for" cause of MFG's damages, and that the harm suffered was "within the ambit of reasonably foreseeable risk." *Id.* at 9.

The evidence at trial will show that, without sales accounting, MFG could not have amassed the huge Euro RTM portfolio that ultimately led to its demise. As a threshold matter, the benefits of sales accounting created a major incentive for MFG to invest heavily in Euro RTMs. Rating agencies were insisting that MFG increase its revenues substantially and reduce its balance sheet leverage as a condition to maintaining its investment grade rating. Sales accounting for Euro RTMs provided both benefits: revenue was recorded upfront and the underlying assets were removed or "derecognized" from the balance sheet. PwC understood this was why MFG pursued the investment strategy. In an audit workpaper, PwC concluded that MFG's "*overall motivation* for entering into these [Euro RTMs] is the ability for those securities to be *de-recognized from the*

*balance sheet, and the gain on sale of those securities … recognized in the current period*."

Numerous contemporaneous documents demonstrate that MFG executives were anxious to obtain the up-front revenue promised by the Euro RTMs. Immediate recognition of the entire stream of future income, however, incentivized MFG to amass a huge RTM portfolio. David Mordecai, Ph.D., will testify that, given the structure of the transaction and the need for MFG to increase revenue substantially without increasing leverage, it was reasonably foreseeable to PwC that off-balance sheet accounting incentivized MFG to continue increasing its Euro RTM portfolio to recognize additional income quarter-after-quarter and generate the revenue it desperately needed. Dr. Mordecai also will testify that MFG -- *objectively* -- could not have amassed its more than $6 billion off-balance sheet exposure without PwC's blatantly negligent approval of sales accounting in the first instance.

The downside consequences of this highly-concentrated portfolio also were reasonably foreseeable to -- and actually foreseen by -- PwC around the time of its approval. In April 2010, Linda McGowan sent to MFG a brochure describing foreseeable liquidity risks for companies like MFG investing in sovereign debt, cautioning that "fears of weaker sovereign credit continue to spread" and could overwhelm even the most successful of companies, which MFG clearly was not. In January 2011, an internal PwC email expressed concern over the material liquidity risk that this created for MFG specifically, warning that the "worsening credit crisis" could "trigger margin calls that [MFG] might not be able to meet." These risks materialized and were a substantial cause in MFG's collapse. On October 24, 2011, Moody's downgraded MFG to one notch above "junk" status, citing, among other things, MFG's "increased exposure to European sovereign debt," and placed it "under review for possible further downgrade" given its belief that MFG was "unlikely" to achieve its financial targets in the near term. Three days later, Moody's

downgraded MFG to "junk," commenting that its "$6.3 billion sovereign risk exposure represented 5 times the company's tangible common equity." And when MFG filed for bankruptcy on October 31, MFG's President submitted an affidavit stating that the "events leading to the chapter 11 filing" were the very ones foreseen by PwC: accumulation of the sizeable Euro RTM portfolio, public concerns regarding "euro-zone sovereign debt," all of which, as Dr. Mordecai will testify, sparked increases in margin calls and an evaporation of liquidity and led to "grave concerns" regarding its "viability and whether it should continue operations in the ordinary course."

PwC's failure to require MFG to write down the DTA also proximately caused MFG's demise. Mr. Turner will testify that, because the DTA depended on MFG's ability to generate income that it could offset with the DTA, the delayed valuation allowance was significant evidence, coming at the worst possible time, that MFG did not believe (and the market now understood) that it could meet its earnings targets.

## III. DAMAGES

Guy Davis, a highly-qualified expert in the field of business valuation, has opined and will testify at trial that MFG's damages range from approximately $1.9 billion to $2 billion. This measure of damages represents MFG's "lost enterprise value," which is designed to capture the financial impact of the total destruction of a business. Such damages are calculated as the value of the business prior to the bad act, offset by residual value after the collapse. With mandatory pre-judgment interest, MFG would be entitled to a damages range of approximately $2.8-3.1 billion.

Dated: New York, New York
January 13, 2017

Respectfully submitted,

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP

By: ______________________________

Daniel J. Fetterman (DFetterman@kasowitz.com)
Michael C. Harwood (MHarwood@kasowitz.com)
Trevor J. Welch (TWelch@kasowitz.com)
David J. Mark (DMark@kasowitz.com)
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700