REDACTED VERSION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MF GLOBAL HOLDINGS LTD., AS PLAN ADMINISTRATOR,<br><br>                              Plaintiff,<br><br>    -against-<br><br>PRICEWATERHOUSECOOPERS LLP,<br><br>                              Defendant. | Case No. 14-cv-2197 (VM) |

## DEFENDANT PRICEWATERHOUSECOOPERS LLP'S
## PRETRIAL MEMORANDUM

Dated: January 13, 2017
       New York, New York

KING & SPALDING LLP

James P. Cusick
James J. Capra, Jr.
David M. Fine
J. Emmett Murphy
1185 Avenue of the Americas
New York, New York 10036
Tel: (212) 556-2100
Fax: (212) 556-2222

*Attorneys for Defendant
PricewaterhouseCoopers LLP*

PricewaterhouseCoopers LLP ("PwC") respectfully submits this Pretrial Memorandum to address briefly the remaining issues to be tried on the professional malpractice claim brought by Plaintiff MF Global Holdings Ltd., as Plan Administrator ("Plan Administrator").

## PRELIMINARY STATEMENT

Many of the facts surrounding MF Global's collapse are essentially undisputed. Upon his arrival in March 2010, new CEO Jon Corzine attempted to restore the Company to profitability after a substantial loss the previous year. Part of his strategy was to capitalize on what he perceived as an outsize profit opportunity in European sovereign bond investments. Beginning in September 2010, he drove the Company to invest heavily in European sovereign bonds, and to finance those investments with repurchase transactions (the "Euro RTMs"). Corzine's investment instincts were arguably sound—the investments were relatively short term, the underlying European sovereign bonds never defaulted, and the Company booked profits of over $110 million in a little more than a year.

But these investments were not without risks. Corzine and other members of senior management understood and advised the Company's Board of Directors that MF Global's trading counterparties could demand additional margin if the perceived risks of the underlying security increased, or if trading counterparties determined that MF Global had become less creditworthy. Such margin calls could in turn stress the Company's liquidity. While the Company's Risk Department set risk limits on the Company's exposure to the Euro RTMs, the Board repeatedly increased those limits at Corzine's request—each time acknowledging the increasing liquidity exposure. In the end, the Company did more than 100 Euro RTM trades, and as of September 30, 2011, its Euro RTMs totaled approximately $6.3 billion (net of reverse repurchase agreements).

In the summer of 2011, a series of events caused the Company setbacks. Interest rates remained at historic lows, resulting in lower interest income on customer balances. Standard & Poor's downgraded long-term U.S. sovereign debt for the first time in history. A downturn in the Euro sovereign debt market and regulatory scrutiny led to increasing liquidity stress. Other business lines suffered during the summer, and the Company reported a significant loss for the quarter ending September 30 (having reported a profit the previous quarter). Market scrutiny increased, and, in a final chaotic week, a scramble to satisfy large customer withdrawals and margin calls led to a massive breach of customer fund segregation—and the notorious $1 billion shortfall that crushed a promising deal to sell the company. The Company filed for Chapter 11 bankruptcy on October 31, 2011.

The Court is intimately familiar with this story, which has been told with remarkable consistency by regulators, Congress, and trustees (including Plaintiff's predecessor-in-interest, Louis J. Freeh). The inescapable conclusion is that MF Global's bankruptcy was the ultimate consequence of its own business decisions, market contagion, and an unfavorable global economic climate.

The Plan Administrator cannot prove that PwC had anything to do with MF Global's business decision to embark on the Euro RTM strategy, or its management of liquidity risk, or its massive segregation breach. Its theory of liability is something different and has no precedent in reported case law. Standing in the shoes of MF Global, it seeks to blame its own collapse on PwC's agreement, two years earlier, with MF Global's nuanced and technical accounting judgments. Not because those accounting judgments were later determined to be wrong (or even challenged) by a regulator. Not because the Company's accounting somehow hid the risks of the Euro RTM trades from MF Global itself. Not because the accounting made the trades more

2

risky. Rather, the Plan Administrator claims the accounting judgments allowed and incentivized the Company to pursue its calculated business strategy.

PwC is confident that the jury will reject this theory. To begin, the evidence will show that the accounting determinations were reasonable, and PwC's audit conclusion upon reviewing those accounting determinations complied with professional standards. Moreover, the senior officers who actually ran MF Global (most notably Jon Corzine) will reject the assertion that the Company was lured into its RTM trading by the accounting. And regardless of the Company's motivations, no reasonable juror could conclude that PwC's agreement with the Company's accounting treatment was in any sense the proximate cause of the Company's collapse. These and other bases for PwC's defense are described below.

