UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MF GLOBAL HOLDINGS LTD., AS PLAN ADMINISTRATOR,<br><br>                                    Plaintiff,<br><br>-against-<br><br>PRICEWATERHOUSECOOPERS LLP,<br><br>                                    Defendant. | Case No. 14-cv-2197 (VM) |

**PRICEWATERHOUSECOOPERS LLP'S MEMORANDUM IN SUPPORT OF ITS MOTION *IN LIMINE* #5 TO EXCLUDE CERTAIN TESTIMONY OF PAUL MICHAUD, DAVID MORDECAI, AND CHRISTINE PALLONE**

Dated: January 20, 2017
          New York, New York

KING & SPALDING LLP

James P. Cusick
James J. Capra, Jr.
David M. Fine
Meredith Moss
J. Emmett Murphy
1185 Avenue of the Americas
New York, New York 10036
Tel: (212) 556-2100
Fax: (212) 556-2222

*Attorneys for Defendant
PricewaterhouseCoopers LLP*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ........................................................................................................................ 3

    I.   Michaud and Mordecai Have No Auditing Expertise and Are Not Competent To Testify About What Business Risks Were "Reasonably Foreseeable" to PwC as Auditor. ................................................................................................................... 3

    II.  Federal Rule of Evidence 702 Prohibits Michaud and Mordecai from Speculating About What Various Actors Knew or Believed or How They Would Have Behaved in Hypothetical Circumstances. ............................................................................... 7

    III. To the Extent Michaud and Mordecai Are Allowed To Testify, They Should Not Be Permitted To Give Duplicative Testimony. ....................................................... 11

    IV. Pallone Is Not Competent To Testify that an Auditor Should Have Known About "Pre-Sales of Assets," and Her Opinion Rests on a False Premise. ................................. 12

CONCLUSION ................................................................................................................... 13

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aguilar v. Int'l Longshoremen's Union Local No. 10*,
  966 F.2d 443 (9th Cir. 1992) ..................................................................................................7

*Buckley v. Deloitte & Touche USA LLP*,
  888 F. Supp. 2d 404 (S.D.N.Y. 2012)......................................................................................8

*Cash v. United States*,
  No. 15-cv-518, 2016 WL 6267952 (D. Me. Oct. 26, 2016) ...................................................11

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)..................................................................................................................3

*Davis v. Carroll*,
  937 F. Supp. 2d 390 (S.D.N.Y. 2013)......................................................................................5

*DeAngelis v. Corzine*,
  No. 11–cv-7886..........................................................................................................................6

*In re Gabapentin Patent Litig.*,
  No. 00-2931, 2011 WL 12516763 (D.N.J. 2011) ...................................................................10

*Goldman v. Bracewell & Patterson, L.L.P.*,
  No. 04-cv-725, 2005 WL 5740234 (M.D. Fla. Sept. 13, 2005)...............................................10

*Highland Capital Mgmt., L.P. v. Schneider*,
  379 F. Supp. 2d 461 (S.D.N.Y. 2005).....................................................................................11

*Luizzi v. Pro Transp., Inc.*,
  No. 02–cv-5388, 2011 WL 1655567 (E.D.N.Y. May 2, 2011) ................................................7

*Luxco, Inc. v. Jim Beam Brands Co.*,
  No. 14–cv-349, 2016 WL 4611385 (N.D. Ill. Sept. 6, 2016) ...................................................9

*Marx & Co. v. Diners' Club Inc.*,
  550 F.2d 505 (2d Cir. 1977).....................................................................................................7

*Medicines Co. v. Mylan Inc.*,
  No. 11-cv-1285, 2014 WL 1758135 (N.D. Ill. May 2, 2014).................................................10

*Milano by Milano v. Freed*,
  64 F.3d 91 (2d Cir. 1995) ........................................................................................................5

*In re Mirena IUD Prods. Liab. Litig.*,
   169 F. Supp. 3d 396, 466, 479 (S.D.N.Y. 2016)..................................................................7, 9

*Colon ex rel. Molina v. BIC USA, Inc.*,
   199 F. Supp. 2d 53 (S.D.N.Y. 2001)...........................................................................................7

*Nimely v. City of N.Y.*,
   414 F.3d 381 (2d Cir. 2005)...................................................................................................5, 7

