UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MF GLOBAL HOLDINGS LTD.,
AS PLAN ADMINISTRATOR,

                              Plaintiff,

            -against-                              Case No. 14-cv-2197 (VM)

PRICEWATERHOUSECOOPERS LLP,

                              Defendant.

**PRICEWATERHOUSECOOPERS LLP'S MEMORANDUM IN SUPPORT OF ITS
MOTION TO BAR THE PLAN ADMINISTRATOR'S NEW THEORY OF CAUSATION**

Dated: March 12, 2017          KING & SPALDING LLP
        New York, New York
                               James P. Cusick
                               James J. Capra, Jr.
                               David M. Fine
                               Meredith Moss
                               Paul Alessio Mezzina
                               1185 Avenue of the Americas
                               New York, New York 10036
                               Tel: (212) 556-2100
                               Fax: (212) 556-2222

                               *Attorneys for Defendant
                               PricewaterhouseCoopers LLP*

**TABLE OF CONTENTS**

I.   The Plan Administrator Has Fundamentally Changed Its Theory of Causation. ......................4

    A.   The Plan Administrator's Disclosed Causation Theory: Sale Accounting Encouraged MF Global To Invest Too Heavily in Euro RTMs, Which In Turn Caused a Liquidity Crisis and the Collapse of the Company. ...............................................5

    B.   The Plan Administrator's New Causation Theory: "Confusion," "Surprise," "Loss of Trust," "Crisis of Confidence." ......................................................................................10

II.  The Court Should Bar The Plan Administrator's New Causation Theory. ...........................13

CONCLUSION...........................................................................................................................21

# TABLE OF AUTHORITIES

## Cases

*Adelphia Recovery Tr. v. Goldman, Sachs & Co.,*
   748 F.3d 110 (2d Cir. 2014)................................................................................. 15

*Aldridge v. Forest River Inc.,*
   635 F.3d 870 (7th Cir. 2011) ............................................................................... 15

*Am. Stock Exch., LLC v. Mopex, Inc.,*
   215 F.R.D. 87 (S.D.N.Y. 2002) ........................................................................... 18

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,*
   757 F.2d 523 (2d Cir. 1985).................................................................................... 7

*Clark v. Penn. R. Co.,*
   328 F.2d 591 (2d Cir. 1964)........................................................................... 19, 21

*Commerce Funding Corp. v. Comprehensive Habilitation Services, Inc.,*
   No. 01-cv-3796, 2005 WL 1026515 (S.D.N.Y. May 2, 2005) ............................. 18

*Design Strategies, Inc. v. Davis,*
   367 F. Supp. 2d 630 (S.D.N.Y. 2005) (Marrero, J.) ...................................... 16, 20

*ESPN, Inc. v. Office of Comm'r of Base*ball,
   76 F. Supp. 2d 416 (S.D.N.Y. 1999)................................................................... 18

*Genereux v. Raytheon Co.,*
   754 F.3d 51 (1st Cir. 2014)............................................................................ 4, 18

*Ginns v. Towle,*
   361 F.2d 798 (2d Cir. 1966)........................................................................... 4, 15

*Intellivision v. Microsoft Corp.,*
   484 F. App'x 616 (2d Cir. 2012) ......................................................................... 15

*Jasper v. Sony Music Entm't, Inc.,*
   378 F. Supp. 2d 334 (S.D.N.Y. 2005).................................................................. 15

*Katt v. City of N.Y.,*
   151 F. Supp. 2d 313 (S.D.N.Y. 2001).................................................................. 18

*Licciardi v. TIG Ins. Grp.,*
   140 F.3d 357 (1st Cir. 1998) ............................................................................... 16

*Matei v. Cessna Aircraft Co.,*
   35 F.3d 1142 (7th Cir. 1994) .............................................................................. 21

*MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP,*
    43 F. Supp. 3d 309 (S.D.N.Y. 2014) ................................................................ 8

*MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP,*
    199 F. Supp. 3d 818 (S.D.N.Y. 2016) ..................................................... 10, 13

*MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP,*
    No. 14-cv-2197, 2017 WL 663565 (S.D.N.Y. Feb. 3, 2017) ........................... 14

*Napolitano v. Compania Sud Americana de Vapores,*
    421 F.2d 382 (2d Cir. 1970) ......................................................................... 14

*New Hampshire v. Maine,*
    532 U.S. 742 (2001) ...................................................................................... 15

*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,*
    322 F.3d 147 (2d Cir. 2003) ........................................................................... 7

*Point Prods. A.G. v. Sony Music Entm't, Inc.,*
    No. 93-cv-4001, 2002 WL 31856951 (S.D.N.Y. Dec. 19, 2002) ................. 15, 17

*Potthast v. Metro-N. R. Co.,*
    400 F.3d 143 (2d Cir. 2005) ......................................................................... 14

*Roberts v. Ground Handling, Inc.,*
    No. 04-cv-4955, 2007 WL 2753862 (S.D.N.Y. Sept. 20, 2007) .................... 17