## I. The Evidence Will Not Support Plaintiff's Sole Malpractice Claim

The Plan Administrator has the burden to establish by a preponderance of the evidence that: (1) PwC owed MF Global a duty of care; (2) PwC breached that duty of care; and (3) PwC's breach was both the actual and proximate cause of MF Global's bankruptcy. *Thomas v. JPMorgan Chase & Co.*, 811 F. Supp. 2d 781, 793 (S.D.N.Y. 2011); *see also Anwar v. Fairfield Greenwich Ltd.*, 118 F. Supp. 3d 591, 604 (S.D.N.Y. 2015).

### A. Duty

PwC does not dispute that it owed a duty of care in performing its audit of MF Global's financial statements. But as set forth below, MF Global's case is premised on an implicit and impermissible expansion of that duty. First, PwC's duty was defined by the terms of its contract and professional standards, which are explicit that *MF Global* was responsible for its accounting determinations and to ensure its financial statements comply with GAAP. Def. Ex. 212, 8/2/2011 Contract (management is responsible "for reporting financial information in conformity with [GAAP]"); Def. Ex. 657, AU § 110.03 ("[T]he fair presentation of financial statements in

3

conformity with [GAAP] is an implicit and integral part of management's responsibility."). Second and more broadly, the auditor does not and cannot give business advice, nor is it the insurer of bad or risky business decisions.

B. Breach

In the typical audit malpractice claim, the audited financial statements are alleged to have contained a fundamental misstatement of the Company's financial condition, or concealed a risk that later materialized.[1] The issue of breach then turns on whether the auditor nevertheless satisfied professional standards—typically Generally Accepted Auditing Standards ("GAAS")—in failing to identify the misstatement and issuing an opinion that the financial statements complied with GAAP. This case is different. The Plan Administrator does not allege that PwC failed to discover a fraud or other risk that led to the Company's downfall, but rather that it failed to disagree with the Company's accounting judgments. Before even getting to PwC's audit procedures, MF Global must first prove its own accounting judgments did not comply with GAAP.[2] It will be unable to do so.

Recognizing that this memorandum is not the place to argue the details of ASC 860 (the relevant GAAP) and the mechanics of the Euro RTMs, PwC submits that the evidence will show the following. MF Global's External Reporting and Accounting Policy group, which reported up to the CFO, was responsible for determining the proper accounting treatment under GAAP for all transactions. The group analyzed the details of the Euro RTMs and whether they should be

---

[1] The Plan Administrator has failed to identify a single audit malpractice case that does not fit this pattern. *See, e.g., Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 396 (S.D.N.Y. 2010) (investors in Madoff feeder fund relied on audit opinion to provide "assurance that the Funds' assets were legitimately invested and accurately valued"); *Cumis Ins. Soc'y Inc. v. Tooke*, 293 A.D.2d 794, 794 (3d Dep't 2002) ("certified [audit] opinions were materially incorrect in that they failed to reflect [employee]'s misappropriations and the cash shortage").

[2] 4D N.Y.Prac., Com. Litig. in New York State Courts § 98:27 (4th ed.) (to sustain negligence claim against an auditor, "[a] violation of a specific professional standard must generally be alleged, usually generally accepted auditing standards, or 'GAAS,' resulting in a material misstatement of the company's financial statements . . . in accordance with generally accepted accounting principles, or 'GAAP.'").

4

accounted for as sales or secured financings under ASC 860. The group's efforts culminated in a memorandum concluding that Euro RTM transactions should be accounted for as sales. The Company affirmed that determination in subsequent formal accounting policy memos. As sometimes would happen for significant transactions, MF Global asked PwC to review the Company's sale accounting conclusion and advise if PwC had any concerns. PwC analyzed the same accounting guidance and made inquiries on the underlying facts, and ultimately advised that sale accounting was appropriate.

In alleging a GAAP violation, Plaintiff will rely on its expert, Lynn Turner, who has opined that the Company's exhaustive analysis was "simply incorrect," citing mostly hypothetical transactions that he claims MF Global could have done that demonstrate MF Global could sell (and thus had "effective control" over) the bond in the final two days before maturity, precluding sale accounting under ASC 860. But Turner is wrong. The Company's internal experts (and later, PwC) explicitly considered the same accounting guidance and the final two days and concluded that sale accounting was proper. PwC's expert, Timothy Lucas, will opine that the Company's judgment to record the transactions as sales was reasonable. Mr. Lucas's experience includes leadership roles at the Financial Accounting Standards Board (FASB), the body responsible for establishing GAAP. While serving as the FASB's Director of Research and Technical Activities, Mr. Lucas was responsible for leading efforts to research and draft the accounting guidance that ultimately became codified as ASC 860.