*Price v. Fox Entm't Grp.*,
   499 F. Supp. 2d 382 (S.D.N.Y. 2007)........................................................................................11

*In re Puda Coal Sec. Inc., Litigation*,
   30 F. Supp. 3d 230, 253-55 (S.D.N.Y. 2014) ............................................................................5

*Querub v. Hong Kong*,
   649 F. App'x 55 (2d Cir. 2016) ................................................................................................2

*R.F.M.A.S., Inc. v. So*,
   748 F. Supp. 2d 244 (S.D.N.Y. 2010).........................................................................................9

*In re Rezulin Prods. Liab. Litig.*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004)........................................................................................11

*Rheinfrank v. Abbott Labs., Inc.*,
   119 F. Supp. 3d 749, 768 (S.D. Ohio 2015) ..............................................................................9

*Schneck v. Int'l Bus. Corp.*,
   No. 92-4370, 1996 WL 885789 (D.N.J. June 25, 1996)..........................................................11

*SEC v. Tourre*,
   950 F. Supp. 2d 666 (S.D.N.Y. 2013).........................................................................................5

*United States v. Holmes*,
   44 F.3d 1150 (2d Cir. 1995)......................................................................................................11

## Other Authorities

Federal Rule of Evidence 403................................................................................................11

Federal Rule of Evidence 702.......................................................................................3, 7, 13

PCAOB Auditing Standard No. 12.......................................................................................3, 6

PCAOB Release No. 2010-004 at 8...........................................................................................6

Defendant PricewaterhouseCoopers LLP ("PwC") submits this memorandum in support of its motion to preclude Plaintiff, MF Global Holdings Ltd., as Plan Administrator, from presenting to the jury certain testimony of Plaintiff's experts Paul Michaud, David Mordecai, and Christine Pallone.  In particular, PwC seeks an order:

(1) barring Michaud and Mordecai from testifying about the "reasonable foreseeability" to PwC of (a) MF Global's Euro RTM buildup and (b) the various risks to MF Global's business (including the risk of a liquidity crisis and bankruptcy) that resulted from that buildup;

(2) barring Michaud and Mordecai from speculating about the states of mind of MF Global, ratings agencies, and regulators, and what those entities would have done under hypothetical circumstances;

(3) barring Michaud and Mordecai from giving duplicative testimony (to the extent they are allowed to testify at all); and

(4) barring Pallone from testifying that PwC should have been aware of the possibility of what she calls "pre-sales" of European bonds.

## INTRODUCTION

A central issue in this case is whether, assuming *arguendo* PwC was negligent in concurring with MF Global's decision to use sale accounting for its European repo-to-maturity transactions ("Euro RTMs"), PwC is legally responsible for MF Global's collapse.  There is no direct connection between the accounting decision and the collapse: MF Global's year-long business strategy to invest heavily in Euro RTMs would have been just as risky no matter how the Euro RTMs were accounted for, ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████ Plaintiff, however, contends that because the ability to use sale accounting was

allegedly a factor in that business strategy, PwC is liable for all the risks associated with the strategy—including risks that MF Global knew about and voluntarily accepted.

To support that expansive, unprecedented theory of auditor liability, Plaintiff intends to present testimony from two economists, Paul Michaud and David Mordecai. Both will testify that certain business risks associated with MF Global's decision to invest in Euro RTMs were "reasonably foreseeable" to PwC in its role as MF Global's auditor. *See* Michaud Report ¶ 8, Opinion #4; Mordecai Report ¶ 11a–b. Both will also speculate about how they believe market regulators, other market participants, and MF Global itself would have acted if the Euro RTMs had been accounted for differently. *See* Michaud Report ¶ 8, Opinion #3; Mordecai Report ¶ 11c.[1]

Michaud's and Mordecai's opinions on those subjects are inadmissible. To begin, Michaud and Mordecai have no expertise in auditing, and thus are not competent to testify about what business risks were reasonably foreseeable to an auditor. As the Second Circuit recently observed, a witness who "lacks experience and expertise in conducting or reviewing audits done according to PCAOB standards" is not qualified to opine on those standards. *Querub v. Hong Kong*, 649 F. App'x 55, 57 (2d Cir. 2016). And expert testimony about what regulators, ratings agencies, and MF Global itself would have done in hypothetical circumstances is inherently speculative, and therefore both unreliable and inadmissible. Finally, to the extent they are permitted to testify, Michaud and Mordecai should not be allowed to give redundant testimony. Rather, Plaintiff should choose one expert to testify on each issue.