*Webb v. Robert Lewis Rosen Assocs., Ltd.,*
    128 F. App'x 793 (2d Cir. 2005) .................................................................. 16

*Zurich Am. Ins. Co. v. ABM Indus., Inc.,*
    397 F.3d 158 (2d Cir. 2005) .................................................................. 15, 20

**Rules**

Fed. R. Civ. P. 15(b) ................................................................................... 15

Fed. R. Civ. P. 16(e) ................................................................................... 14

Fed. R. Civ. P. 16(f) ................................................................................... 20

Fed. R. Civ. P. 37(b) ................................................................................... 20

**Other Authorities**

B. McLannahan,
    *PwC accuses Corzine over MF Global run,*
    FIN. TIMES (Mar. 10, 2017), https://goo.gl/OT5vrA ................................... 13

## MEMORANDUM IN SUPPORT OF MOTION TO BAR THE PLAN ADMINISTRATOR'S NEW THEORY OF CAUSATION

"The basic purpose of the federal rules" is "to eliminate trial by ambush, sometimes called the sporting theory of justice." *Ginns v. Towle*, 361 F.2d 798, 801 (2d Cir. 1966). To that end, the admonition against "changing horses in midstream . . . applies in litigation as well as in life. Thus, when a litigant commits to a theory of the case and sticks to that theory past the point of no return, he cannot thereafter switch to a different theory simply because it seems more attractive at the time." *Genereux v. Raytheon Co.*, 754 F.3d 51, 53 (1st Cir. 2014). The Plan Administrator has violated that admonition by raising, for the first time at trial, a new theory of causation that was not disclosed in, and is contrary to, the allegations in its complaint, the arguments it used to avoid dismissal and summary judgment, the expert reports it produced during discovery, and the disclosures in its pretrial memorandum.

PricewaterhouseCoopers LLP submits this memorandum in support of its motion to bar the Plan Administrator's new theory of causation. In particular, PwC asks the Court to (1) preclude the Plan Administrator from presenting to the jury any further evidence or argument concerning its new causation theory and strike the evidence and argument already presented in support of that theory; and (2) instruct the jury that the Plan Administrator cannot prevail unless it proves its original theory of causation. In the alternative, PwC requests that the Court grant a mistrial in order to mitigate the prejudice PwC faces from having to respond to an entirely new theory in the midst of trial.

## I.      The Plan Administrator Has Fundamentally Changed Its Theory of Causation.

For nearly three years, from the inception of this case until the eve of trial, the Plan Administrator's theory of causation—as conveyed to the Court and to PwC—was that sale accounting enabled MF Global to pursue a business strategy of investing too heavily in Euro

4

RTMs, which, in turn, led to a liquidity crisis and then the collapse of the company in October 2011.  The Plan Administrator's theory has been that sale accounting was the gateway to those Euro RTM transactions.  Without sale accounting, the Plan Administrator has maintained, the company would not have embarked on its Euro RTM strategy.  Under that theory, there was no question that the Euro RTM strategy was unreasonable and the cause of MF Global's collapse. The causation issues were whether PwC's approval of sale accounting was a but-for cause of the Euro RTM strategy and, if so, whether PwC's approval was a proximate cause of MF Global's liquidity crisis and collapse.

After the first four days of trial, however, it appears as if the Plan Administrator is abandoning that theory and dramatically changing course.  The Plan Administrator now maintains that the Euro RTM strategy was a sound business decision that the company could and would have pursued regardless of PwC's accounting advice, and that MF Global's collapse was caused, not by a liquidity crisis resulting from the Euro RTM strategy, but by market "confusion," a "loss of trust," or a "crisis of confidence" in MF Global's financial statements that occurred in October 2011 and is somehow attributable to PwC's accounting approval.

> **A.**  **The Plan Administrator's Disclosed Causation Theory: Sale Accounting Encouraged MF Global To Invest Too Heavily in Euro RTMs, Which In Turn Caused a Liquidity Crisis and the Collapse of the Company.**

The Plan Administrator filed its pretrial memorandum on January 13, 2017.  In a section titled "PWC'S NEGLIGENCE PROXIMATELY CAUSED MFG'S HARM," it stated: "The evidence at trial will show that, without sales accounting, MFG could not have amassed the huge Euro RTM portfolio that ultimately led to its demise."  Pretrial Mem. at 8; *see also id.* at 5 (MF Global's "ability to pursue [the Euro RTM] strategy was dependent on PwC's approval of sales accounting treatment for those transactions").  The Plan Administrator represented that one of its designated causation experts, David Mordecai, would "testify that MFG . . . could not have

amassed its more than $6 billion off-balance sheet exposure [to Euro RTMs] without . . . sale accounting" and that "accumulation of [a] sizeable Euro RTM portfolio . . . sparked increases in margin calls and an evaporation of liquidity" that drove MF Global into bankruptcy.  *Id.* at 9–10; *see also id.* at 9 ("The downside consequences of this highly-concentrated [Euro RTM] portfolio also were reasonably foreseeable to—and actually foreseen by—PwC around the time of its approval [of sale accounting].").