Moreover, the accounting determination here was precisely the kind of reasonable judgment call that accountants must make every day. "Financial accounting is not a science. It addresses many questions as to which the answers are uncertain and is a process that involves continuous judgments and estimates. A plaintiff alleging a GAAP violation when a restatement

did not occur (as here) faces a high hurdle to allege a GAAP violation (as opposed to mere error in judgment), because GAAP is not the lucid or encyclopedic set of pre-existing rules that it might be perceived to be." *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 162 n.9 (S.D.N.Y. 2015) (internal quotations and citations omitted); *Thor PowerTool Co. v. Comm'r*, 439 U.S. 522, 544 (1979) (GAAP is "far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions").

The Plan Administrator will therefore have to prove that *no reasonable accountant* looking at the same facts and accounting principles could have come to the conclusion that sale accounting applied. *See* N.Y. Pattern Jury Instr.—Civil 2:154 (an auditor "does not guarantee the correctness of the accounts. [It] undertakes to use such skill and care in the performance of the work as a reasonably skillful and diligent . . . accountant would use under the same circumstances."); *Mishkin v. Peat, Marwick, Mitchell & Co.*, 744 F. Supp. 531, 538 (S.D.N.Y. 1990) (an auditor is "not responsible for mere error of judgment").

Such a finding would be remarkable. It would require the Plan Administrator to prove the incompetence of all of the MF Global accountants who reviewed the sale accounting determination, including Margaret Sear—a CPA with an advanced degree in finance and substantial accounting experience, who spent months on the analysis—and the more senior accountants at MF Global who reviewed her conclusions, including its Global Controller, the Chief Accounting Officer, and the CFO.[3] And, it would require the Plan Administrator to prove that PwC's own team of auditors and internal experts similarly adopted an unreasonable interpretation of ASC 860. The Plan Administrator will be unable to do so.

In addition, the Plan Administrator will have to prove that PwC violated GAAS in auditing the Company's financial statements and agreeing with its accounting. But the evidence

---

[3] To this day, no Company witness has disavowed sale accounting for the Euro RTMs.

will show that PwC diligently performed its audit consistent with professional standards. PwC gained an understanding of the Euro RTM trades, confirmed the facts of the trades with MF Global, consulted internal specialists, properly challenged MF Global when facts changed, and at all times demonstrated independence and professional skepticism.

The Complaint also includes a claim based on MF Global's decision not to take a valuation allowance against the U.S. deferred tax asset ("DTA") it reported at the end of fiscal year 2011 (March 31). But the applicable GAAP standard (ASC 740) is clear that a DTA valuation allowance assessment is a matter of judgment by management, involving a "more-likely-than-not" (50.1%) test that requires the weighing of all positive and negative evidence, including estimates of the Company's future business prospects. The evidence will show that the Company's able tax professionals performed a robust DTA analysis for fiscal year-end 2011 and concluded that no valuation allowance was necessary, and they will testify that they stand by their work and the judgments they made at the time. PwC also did substantial work on DTA for 2011, including a consultation with its national office experts, after which the audit team concurred with management's assessment that no valuation allowance was required. The Plan Administrator's hindsight second-guessing of the Company's conclusion will fail. In any event, Plaintiff's expert ascribes no damages to MF Global's failure to take a valuation allowance earlier (focusing exclusively on the Euro RTMs instead), which confirms that DTA is a non-issue for trial.

### C. Proximate Cause

"Causation of course has two major components: cause-in-fact, or 'but-for' cause, and proximate cause." *Semi-Tech Litig., LLC v. Bankers Tr. Co.*, 353 F. Supp. 2d 460, 482 (S.D.N.Y. 2005), *aff'd sub nom. In re Bankers Trust Co.*, 450 F.3d 121 (2d Cir. 2006).

7

To establish but-for causation, plaintiff must "demonstrate that [it] would not have suffered damages but for defendant's negligence." *Cannonball Fund, Ltd. v. Marcum & Kliegman, LLP*, 110 A.D.3d 417, 418 (1st Dep't 2013). The testimony of MF Global's CEO Corzine, the undisputed driver of the RTM strategy, will establish that sale accounting was not a "but-for" cause of the Euro RTM buildup, because the Company would have made those investments even without sale accounting. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Others in management echoed those same sentiments. Such evidence at trial will defeat the Plan Administrator's entire causation theory.