---

[1] Michaud's and Mordecai's three expert reports (one from Michaud and two from Mordecai) and Pallone's one expert report were previously submitted to the Court by Plaintiff under seal as part of its opposition to PwC's summary judgment motion on March 11, 2016. PwC stands ready to file additional copies of the reports if doing so would assist the Court.

2

Similarly, Plaintiff intends to present testimony from an industry expert, Christine Pallone, who has offered an opinion that PwC should have been aware of the possibility of a hypothetical transaction that Pallone calls a "pre-sale of the underlying asset." *See* Pallone Report ¶¶ 15–16. But she bases that opinion on her "understanding" of what auditors should be expected to know, despite having no expertise in auditing. Her opinion also relies on a false premise.

## ARGUMENT

**I.   Michaud and Mordecai Have No Auditing Expertise and Are Not Competent To Testify About What Business Risks Were "Reasonably Foreseeable" to PwC as Auditor.**

Michaud and Mordecai opine that auditing standards required PwC to be aware of certain risks to MF Global's business that were posed by the company's strategic decisions and broader economic trends. But they are completely unqualified to render such an opinion. Neither Michaud nor Mordecai is a Certified Public Accountant, much less a trained financial statement auditor, and thus neither is qualified to opine on the extent to which (or even whether) PwC was required by applicable auditing standards to understand aspects of its audit client's business. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–90 (1993) (discussing federal courts' gatekeeping role under Fed. R. Evid. 702).

Michaud goes so far as to cite PCAOB Auditing Standard No. 12 for the proposition that "as MF Global's auditor, PwC had an obligation to understand MF Global's business." Michaud Report ¶ 106 & n.55. He adds that, under that standard, PwC's obligation was not limited to "aspects of [MF Global]'s business that could impact [its] financial statements," but extended to all the business risks associated with "trading in European sovereign debt during the unfolding of the European credit crisis." *Id.* at ¶ 106. Mordecai's testimony is similar: while he does not cite Auditing Standard No. 12, he refers to "commonly accepted practice standards and guidelines,"

3

Mordecai Report ¶ 13, and he repeatedly opines on what PwC should have foreseen "[i]n its role as auditor." *Id.* at ¶ 41; *see also, e.g.*, *id.* at ¶¶ 33, 42, 45.

Building from their claimed understanding of an auditor's obligations under generally accepted auditing standards—a subject on which they have no expertise—Michaud and Mordecai proceed to opine that PwC should have foreseen at some point (although they do not say when) that MF Global was going to execute more than 100 RTMs totaling almost €10 billion over a thirteen-month period, and should have foreseen a broad range of business risks—both macroeconomic and company-specific—that MF Global faced over time. For example, they both state that PwC should have predicted that approving sale accounting would lead MF Global to "embark on a strategy by which it would substantially increase its holdings in Euro RTMs." Michaud Report ¶ 112; *see also id.* at ¶¶ 110, 120; Mordecai Report ¶¶ 11a, 30–32.

Mordecai goes even further, stating that PwC not only should have foreseen MF Global's decision to invest heavily in Euro RTMs, but should also have foreseen that macroeconomic factors could undermine the company's Euro RTM strategy and "lead to a funding crisis that would jeopardize the [company's] existence." Mordecai Report ¶ 11b. He states that, in its role as auditor, PwC should have foreseen both that "credit conditions were at risk of rapid deterioration for European sovereigns" and that the risk was heightened by "the widening and increased volatility in credit default swap spreads" and by "high positive correlations between [credit default swap] spreads for sovereigns." *Id.* at ¶¶ 32–33, 42; *see also id.* at ¶ 41 (PwC should have known of a "large spike in [credit default swap] volatility in or around May 2010"); *id.* at ¶ 42 (PwC should have been aware that "an empirical analysis of the sovereigns underlying [MF Global's] Euro RTM portfolio" would have shown "high historical correlations among the PIIBS [Portugal, Ireland, Italy, Belgium, and Spain] countries directly prior to the investment

4

period"); Mordecai Rebuttal Report ¶ 12 (PwC should have known about clearinghouses' margin requirements and banks' limits on intraday borrowing).