The causation theory disclosed in the Plan Administrator's pretrial memorandum was the same one it had consistently advanced throughout the three-year history of this litigation.

1. *The Plan Administrator's Complaint.*—The Plan Administrator filed its complaint on March 28, 2014.  The complaint's preliminary statement alleged that "[b]ut for PwC's erroneous accounting advice, MF Global Holdings could not have—and would not have—invested heavily in European sovereign debt to generate immediate revenues and would not have suffered the massive damages that befell the Company in 2011."  Compl. ¶ 3.  It elaborated that "the accounting treatment for the Euro RTMs was critically important to MF Global Holdings" and "MF Global Holdings' decision to invest heavily in European sovereign debt through Euro RTM transactions was dependent on PwC's approval of accounting for the Euro RTM transactions as sales."  *Id.* ¶ 4.  That investment strategy was dangerous, it alleged, because "the Company was in a weak financial condition and . . . huge positions in European sovereign debt posed significant additional risks to MF Global Holdings."  *Id.*

The complaint reiterated that theory of causation in a section titled "PwC's Negligence Caused MF Global Holdings Massive Damages."  *Id.* at 43.  According to the complaint, "[i]n reliance on PwC's negligent advice as to how to account for, and its approval of the accounting for, the Euro RTMs, MF Global Holdings could and did amass a significant Euro RTM position

that ultimately caused massive damages to the Company.  PwC knew that MF Global Holdings' decision to invest heavily in Euro RTMs was dependent on PwC's advice concerning the accounting treatment for these transactions." *Id.* ¶ 137.  "When the foreseeable liquidity crisis occurred as a result of the Company's large positions in Euro RTMs, the Company sustained massive damages."  *Id.* ¶ 140; *see also id.* ¶¶ 35, 49, 51, 57, 83, 137 (alleging that MF Global's pursuit of the Euro RTM strategy was dependent on PwC's accounting approval); *id.* ¶¶ 138–144 (explaining how the Euro RTM strategy resulted in a liquidity crisis that ended in bankruptcy).[1]

2. *The Plan Administrator's Opposition to PwC's Motion To Dismiss.*—PwC's motion to dismiss argued, among other things, that the complaint did not adequately plead causation, and that even accepting the allegations as true, "the Company's bankruptcy was caused, not by accounting advice, but by business decisions the Company made to engage in more than EUR 5.3 billion of RTM transactions."  Mot. To Dismiss at 2.  In opposing that motion, the Plan Administrator did not dispute that the Euro RTM transactions caused the company's collapse. Rather, its response was that "but for PwC's negligent advice and audits, [MF Global] would not and could not have invested heavily in European sovereign debt."  Opp. to Mot. To Dismiss at 6; *see also, e.g.*, *id.* at 1 (MF Global's "decision to engage in the Euro RTM transactions was dependent on PwC's professional opinion concerning the accounting treatment"); *id.* (MF Global "relied on that erroneous accounting advice in implementing its investment strategy"); *id.* at 7 ("the buildup of [MF Global's] Euro RTM positions . . . could not have occurred without PwC's

---

[1] The complaint's factual allegations concerning causation—including that MF Global's "significant Euro RTM position . . . caused massive damages to the Company" and that MF Global's liquidity crisis in October 2011 was "a result of the Company's large positions in Euro RTMs," Compl. ¶¶ 137, 140—are "judicial admissions" by which the Plan Administrator is "bound throughout the course of the proceeding."  *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) (quoting *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985)).

advice and opinion that [MF Global] should utilize sale accounting"); *id.* at 8 ("Without PwC's advice concerning the Euro RTM accounting treatment, [MF Global] could not have built up a portfolio large enough, or been so seriously under-reserved, to result in this liquidity crisis"). It was "the Company's large position in Euro RTMs," the complaint alleged, that "foreseeabl[y]" caused a "liquidity crisis" resulting in "massive damages" to MF Global. *Id.*; *accord id.* at 9 ("It was reasonably foreseeable to PwC that the liquidity issues that were attendant to the huge build-up of the Euro RTM exposure, combined with [MF Global's] weak financial condition, would cause the Company's collapse and the resulting damages.").

In denying PwC's motion to dismiss, the Court expressly relied on the Plan Administrator's causation theory. The Court held that the Plan Administrator had adequately pleaded causation because it had alleged that PwC's accounting "advice impacted MF Global's implementation of the RTM strategy, which in turn contributed to the company's alleged losses." *See MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 43 F. Supp. 3d 309, 314 (S.D.N.Y. 2014). The Court held that given the Plan Administrator's allegations, it was "plausible to conclude that PwC's accounting advice was a substantial factor in how MF Global's investments through RTM transactions harmed MF Global." *Id.*

3. *The Plan Administrator's Expert Reports.*—In August 2015, the Plan Administrator produced several expert reports in support of its causation theory.