Even if the Plaintiff meets the requisite but-for causation, it will also have to show that PwC's audit was a proximate cause of the Company's collapse, despite overwhelming evidence that the real cause was the Company's aggressive business strategy, which backfired because of adverse market developments in late summer and early fall of 2011. Plaintiff apparently will attempt to show causation through two experts, Paul Michaud and David Mordecai, both of whom opine that an auditor has a duty to understand its client's business in order to plan and perform its audit, and from there leap to the opinion that every event that befell MF Global should have been reasonably "foreseeable" to PwC as auditor. But neither Mordecai nor Michaud is an auditing expert, and, thus, neither is qualified to opine on what was "foreseeable" to PwC. *See, e.g., United States v. Lesniewski*, No. 11-1091, 2013 WL 3776235, at *10 (S.D.N.Y. July 12, 2013), *aff'd sub nom. United States v. Rutigliano*, 614 F. App'x 542 (2d Cir. 2015). More important, their conception of "foreseeability" is improper because it is divorced from the *duty* of an auditor. *Sacher v. Beacon Assocs. Mgmt. Corp.*, 114 A.D.3d 655, 657 (2d

Dep't 2014) ("liability does not attach unless the harm is within the class of reasonably foreseeable hazards that the duty exists to prevent") (internal quotation marks and citation omitted). The adverse financial consequences of a client's unsuccessful business strategy are not among the foreseeable hazards that auditors are engaged to protect against. *AUSA Life Ins. Co. v. Ernst & Young*, 119 F. Supp. 2d 394, 405 (S.D.N.Y. 2000), *aff'd*, 39 F. App'x 667 (2d Cir. 2002) ("few if any accounting firms would be so reckless as to certify the financial statements of a publicly held company" if they were liable for "bad management decisions"); *Johnson Bank v. George Korbakes & Co., LLP*, 472 F.3d 439, 443 (7th Cir. 2006) ("an auditor's duty is not to give business advice; it is merely to paint an accurate picture of the audited firm's financial condition").

In the end, a proximate cause determination must be based on, among other things, "mixed considerations of logic, common sense, [and] justice." *Sheehan v. City of N.Y.*, 40 N.Y.2d 496, 503 (1976). The Plan Administrator's causation theory meets none of these criteria.

## II. Damages

Plaintiff seeks substantial damages based on a so-called "lost enterprise value" calculation performed by its expert, Guy Davis. PwC's expert will opine that Davis's analysis is fundamentally flawed and that the accounting treatment did not cause any damages; and that even if not fundamentally flawed, it would require several corrections that would substantially reduce or zero out the damages. MF Global's own responsibility—and the responsibility of others—for MF Global's alleged damages will of course also be an important factual determination for the jury in the unlikely event it reaches that question. *MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 57 F. Supp. 3d 206, 212 (S.D.N.Y. 2014) ("The Plan Administrator cannot collect for damages attributable solely to MF Global's business strategy, rather than to PwC's allegedly erroneous accounting advice.").

III. *In Pari Delicto*

This Court held that "triable issues of fact exist as to whether the affirmative defense of *in pari delicto* bars the Plan Administrator's professional malpractice claim." *MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, No. 14-CV-2197 (VM), 2016 WL 4197062, at *18 (S.D.N.Y. Aug. 5, 2016). In the unlikely event a jury were to find the Plan Administrator proved each of the elements of liability above, the jury would necessarily also have concluded that MF Global's own accountants chose an accounting treatment that no reasonable accountant would have chosen, perhaps (as one of MF Global's own experts has opined) to mask the true financial condition of the Company. Such findings of fact would likely lead a jury to conclude that MF Global committed wrongdoing that was equal to or greater than that committed by PwC. *New Greenwich Litig. Tr., LLC v. Citco Fund Servs. (Eur.) B.V.*, 41 N.Y.S.3d 1, 7 (1st Dep't 2016); *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 464 (2010) (plaintiff "should not profit from [its] own misconduct").

Dated: January 13, 2017
New York, NY

Respectfully submitted,

KING & SPALDING LLP

By: _____
James P. Cusick
James J. Capra, Jr.
David M. Fine
J. Emmett Murphy
1185 Avenue of the Americas
New York, New York 10036
Tel: (212) 556-2100

*Attorneys for Defendant PricewaterhouseCoopers LLP*