All of these foreseeability opinions stem from Michaud's and Mordecai's unsupported and unsupportable opinion about what the auditing standards required PwC to understand about its client's business.  Yet neither is an auditor.  Their training and experience are in economics and finance.  *See* Michaud Report ¶¶ 1–4; Mordecai Report ¶¶ 4–10.  That training does not qualify them to opine on what PwC should have known about MF Global's business or the industry and macroeconomic risks that MF Global faced at unspecified points in time.  Just "because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." *Nimely v. City of N.Y.*, 414 F.3d 381, 399 n.13 (2d Cir. 2005).  Rather, an expert must "stay within the reasonable confines of [his] subject area."  *Davis v. Carroll*, 937 F. Supp. 2d 390, 413 (S.D.N.Y. 2013); *see, e.g.*, *Milano by Milano v. Freed*, 64 F.3d 91, 97 & n.6 (2d Cir. 1995) (pediatric neurologists could not testify about what was reasonable for radiologists); *In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 230, 253–55 (S.D.N.Y. 2014) (expert on Chinese auditing standards could not testify about what was reasonable for U.S. auditors), *aff'd sub nom. Querub*, 649 F. App'x at 57; *SEC v. Tourre*, 950 F. Supp. 2d 666, 677–78 (S.D.N.Y. 2013) (expert on the "general area of structured finance" could not testify about "synthetic CDOs, a very specific type of security").

Even a cursory reading of the relevant auditing standard demonstrates that it imposes only a limited obligation on the auditor and does not require an auditor to master every nuanced aspect of its client's business, much less every industry or macroeconomic risk that could affect the client's business in the future.  That standard, AU § 311, requires an auditor to acquire a

5

sufficient "level of knowledge of the [client]'s business" to "plan [and] perform the audit" and to identify "events, transactions, and practices that, in [the auditor's] judgment, may have a significant effect on the financial statements." AU § 311.06. Its focus is on things that might lead to errors in recording historical information that is incorporated into the firm's financial statements, not future events or inchoate risks that might affect the company's future performance. It is telling that Plaintiff's only expert witness who is arguably qualified to interpret AU § 311 or Auditing Standard No. 12, Lynn Turner, does not opine that those standards required PwC to anticipate MF Global's Euro RTM buildup or other business risks the company faced.[2]

Mordecai's baseless foreseeability opinion is especially unfounded and inconsistent with his prior statements. In prior litigation brought by MF Global's Litigation Trustee against MF Global's former officers, Mordecai opined that MF Global's massive Euro RTM buildup was "commercially unreasonable." Mordecai Report, *DeAngelis v. Corzine*, No. 11–cv-7886, at ¶ 49; *see also* Mordecai Rebuttal Report ¶ 15 (MF Global's Euro-RTM portfolio "far exceeded, by a substantial order of magnitude," that of its "peer" firms). But if MF Global's massive build-up of Euro RTMs was commercially unreasonable, then it could not have been reasonably foreseeable to PwC as auditor. And if the Euro-RTM buildup was not foreseeable to PwC as auditor, then the risks and harm that flowed from it could not have been foreseeable either.

---

[2] Section 311 also specifically notes that "[t]he level of knowledge customarily possessed by management relating to the entity's business is *substantially greater* than that which is obtained by the auditor in performing his audit." AU § 311.06 (emphasis added). Neither Michaud nor Mordecai even mentions AU § 311. As previously noted, Michaud cites PCAOB Auditing Standard No. 12, *see* Michaud Report ¶ 106 n.55, but that standard was not in effect at the time of PwC's audits. *See* PCAOB Release No. 2010-004 at 8 (noting that Auditing Standard No. 12 would be effective for audits of fiscal years beginning on or after Dec. 15, 2010). MF Global's 2011 fiscal year began on April 1, 2010.

Finally, even if Michaud and Mordecai were qualified to opine on reasonable foreseeability in this context, their opinions would improperly "usurp[] . . . the role of the jury in applying that law to the facts before it."  *Nimely*, 414 F.3d at 397; *see, e.g.*, *Luizzi v. Pro Transp., Inc.*, No. 02-cv-5388, 2011 WL 1655567, at *2–5 (E.D.N.Y. May 2, 2011) (barring expert testimony about whether plaintiff's losses were "reasonably foreseeable" to the defendant; foreseeability was for the jury to decide, as it "clearly require[d] application of the law to the specific facts of this case"); *see also Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992) ("foreseeability" of plaintiffs' reliance was an "inappropriate subject[] for expert testimony").  Such testimony would "not aid the jury in making a decision," but rather would "attempt[] to substitute the expert's judgment for the jury's."  *Nimely*, 414 F.3d at 397 (internal quotation marks omitted); *see also Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 508–11 (2d Cir. 1977); *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 96 (S.D.N.Y. 2001).