First, David Mordecai opined that, "[b]ut for sales accounting treatment, it is highly unlikely that MF Global could have accumulated such large and highly concentrated positions in Euro RTMs (and the associated risks)." Mordecai Rep. ¶ 11(c). He stated that PwC should have foreseen that "sales accounting could result in . . . an accumulation of a large portfolio of Euro RTMs," which in turn "could lead to a funding crisis that would jeopardize the existence of MF

Global." *Id.* ¶ 11(b); *see also id.* ¶ 11(c) ("Without the sales accounting treatment, the RTM strategy is unlikely to have launched.").

Second, Paul Michaud similarly opined that "MF Global could not have accumulated the same volume of Euro RTM transactions on its balance sheet as it accumulated off-balance sheet if not for the sales accounting treatment that PwC approved." Michaud Rep. ¶ 8; *see also id.* ¶¶ 113, 119.

Third, Guy Davis calculated MF Global's alleged damages on the assumption "that PwC's breach of the accounting standards caused the accumulation of billions in a [Euro RTM] portfolio." Davis Rep. ¶ 6. Davis's damages model was based on comparing MF Global's value following its collapse to the value it supposedly would have had in a hypothetical scenario that "remove[d] the impact of the $6.3 billion Euro RTM portfolio accumulation (holding all other business and economic factors constant)." *Id.* ¶ 14.[2]

4. *The Plan Administrator's Opposition To Summary Judgment.*—The Plan Administrator's opposition, filed in March 2016, continued to advance the same causation theory. In response to PwC's argument that there was no genuine dispute that MF Global's bankruptcy was caused by "the Company's business decisions to accumulate Euro RTMs," Sum. J. Mot. at 15, the Plan Administrator countered that MF Global "would not and could not have amassed the large, highly concentrated portfolio of Euro RTMs but for PwC's advice and approval of sale accounting," Sum. J. Opp. at 3; *see also, e.g., id.* ("PwC was aware of the risks of MFG's Euro RTM strategy . . . . [S]ale accounting was a necessary precondition of [MF Global's] ability to amass a huge RTM portfolio, thereby taking on the unsustainable liquidity

---

[2] Copies of the Plan Administrator's expert reports were provided to the Court in conjunction with summary-judgment briefing. PwC stands ready to provide additional copies at the Court's request.

and other risks associated with it."). The Plan Administrator's opposition added that there was no dispute that "the Euro RTMs were the root cause" of MF Global's collapse. *Id.* at 16 (quoting PwC's motion).

In denying summary judgment, the Court once again relied on the Plan Administrator's causation theory. It stated that "the Plan Administrator seeks to prove that the RTM Strategy was dependent on treatment of the RTM trades under sale accounting principles, and that PwC's approval of such a professional practice permitted MF Global to undertake the doomed strategy." *MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 199 F. Supp. 3d 818, 840 (S.D.N.Y. 2016). The Plan Administrator avoided summary judgment because the Court concluded there was a material factual dispute on the critical issue of whether that allegedly "doomed" strategy was "contingent on sale accounting treatment." *Id.* at 840, 842; *see also id.* at 826.

### B. The Plan Administrator's New Causation Theory: "Confusion," "Surprise," "Loss of Trust," "Crisis of Confidence."

When the Plan Administrator delivered its opening statement to the jury on March 10, 2017, the disclosed causation theory—sale accounting caused an excessive Euro RTM buildup, which in turn caused the collapse—was conspicuously absent. Instead, counsel argued that when "PwC's [alleged] audit failures came to light in October of 2011, . . . the parties on whom MF Global relied lost confidence in the company's financial position, sparking a cash crisis that rapidly resulted in" bankruptcy. 3/7 Tr. at 16:1–6. Counsel framed PwC's duty to MF Global as "a duty to build . . . trust with those parties that MF Global needed in order to do business." *Id.* at 24:2–3; *see also id.* at 14:25–15:3 ("MF Global relied on PwC to create trust in its financial position"); *id.* at 20:16–21 (similar). Counsel stated that "when the company was forced to disclose the results of PwC's two audit failures," the "market was surprised," which led to a "crisis of confidence." *Id.* at 39:11–40:2. Because of the "confusion that PwC created," "the

investors lost confidence, the creditors lost confidence, the credit rating agencies lost confidence." *Id.* at 40:18–41:15. "And when they fled, the company collapsed." *Id.* at 41:20. There was no discussion in the Plan Administrator's opening statement of sale accounting leading to overinvestment in Euro RTMs or to that overinvestment causing a liquidity crisis that brought down the company. And there was no reference to any of the Plan Administrator's designated experts on causation and damages.

The testimony of the Plan Administrator's first fact witness, Jon Corzine, also suggests that the Plan Administrator has made an about-face on its theory of causation. The Plan Administrator's lawyers had met with Corzine five or six times (for 12 to 20 hours) in the weeks leading up to trial to prepare him for his testimony and made "pretty clear the kinds of themes that they were going to address" at trial, including "trust and confidence." 3/9 Tr. at 627:22–628:1, 629:1–10, 630:10–21. At the last minute, Corzine was promoted from nineteenth to second on the Plan Administrator's witness list, and the Plan Administrator proceeded to elicit testimony from Corzine that was seemingly intended to support its new causation theory.