## II. Federal Rule of Evidence 702 Prohibits Michaud and Mordecai from Speculating About What Various Actors Knew or Believed or How They Would Have Behaved in Hypothetical Circumstances.

Experts may not testify about a party's state of mind or how the party would have acted in hypothetical circumstances.  Speculation about the party's "intent, motives, or state of mind" has "no basis in any relevant body of knowledge or expertise."  *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 466, 479 (S.D.N.Y. 2016) (quoting *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 442 (E.D.N.Y. 2011)).  Yet Michaud and Mordecai both make numerous assertions about what third parties—and MF Global itself—would have done if PwC had insisted that MF Global account for its Euro RTMs differently.  Those assertions are speculative and inadmissible under Federal Rule of Evidence 702.

Michaud and Mordecai cross the line into impermissible speculation when they opine about what regulators, market participants, and MF Global itself would have done if MF Global had accounted for its Euro RTMs differently.  For example, Mordecai speculates that a change in accounting would have caused the ratings agencies to immediately downgrade MF Global. Mordecai Report ¶ 49.  He further speculates that, as a result of that imagined downgrade, MF Global would have abandoned its Euro RTM business strategy.  *Id.*  He offers that rank speculation even though the Euro RTM strategy had been endorsed by MF Global's CEO, Jon Corzine, and approved by MF Global's Board as the best and only plan for saving the company, ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████  For his part, Michaud speculates that if MF Global had used a different accounting method for the Euro RTMs, unnamed "regulators" would have "pressured" MF Global to abandon its Euro RTM strategy, and MF Global would have bowed to that pressure—even though Michaud's speculation does not indicate what regulators Michaud is referring to, what pressure they would (or could) have applied, or why Corzine and MF Global would have bowed to such pressure. Michaud Report ¶¶ 100–02, 105; *see also id.* at ¶¶ 117–19.

This court rejected a similar attempt to pin a company's bankruptcy on its auditor through speculative expert testimony in *Buckley v. Deloitte & Touche USA LLP*, 888 F. Supp. 2d 404 (S.D.N.Y. 2012).  The trustee for the defunct company sought to introduce expert testimony about "what would have happened if Deloitte's audit had reported inaccuracies" in the company's financial statements.  *Id.* at 412.  The expert claimed to have "analyzed [the] hypothetical response" to such a report and "determined with reasonable certainty" that the

8

company's lenders "would have pressed for corrective action to be taken" and its board of directors "*would have* restructured the company to focus on its core and most profitable businesses."  *Id.* at 413–14.  The court held that testimony about what the lenders and the board would have done "if certain hypothetical events took place" was "inadmissible as speculation."  *Id.*  The expert's "generalized experience" with the industry could not take the place of "specific evidence" regarding "how this particular set of financial institutions would [have] respond[ed] to a significant business event."  *Id.* at 414.

Likewise, in *Mirena*, the court precluded both sides' experts from testifying about "what type of label the FDA would have hypothetically accepted or rejected" for a product had it been given additional information.  169 F. Supp. 3d at 474; *see also id.* at 466, 479.  Such testimony, it held, would amount to "impermissible speculation about the state of mind of the FDA."  *Id.* at 466; *cf. R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 248 (S.D.N.Y. 2010) (expert testimony based on "subjective belief or unsupported speculation" is unreliable and should be excluded).  What FDA's conduct suggested about what it would or would not have done in hypothetical circumstances was a subject for attorney argument, not expert testimony.  *Mirena*, 169 F. Supp. 3d at 474.