For example, Corzine testified on direct examination that in October 2011 the market not only "lost trust in [MF Global's] financial condition," but also "lost trust in our financial statements." 3/9 Tr. at 607:16–608:3. According to Corzine, MF Global's "counter-parties, including our clearing banks, did not trust that we were fully disclosed on all of the information they need[ed] to make a credit judgment; therefore, they didn't want to extend credit." *Id.* at 605:6–12. Corzine also testified that there was "confusion that existed with regard to people thinking we were losing money in the Euro sovereigns because of the reported loss, that there were questions about the balance sheet and the earnings statement of the firm," and that such "confusion led to the actions of many, many counterparties in the marketplace." *Id.* at 600:3–8,

608:13–22.  He concluded his direct testimony by stating that "if the marketplace had understood that we did not lose this money with regard to the Euro sovereigns, we would have been in a much more secure position . . . .  The confusion between the losses of the DTA and the positions that were held with regard to the Euro sovereign created a sense of distrust in the marketplace which picked up momentum" in the week before MF Global's bankruptcy.  *Id.* at 610:3–9.

The Plan Administrator also elicited from Corzine testimony that undermined its former causation theory.  For example, Corzine testified on direct examination that the Euro RTMs were an "attractive opportunity for MF Global to improve our earnings," that he "could [have done] the investments in European bonds on the balance sheets if [he had] needed to," and that the "accounting treatment" did not "drive" MF Global's decision to invest in the Euro RTMs.  *Id.* at 542:18–543:3.  He also testified that, contrary to the Plan Administrator's position that sale accounting was a prerequisite to MF Global's Euro RTM strategy, there would have been a number of "advantages" to executing the strategy without sale accounting.  *See id.* at 543:4–547:22.  At summary judgment, the Plan Administrator had criticized PwC for relying on Corzine's similar deposition testimony that sale accounting "wasn't a driver" of the Euro RTM strategy and maintained that "contemporaneous evidence, including statements by Corzine himself are to the contrary."  Sum. J. Opp. at 17.  At trial, however, the Plan Administrator elicited that very testimony without challenging its veracity and without bringing up any allegedly "contrary" statements or evidence.  There was no sign of the Plan Administrator's previous position that PwC was responsible for MF Global's decision to invest heavily in Euro RTMs, which in turn caused the company's collapse.

It is not entirely clear what the Plan Administrator now alleges caused MF Global's bankruptcy.  It seems, however, that the Plan Administrator is no longer contending that MF

Global's "huge Euro RTM portfolio . . . ultimately led to its demise." Pretrial Mem. at 8. Nor is it advancing the theory that allowed it to survive summary judgment, that "PwC's approval of [sale accounting] permitted MF Global to undertake the doomed [Euro RTM] strategy." *MF Glob. Holdings*, 199 F. Supp. 3d at 840. On the contrary, at a sidebar on the first day of trial, the Plan Administrator's counsel stated that the Plan Administrator's "whole theory of causation" is that "the company didn't collapse because the trades didn't pay, the company collapsed because people lost trust in the numbers and took their money out." 3/7 Tr. at 90:25–91:13. Counsel added that "[t]he [Euro RTM] trades weren't bad, every single trade paid not 90 percent, not 85 percent—100 percent." *Id.* at 91:8–9. And the Plan Administrator's counsel echoed that sentiment in recent comments to the media, stating: "Even though the bonds all paid off in full, the market conflated the [DTA] loss with the European bonds. . . . The combination of the writedown and the disclosure of the $6.3bn caused the market and MF Global's counterparties to lose trust in MF Global's financial condition and financial statements, with devastating results." B. McLannahan, *PwC accuses Corzine over MF Global run*, FIN. TIMES (Mar. 10, 2017), https://goo.gl/OT5vrA.

## II.   The Court Should Bar The Plan Administrator's New Causation Theory.

The Plan Administrator's unveiling of an entirely new, undisclosed causation theory for the first time at trial is precisely the kind of bait-and-switch the federal rules are designed to prevent. The Court should preclude the Plan Administrator from offering evidence or argument relevant to that new theory, strike the evidence and argument already presented in support of that theory, and instruct the jury that the Plan Administrator cannot prevail unless it proves causation under its original theory.

As an initial matter, the Plan Administrator's new causation theory violates the spirit, if not the letter, of the Court's *in limine* order. The need to avoid unfair surprise is precisely why

PwC moved *in limine* to preclude the Plan Administrator from presenting new theories of liability for the first time at trial.  The Court granted the motion.  *See MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, No. 14-cv-2197, 2017 WL 663565, at *9 (S.D.N.Y. Feb. 3, 2017).  It held that "[a]llowing a new claim at such a late stage of litigation" would "unduly prejudice PwC."  *Id.*  The Court also noted the Plan Administrator's representation in its *in limine* briefing "that it d[id] not intend to introduce any new theories of liability" at trial.  *Id.* While the Plan Administrator may argue that PwC's motion *in limine* was directed to new theories of *negligence* rather than new theories of *causation*, the same rule against trial-by-ambush should apply regardless of the specific element on which the Plan Administrator's theory has shifted.