Those cases are the rule, not the exception.  Many courts have similarly refused to permit expert testimony about how a party would have acted in a hypothetical world.  *See, e.g.*, *Rheinfrank v. Abbott Labs., Inc.*, 119 F. Supp. 3d 749, 768 (S.D. Ohio 2015) (excluding testimony about "what the FDA would have done in hypothetical circumstances"); *Luxco, Inc. v. Jim Beam Brands Co.*, No. 14-cv-349, 2016 WL 4611385, at *5 (N.D. Ill. Sept. 6, 2016) (excluding testimony about what plaintiff and its officers would have done if certain information had been disclosed to them; concluding that such testimony would be "speculative and

9

subjective" and not "helpful to the trier of fact"); *Medicines Co. v. Mylan Inc.*, No. 11-cv-1285, 2014 WL 1758135, at *7 (N.D. Ill. May 2, 2014) (excluding testimony about "what the Patent Office Examiner would have done or thought had [the plaintiff] given her different information"); *In re Gabapentin Patent Litig.*, No. 00-2931, 2011 WL 12516763, at *7 (D.N.J. 2011) (excluding testimony about "actions generic manufacturers would have taken in the 'but for' world," as such opinions "necessarily depend on the state of mind of [the generic manufacturer's] decision makers, and such testimony is more appropriately given by a fact witness, rather than an expert"); *Goldman v. Bracewell & Patterson, L.L.P.*, No. 04-cv-725, 2005 WL 5740234, at *3–4 (M.D. Fla. Sept. 13, 2005) (excluding as "speculative" testimony about what buyer "would have done had it received accurate sales projections").

Michaud and Mordecai should not be allowed to offer rank speculation-masquerading-as-opinion about how ratings agencies and regulators would have behaved in a hypothetical world where MF Global's accounting was different. Nor should they be allowed to pile speculation on top of speculation by "opining" about how MF Global would have reacted to the theoretical actions of ratings agencies and regulators. How those entities might have acted in hypothetical circumstances, and what effect their behavior might have had on MF Global's conduct, are not appropriate subjects for expert testimony.

For the same reasons, Mordecai should not be allowed to testify about what he believes "market participants" knew or believed about MF Global's Euro RTM strategy. For example, Mordecai admits he is not qualified to offer an "accounting or auditing opinion" about the adequacy of the disclosures in MF Global's financial statements, and there is no claim in the case that MF Global's financial statement disclosures were inadequate. Nonetheless, Mordecai opines that unidentified "market participants did not . . . understand" MF Global's Euro RTM

10

investments because the company's financial statements did not "adequately, appropriately, or suitably" disclose those investments. Mordecai Rebuttal ¶¶ 23–25. Speculating about the state of mind of unnamed third parties is impermissible. *See Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469–70 (S.D.N.Y. 2005) (expert testimony "regarding the state of mind and motivations of certain parties," including what certain individuals "knew," were "likely aware" of, or were "likely concerned" about, was inadmissible "speculation").[3]

### III. To the Extent Michaud and Mordecai Are Allowed To Testify, They Should Not Be Permitted To Give Duplicative Testimony.

The Court has wide latitude to exclude needlessly cumulative evidence. *See* Fed. R. Evid. 403; *United States v. Holmes*, 44 F.3d 1150, 1157 (2d Cir. 1995). Courts frequently exercise that discretion to bar multiple experts from testifying to the same basic conclusions. *See, e.g.*, *Price v. Fox Entm't Grp.*, 499 F. Supp. 2d 382, 390 (S.D.N.Y. 2007) (limiting party to one of two experts because "there was substantial overlap between the reports and there is absolutely no need for both experts to testify"); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 550 (S.D.N.Y. 2004) (excluding expert testimony that was "cumulative and certain to waste time"); *Schneck v. Int'l Bus. Corp.*, No. 92-4370, 1996 WL 885789, at *25 (D.N.J. June 25, 1996) (excluding expert whose testimony would "add nothing to plaintiffs' case beyond that which has already been proffered in the report of" another expert). Duplicative expert testimony does more than just waste time; it also encourages the jury to value quantity over quality and to substitute nose-counting of experts for a careful evaluation of the substance of their testimony. *Cash v. United States*, No. 15-cv-518, 2016 WL 6267952, at *4 (D. Me. Oct. 26, 2016).

---

[3] Elsewhere in his rebuttal report, Mordecai tries to bolster his opinion by citing the congressional testimony of Richard Cantor, an officer at Moody's. *See* Mordecai Rebuttal ¶ 26. But Cantor's testimony, when quoted by Mordecai, is inadmissible hearsay. Moreover, Cantor himself is on Plaintiff's witness list and can testify directly (and be cross-examined) about what he knew or believed, making speculative expert testimony on that topic even less appropriate.