The Plan Administrator's tactics also contravene fundamental rules of civil procedure. MF Global's pretrial memorandum, submitted pursuant to this Court's standing order, outlined its former theory of causation and contained no preview of its new theory.  The principle that a final pretrial order may be modified "only to prevent manifest injustice," Fed. R. Civ. P. 16(e), extends to required pretrial memoranda setting forth each party's theory of the case.  For example, the Second Circuit affirmed a district court's decision not to instruct the jury on *res ipsa loquitur* when the plaintiff had not included a *res ipsa loquitur* theory in its pretrial memorandum.  *See Potthast v. Metro-N. R. Co.*, 400 F.3d 143, 156 (2d Cir. 2005); *see also Napolitano v. Compania Sud Americana de Vapores*, 421 F.2d 382, 385–86 (2d Cir. 1970) (affirming district court's decision to preclude testimony of witnesses not named in defendant's pretrial memorandum).  Moreover, a party may not amend its complaint during trial if doing so would prejudice the opposing party.  *See* Fed. R. Civ. P. 15(b).  Allowing a plaintiff to raise a new theory for the first time at trial would undermine "[t]he basic purpose of the federal rules,"

which is "to eliminate trial by ambush."  *Ginns*, 361 F.2d at 801; *see also Point Prods. A.G. v.*

*Sony Music Entm't, Inc.*, No. 93-cv-4001, 2002 WL 31856951, at *3 (S.D.N.Y. Dec. 19, 2002)

("With the enactment of the Federal Rules in 1938, the policy of full disclosure became

fundamental to federal litigation.  'Trial by ambush' was no longer acceptable.").

Judicial estoppel likewise prevents the Plan Administrator from disavowing the theory of

causation it used to persuade this Court to deny PwC's motions to dismiss and for summary

judgment.  The Plan Administrator's surprising, last-minute change in position is exactly the sort

of gamesmanship that offends the "integrity of the judicial process" that the doctrine of judicial

estoppel is meant to protect.  *Adelphia Recovery Tr. v. Goldman, Sachs & Co.*, 748 F.3d 110,

116 (2d Cir. 2014) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001); *see*

*Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 620 (2d Cir. 2012) (a party is judicially

estopped by positions it took to defeat a motion to dismiss); *Jasper v. Sony Music Entm't, Inc.*,

378 F. Supp. 2d 334, 343 (S.D.N.Y. 2005).

Courts regularly preclude parties from presenting new theories raised for the first time

late in litigation.  *See, e.g.*, *Aldridge v. Forest River Inc.*, 635 F.3d 870, 875–76 (7th Cir. 2011)

(affirming grant of motion *in limine* and denial of motion to amend complaint where plaintiff

sought to "add[] a new theory of liability to the case at the late stage of the proceedings,"

observing that the district court's rulings "prevented surprise to the defendants regarding the

nature of the case that they had been defending throughout the litigation"); *Zurich Am. Ins. Co. v.*

*ABM Indus., Inc.*, 397 F.3d 158, 172–73 (2d Cir. 2005) (affirming exclusion of evidence related

to new theory of recovery unveiled when "discovery was closed and trial was approaching" and

defendant would be "substantially prejudiced"); *Webb v. Robert Lewis Rosen Assocs., Ltd.*, 128

F. App'x 793, 797 (2d Cir. 2005) (affirming exclusion of evidence concerning conduct outside

the time frame that was relevant under plaintiff's original theory of the case); *Design Strategies, Inc. v. Davis*, 367 F. Supp. 2d 630, 633 (S.D.N.Y. 2005) (Marrero, J.) (precluding evidence of new damages theory disclosed shortly before trial), *aff'd*, 469 F.3d 284 (2d Cir. 2006); *see also Licciardi v. TIG Ins. Grp.*, 140 F.3d 357, 359–65 (1st Cir. 1998) (vacating decision on jury verdict "procured . . . by ambush tactics" where defense expert "changed course 180 degrees . . . on a key topic at the heart of plaintiff's case," "plaintiff's case was built on the sensible belief that [certain facts were] uncontested," and "[t]here was no prior disclosure of the coming volte face").

This Court's decision in *Design Strategies* is instructive. The plaintiff in that case advanced a lost-profits theory of damages on the eve of trial. 367 F. Supp. 2d at 633. In barring that theory, this Court held that "to the extent that [plaintiff] gave Defendants notice of its intention to seek lost profits in its Complaint, it arguably took that notice away by omitting such damages from its subsequent representations . . . and by failing to produce any discovery with respect to them." *Id.* at 633–34. The Court further held that the defendants would be prejudiced if the plaintiff were allowed to pursue the new theory "in that [they] would be required either to postpone a trial for which they are otherwise prepared . . . or proceed without having had the opportunity to conduct adequate discovery on this issue." *Id.* at 635. There is even more reason to bar the Plan Administrator's new causation theory. Unlike the new damages theory in *Design Strategies*, which was arguably disclosed in the complaint and withdrawn later, the Plan Administrator's new causation theory was never disclosed and contradicts the allegation in the

complaint that MF Global's "significant Euro RTM position . . . ultimately caused massive damages to the Company."  Compl. ¶ 137.[3]