11

The Court should exercise its discretion to preclude Plaintiff from offering the same expert opinions from Michaud and Mordecai. Their reports overlap on several key issues, as shown below.

| Michaud | Mordecai |
|---|---|
| "Opinion #1: Without sales accounting treatment for its European Sovereign Repurchase Agreements, MF Global's revenue would have been lower each quarter from September 2010 through June 2011, and its leverage ratios would have been higher each quarter from September 2010 through September 2011. These results would have been contrary to the specific guidance given to MF Global by rating agencies." ¶ 8. | "MF Global needed to reduce leverage ratios and increase reported profits on a recurring basis, in order to avoid ratings downgrades. Sales accounting treatment, while creating the inaccurate appearance of increased recurring income with reduced leverage ratios, presented these immediate benefits to MF Global." ¶ 30. |
| "Opinion #3: MF Global could not have accumulated the same volume of Euro RTM transactions on its balance sheet as it accumulated off-balance sheet if not for the sales accounting treatment that PwC approved." ¶ 8. | "But for sales accounting treatment, it is highly unlikely that MF Global could have accumulated such large and highly concentrated positions in Euro RTMs (and the associated risks)." ¶ 11c. |
| "Opinion #4: MF Global's accumulation of a large portfolio of Euro RTM transactions was foreseeable to PwC." ¶ 8. | "Since MF Global needed to dramatically improve both its leverage and profitability ratios to preserve its credit ratings, it would have been reasonably foreseeable to PwC that sales accounting could result in a reach for yield and an accumulation of a large portfolio of Euro RTMs." ¶ 11a. |

IV.  **Pallone Is Not Competent To Testify that an Auditor Should Have Known About "Pre-Sales of Assets," and Her Opinion Rests on a False Premise.**

Pallone opines that PwC should have been aware that it was possible for MF Global to engage in a transaction that she calls a "pre-sale" of a European sovereign bond. *See* Pallone Report ¶¶ 41–43, 51. She offers two bases for that opinion, one of which she is not qualified to give and the other of which is false. First, she says that she "understand[s] that Generally Accepted Auditing Standards require an auditor, such as PwC, to obtain a sufficient

12

understanding of the audited business, its transactions, and the industry in which it operates." *Id.* at ¶ 50; *see also id.* at ¶ 11.  But Pallone is not an auditor and has no auditing experience, and thus she is not qualified to offer an opinion about what an auditor is required to understand or should know.  Second, she says that "the availability of such transactions should have been apparent to anyone familiar with MF Global's repo business because MF Global actually engaged in such transactions."  *Id.* at ¶ 52.  That statement is false and has no basis insofar as it is directed to "pre-sales."  Unlike two other transactions Pallone discusses, MF Global did not engage in any "pre-sales" of European sovereign bonds, and Pallone does not contend otherwise.  *Compare id.* at ¶ 39 (discussing a two-day repo transaction) *and id.* at ¶ 48 (discussing a reverse repo transaction) *with id.* at ¶¶ 41–43 (no discussion of any pre-sale transaction).  In sum, Pallone has no basis to opine that PwC, as auditor, should have known that it was possible for MF Global to engage in a hypothetical pre-sale of a European sovereign bond.

## CONCLUSION

PwC seeks an order, pursuant to Federal Rule of Evidence 702, barring Michaud and Mordecai from (1) testifying about the "reasonable foreseeability" to PwC of various risks to MF Global's business; (2) speculating about the states of mind of MF Global, ratings agencies, and regulators, and what those entities would have done under hypothetical circumstances; and (3) giving duplicative testimony; and (4) barring Pallone from testifying that PwC should have been aware of the possibility of "pre-sales" of European bonds.

Dated: January 20, 2017  
        New York, New York

Respectfully submitted,

KING & SPALDING LLP

By: <u>/s/ James P. Cusick</u>  
James P. Cusick  
James J. Capra, Jr.  
David M. Fine  
Meredith Moss  
J. Emmett Murphy  
1185 Avenue of the Americas  
New York, New York 10036  
Tel: (212) 556-2100

*Attorneys for Defendant PricewaterhouseCoopers LLP*

14