Other courts in this District have issued similar rulings.  For example, in *Roberts v. Ground Handling, Inc.*, No. 04-cv-4955, 2007 WL 2753862 (S.D.N.Y. Sept. 20, 2007), the plaintiff asserted a new theory of the case three years after filing her complaint and three months before trial.  *Id.* at *3.  The new theory "was not alleged in the Complaint, nor raised during discovery nor mentioned in any of plaintiff's motion papers, nor at any of the numerous court conferences held in this case."  *Id.*  The court excluded all evidence related to the new theory, holding:

> Because plaintiff did not allege this theory or produce any evidence of it during the past three years, defendant had no reason to conduct any discovery relating to [it].  Clearly, if we were to allow plaintiff to pursue this theory at trial, we would have to provide defendant with sufficient time to conduct the appropriate discovery. . . .  To require defendant to incur additional costs and to change its strategy on the eve of trial because plaintiff has concocted a new theory three years into the litigation is simply not fair and would, in a real sense, unduly prejudice defendant.

*Id.* at *5.

Likewise, in *Point Products*, the court barred a new damages theory because the plaintiff "had eschewed [that] theory for almost three years."  2002 WL 31856951, at *2.  The court held that the plaintiff was guilty of undue delay because "[b]y the time [it] broached this new approach, discovery had been completed and trial was scheduled."  *Id.* at *4.  It also noted that allowing a new theory so late in the proceedings would cause "significant" prejudice to the defendant, who would be entitled to, and very likely require, additional discovery, redeposition

---

[3] Although the particular violation this Court identified in *Design Strategies* concerned the disclosure requirements of Civil Rule 26, the same principles govern violations of Rule 16 and other trial-by-ambush tactics, as the other cases cited herein demonstrate.

of plaintiff's witnesses, supplemental expert reports, and additional briefing on the issue.  *Id.*; *see also Am. Stock Exch., LLC v. Mopex, Inc.*, 215 F.R.D. 87, 94 (S.D.N.Y. 2002) (refusing to allow new theory of patent infringement five weeks after completion of fact discovery); *Katt v. City of N.Y.*, 151 F. Supp. 2d 313, 346–50 (S.D.N.Y. 2001) (refusing to consider statute-of-limitations defense that defendants failed to raise in any of their "extensive pretrial submissions, including two joint pretrial orders"); *ESPN, Inc. v. Office of Comm'r of Baseb*all, 76 F. Supp. 2d 416, 420 n.3 (S.D.N.Y. 1999) (refusing to consider alternate theory of damages raised six days before trial); *Commerce Funding Corp. v. Comprehensive Habilitation Services, Inc.*, No. 01-cv-3796, 2005 WL 1026515, at *6 (S.D.N.Y. May 2, 2005) (refusing to allow defendant to raise "eleventh hour fraud defense" not raised in pretrial order or any prior submission).

The Plan Administrator will no doubt try to point to "snippets" of its prior filings "that, if taken in isolation, might sow the seeds of doubt" about whether its new theory is entirely new. *Genereux*, 754 F.3d at 58.  "But context is important," and the record, "read as a whole, is transparently clear" that the Plan Administrator's new theory is a radical departure from its original theory of causation.  *Id.*

PwC would be substantially prejudiced by having to develop a response to the Plan Administrator's new theory in the middle of trial.  PwC relied on the Plan Administrator's representations concerning its theory of causation when it developed and executed its discovery and expert-witness strategy.  It did not take discovery, identify witnesses, or retain experts to disprove a claim that market participants were "confused" or experienced a "loss of trust" in MF Global's financial statements in October 2011.  It did not explore those subjects in depositions, including depositions that may be the only way of presenting testimony from witnesses who reside outside of trial-subpoena range or are otherwise unavailable.  Nor did PwC take steps to

prove what role the Euro RTM strategy played in MF Global's collapse, as the Plan Administrator had made it a basic premise of its causation theory that the Euro RTMs caused the collapse.  Instead, PwC prepared for three years to defend against the specious claim that its accounting approval caused MF Global to invest too heavily in Euro RTMs and that it was the proximate cause of the resulting damages to MF Global.  PwC also filed and briefed motions to dismiss and for summary judgment directed to the Plan Administrator's disclosed theory of causation.

The prejudice to PwC from having conducted years of discovery and litigation tailored to the Plan Administrator's original theory can be addressed, if at all, only through significant remedial actions by the Court.  While the Plan Administrator's new theory still sounds in professional malpractice, the proof required to answer that new theory is vastly different from what was called for under the prior theory.  For example, under the original theory, PwC could prevail by showing that its accounting approval did not cause MF Global to invest in Euro RTMs—a fact the Plan Administrator now appears to concede.  By contrast, answering the Plan Administrator's new theory would require evidence that PwC's accounting approval did not cause market participants to become "confused" or lose "confidence" in MF Global's financial statements.  But because that theory was never disclosed, PwC had no reason to conduct discovery—fact or expert—in furtherance of such a defense.  The Plan Administrator has no excuse for disrupting the trial and ambushing PwC in this fashion.

The Court has broad discretion in fashioning a remedy for the Plan Administrator's unfair tactics.  *See generally Clark v. Penn. R. Co.*, 328 F.2d 591, 594–95 (2d Cir. 1964) (holding that where a party engages in unfair, trial-by-ambush tactics and "springs a surprise witness on his adversary in defiance of the terms of a pre-trial order or statement," the court has wide discretion

to decide "what is to be done . . . upon the facts and circumstances of that case," including the power to exclude the testimony or declare a mistrial); *see also* Fed. R. Civ. P. 16(f) (authorizing courts to "issue any just orders," including the full range of discovery sanctions listed in Rule 37(b), as sanction for violation of pretrial order).

In these circumstances, an appropriate remedial order must have at least two components. First, the Plan Administrator must be barred from presenting any further evidence or argument on its new theory of causation, and the Court must strike all of the testimony and argument that has already been offered pertaining to that new theory, including any references to a "loss of trust" or "crisis of confidence" in MF Global's financial statements that allegedly occurred in October 2011. Any such evidence is irrelevant and unfairly prejudicial in light of the Plan Administrator's claims as it has described them to the Court and to PwC for the last three years. *See, e.g.*, *Zurich Am. Ins.*, 397 F.3d at 172–73; *Design Strategies*, 367 F. Supp. 2d at 633. Second, the Court must provide an immediate curative instruction informing the jury that the Plan Administrator cannot prevail on its claim unless it proves that but for PwC's approval of sale accounting, MF Global would not have pursued the Euro RTM strategy, and that PwC's approval was the actual and proximate cause of MF Global's collapse. That point should be reiterated after the close of evidence, when the Court gives the jury its final instructions on causation.[4]

---

[4] PwC proposes that the Court give the following curative instruction at the earliest opportunity:
> In the opening statement of the Plan Administrator and the testimony of Mr. Corzine, you have heard several references to market participants allegedly having lost trust or confidence in MF Global's financial statements in October 2010. To be clear, the Plan Administrator's claim in this case is not that Pricewaterhouse's actions caused the market to lose trust in MF Global's financial statements. The Plan Administrator's claim is that when Pricewaterhouse approved of MF Global's decision to use a particular type of accounting for repurchase-to-maturity transactions, that approval caused MF Global to invest too

In the alternative, if the Court does not grant PwC all of the relief requested in the preceding paragraph, the Court should declare a mistrial. *See Clark*, 328 F.2d at 594–95 (recognizing that a mistrial can be an appropriate remedy for abusive trial tactics that result in unfair surprise). PwC's right to a fair trial has already been compromised. Without a comprehensive order to address the severe prejudice to PwC stemming from the Plan Administrator's shift in its theories of causation, a mistrial will be necessary. *Cf. Matei v. Cessna Aircraft Co.*, 35 F.3d 1142, 1147 (7th Cir. 1994) (affirming grant of mistrial where plaintiff presented undisclosed expert testimony in order to afford defendant the "opportunity it needed to rebut the experts' testimony" and "avoid[] any possible prejudice").[5]

## CONCLUSION

PwC respectfully requests that the Court preclude the Plan Administrator from presenting any further evidence or argument concerning its new causation theory, strike the evidence and argument already presented in support of that theory, and instruct the jury that the Plan Administrator cannot prevail unless it proves its original, disclosed causation theory.

---

heavily in transactions involving European sovereign bonds, and that MF Global's investment in those European bonds ultimately caused the company to collapse. That is the chain of causation that the Plan Administrator must prove in order to prevail in this case.

[5] If the Court does not grant the relief PwC requests in this motion, PwC reserves the right to seek alternative forms of relief to mitigate the prejudice it will face from having to respond to the Plan Administrator's new theory at trial. Such relief could include, but would not be limited to, (1) leave to present undisclosed witnesses or have designated experts testify beyond the scope of their reports, (2) additional discovery and a continuance, (3) leave to offer the Plan Administrator's complaint and expert reports into evidence, and (4) reconsideration of the Court's order barring the use of pleadings from prior litigation that directly contradict the Plan Administrator's new causation theory. None of those measures, however, would be sufficient to address the prejudice and fundamental unfairness to PwC resulting from the Plan Administrator's abusive tactics.

Dated:  March 12, 2017                          Respectfully submitted,
        New York, New York
                                                KING & SPALDING LLP


                                        By:     /s/ James P. Cusick
                                                James P. Cusick
                                                James J. Capra, Jr.
                                                David M. Fine
                                                Meredith Moss
                                                Paul Alessio Mezzina
                                                1185 Avenue of the Americas
                                                New York, New York 10036
                                                Tel: (212) 556-2100

                                                *Attorneys for Defendant*
                                                *PricewaterhouseCoopers LLP*